WK:EL
F. #2023V02186

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -                    Docket No.  90–CR-446 (FB)

VITTORIO AMUSO,
      also known as "Vic,"

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - -X


THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION
TO THE DEFENDANT'S MOTION FOR SENTENCE REDUCTION
PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)



                        BREON PEACE
                        UNITED STATES ATTORNEY
                        Eastern District of New York
                        271 Cadman Plaza East
                        Brooklyn, New York 11201




Elias Laris
Assistant U.S. Attorney
     (Of Counsel)

## PRELIMINARY STATEMENT

The defendant Vittorio "Vic" Amuso was found guilty by a jury on 54 counts, including racketeering and racketeering conspiracy, nine counts of conspiracy to commit murder or attempted murder in-aid-of racketeering, six counts of substantive murder in-aid-of racketeering, 34 counts of bribing labor officials, one count of conspiracy to bribe labor officials, one count of conspiracy to commit extortion, and one count of conspiracy to evade income tax.

Amuso now requests that the Court release him because "extraordinary and compelling" circumstances exist due to his "advanced age and failing health, along with his long imprisonment and exceptional institutional record," among other things. Notwithstanding the fact that Amuso's medical condition and circumstances do not constitute extraordinary and compelling circumstances for release in the first instance, the Court need not even reach this issue. The applicable sentencing factors in Title 18, United States Code, Section 3553(a) weigh heavily against release when considering the crimes of conviction and Amuso's ongoing ties to the Luchese Crime Family, through which he committed those crimes. Most notably the nature and circumstances of the offenses, the need to protect the community from further crimes by Amuso, and the need to promote respect for the law and provide just punishment for the offense require that his motion for early release be denied. Amuso should continue to serve the sentence originally contemplated, required by statute, and imposed by the Court – life in prison.

## BACKGROUND

I.    The Offenses of Conviction

On June 15, 1992, following an over-one-month long trial, a jury found Vittorio "Vic" Amuso guilty of all counts of a 54-count superseding indictment (the "Indictment"). (See ECF 85). Amuso committed and facilitated the crimes outlined in the Indictment through his position as the Boss of the Luchese organized crime family (the "Luchese Crime Family"), one

of the five major organized crime families in New York making up "La Cosa Nostra." As proven at trial, Amuso's conduct was heinous. It included, among other things, several murders and attempted murders, racketeering, extortion, bribery, and fraud.

A. The Luchese Crime Family

In the underlying prosecution, Amuso was charged with various racketeering offenses which he committed as the Boss of the Luchese Crime Family. Amuso joined the organization in approximately 1978 and, after rising through its ranks, he was chosen by former Boss Anthony Corallo to succeed Corallo as Boss in late 1986. See Presentence Investigation Report, dated August 26, 1992 ("PSR") ¶ 30. Soon after, Amuso promoted Anthony Casso from the position of Captain to Consigliere in 1988 and Underboss in 1990. Id.

The mission of the Luchese Crime Family was to generate income, which each member shared with Amuso and Casso. PSR ¶ 33. Under Amuso's pre-Indictment leadership, the Luchese Crime Family contained between 500 and 1,000 "associates" and at least 120 "made members." PSR ¶ 31. The Luchese Crime Family earned substantial income through narcotics distribution, loansharking, gambling, and exercising influence over unions in the trucking, garment and construction industries, which increased following Amuso's rise to power. PSR ¶ 34. These groups paid kickbacks to corrupt union officials—of which the Luchese Crime Family received a cut—to avoid threatened bodily harm and economic injury. Id.

B. Window Replacement Industry

The Luchese Crime Family exercised particular control over the New York City Housing Authority ("NYCHA") window replacement industry, which racket was central to the underlying prosecution. PSR ¶ 35. Through this scheme, Amuso was able to extort payoffs from window manufacturers and exercise his influence to inflate bids for NYCHA projects by

determining in advance which company would obtain the contract, thereby presenting New York City with exaggerated estimates for the planned work. Id. Between 1987 and 1989, the Luchese Crime Family received $1,000,000 in kickbacks from the scheme, 75% of which went to Amuso and Casso. Id.

C. Murders and Conspiracies to Murder

Amuso demanded complete obedience from his subordinates and frequently employed murder to protect his position in the Luchese Crime Family. PSR ¶ 37. As proven at trial, and detailed further below, Amuso ordered the murder of over a dozen individuals, nine of whom were in fact murdered:

- Murder of Sorecho Nalo (Racketeering Acts 1A and 1B, Counts 5 and 6): Sorecho Nalo threatened to kill an associate of the Luchese Crime Family and attempted to take over the associate's gambling establishments in Astoria, New York, from which Amuso received approximately $1,000 per week. In Fall 1988, the associate asked Amuso to have Nalo murdered.

  On October 25, 1988, Nalo was lured to the associate's travel agency in Astoria, where Nalo was shot to death by members of the Luchese Crime Family. (PSR ¶ 38).

- Murder of Thomas Gilmore (Racketeering Acts 2A and 2B, Counts 7 and 8): Thomas Gilmore was an associate of the Luchese Crime Family. Amuso believed that Gilmore was an informant and ordered his murder in late 1988. On February 6, 1989, Gilmore was shot to death in an alley behind his home. (PSR ¶ 39).

- Murder of Michael Pappadio (Racketeering Acts 3A and 3B, Counts 9 and 10): Michael Pappadio was a soldier in the Luchese Crime Family and oversaw Amuso's lucrative interests in the garment industry until Amuso suspected that Pappadio was keeping large amounts of money for himself. When Pappadio refused to vacate his position in the garment industry and began avoiding other members of the Luchese Crime family, Amuso ordered his murder in 1988.

  On May 13, 1989, Pappadio was lured to a bagel shop in Howard Beach, New York, where he was bludgeoned to death with a cable and shot in the head with a small caliber pistol. (PSR ¶ 40).

- <u>Murder of John Petrucelli</u> (Racketeering Acts 4A and 4B): After Gus Ferace, an associate of the Bonanno Crime Family, killed Special Agent Everett Hatcher of the Drug Enforcement Administration in February 1989, a national manhunt ensued. During a commission of La Cosa Nostra, it was ruled that no one was to aid in Ferace's escape. John Petrucelli, a soldier in the Luchese Crime Family, bragged that he was hiding Ferace, at which time Amuso ordered Petrucelli to kill Ferace. When Petrucelli failed to do so, Amuso ordered Petrucelli's execution.

  On September 13, 1989, Petrucelli was shot to death outside of his apartment in Yonkers, New York. (PSR ¶ 41).

- <u>Murder of John Morrissey</u> (Racketeering Acts 5A and 5B): John Morrissey was a shop steward in Local 580 of the Architectural and Ornamental Iron Workers Union. Morrissey collected Amuso's payoffs from various window replacement manufacturers for several years and delivered the money to Peter Chiodo, a captain of the Luchese Crime Family. Following Morrissey's indictment for the above-mentioned activities, Amuso was concerned that he would cooperate with the government.

  At Amuso's command, Morrissey was driven to a secluded area of New Jersey on September 17, 1989 for an alleged meeting with Amuso. Morrissey was shot to death and buried there. Amuso hoped that law enforcement would think that Morrissey was a fugitive from justice. (PSR ¶ 42).

- <u>Attempted Murder of Joseph LaMorte and Conspiracy to Murder Anthony Accetturo, Sr. and Anthony Accetturo, Jr.</u> (Racketeering Acts 6A and 6B): Anthony Accetturo Sr. was a captain in the Newark, New Jersey, faction of the Luchese Crime Family. Amuso believed that he was an informant and grew very upset when Accetturo, Sr. refused to meet with him (Accetturo, Sr. feared that he would be executed). Amuso demanded that Accetturo's entire crew, which included Accetturo Jr. and Joseph La Morte, be murdered.

  After several unsuccessful attempts to locate Accetturo Sr., LaMorte was observed in Florida where he owned a house. Amuso initially wanted LaMorte to be kidnapped and tortured until he divulged the whereabouts of Accetturo, Sr. (who was incarcerated at the time). However, LaMorte proved to be elusive, and Amuso subsequently ordered that he be murdered. LaMorte was shot in the neck and shoulder outside his Florida home on November 10, 1989. He was able to drive himself to a nearby medical facility following the attack and recovered from his injuries. (PSR ¶ 43).

- <u>Attempted Murder of Joseph Martinelli</u> (Racketeering Acts 7A and 7B, Counts 11 and 12): Joseph Martinelli was the principal owner of North Berry Concrete, a large company under the Luchese Crime Family's control. In 1989, Amuso had Martinelli's life threatened when he stopped paying Amuso kickbacks. Martinelli's brothers subsequently drove to Amuso's home armed

with shotguns, warning Amuso's family that Amuso should leave Martinelli alone. Amuso demanded that Martinelli be killed.

In early 1990, Martinelli was lured to a video store parking lot in Staten Island, where his would-be killers planned to shoot him. On that date, a gun was placed to Martinelli's head, but it failed to fire. Martinelli was told that the incident was a practical joke and his life was later spared when he purchased supplies from companies associated with the Luchese Crime Family. (PSR ¶ 44).

- <u>Murder of Michael Salerno</u> (Racketeering Acts 8A and 8B): Michael Salerno was a prominent member of the Luchese Crime Family's Bronx faction, with ambitions of becoming a Boss. He was closely associated with Anthony Corallo and grew resentful when Corallo promoted Amuso to leader, especially since the majority of the family's Bosses were traditionally chosen from the Bronx division (whereas Amuso belonged to the Brooklyn group). Amuso, knowing of Salerno's hostility, thought he might be an informant and ordered Salerno's murder.

  In June 1990, the Salerno was shot through the heart and stabbed in the throat. (PSR ¶ 45).

- <u>Murder of Bruno Facciola</u> (Racketeering Acts 9A and 9B, Counts 13 and 14): Bruno Facciola was a long-time soldier in the Luchese Crime Family. Amuso feared that Facciola was coopering with the government and ordered him to be murdered. On August 24, 1990, Facciola was lured to an auto-body shop but attempted to escape when he realized he was going to be killed. Facciola was dragged back inside where he was shot and stabbed to death. A dead canary was placed in his mouth, which served as Amuso's warning to potential informants. (PSR ¶ 46).

- <u>Murders of Larry Taylor and Al Visconti</u> (Racketeering Acts 10 and 11, Counts 15 and 16): Larry Taylor and Al Visconti were both associates of the Luchese Crime Family and close friends of Bruno Facciola. Visconti was also in a common-law relationship with Facciola's sister. Upon learning that Taylor and Visconti planned to avenge Facciola's death, Amuso demanded their executions.

  Taylor was shot to death on February 5, 1998, while sitting in his car in the Canarsie section of Brooklyn. Visconti was shot in the head and groin (the latter because Amuso had heard a rumor that Visconti was bisexual) in the lobby of his apartment building in Bensonhurst, New York, on March 26, 1991. (PSR ¶ 47).

- <u>Attempted Murder of Peter Chiodo</u> (Racketeering Acts 12A and 12B, Counts 18 and 19): Peter Chiodo was a made member of the Luchese Crime Family from 1987 to 1991. Prior to his elevation to captain in 1988, he was a soldier

in Anthony Casso's crew.  Chiodo participated in the Luchese Crime Family's monopolization of the New York window replacement industry (described further below), for which he was indicted in May 1990.

After Chiodo pleaded guilty to the indictment without Amuso's permission, Amuso feared that Chiodo was cooperating with the government and wanted Chiodo dead.   The Luchese Crime Family tapped Chiodo's phone to learn when Chiodo would be travelling alone.  On May 8, 1990, Chiodo was approached by several individuals at a gas station and shot 12 times throughout his body.  Chiodo was left partially paralyzed and confined to a wheelchair at the time of the writing of the PSR.  Later, at Amuso's command, Chiodo's father was grabbed in the street and warned that he would be killed if Chiodo ever testified against Amuso.  (PSR ¶ 49).

D.  <u>Flight from Justice</u>

After learning from corrupt law enforcement officers that he was going to be arrested for his illegal monopolization of the window replacement industry, Amuso fled from justice in May 1990.  PSR ¶ 36.  In January 1991, Amuso named a temporary acting Boss of the Luchese Crime Family but retained most of his powers, including the sole right to initiate new members and approve murders.  <u>Id.</u>  On July 28, 1991, FBI agents located Amuso in Scranton, Pennsylvania, and placed him under arrest.  PSR ¶ 49.  On Amuso's person was a New York State driver's license containing the name Joseph LaStrada.  <u>Id.</u>  Amuso refused to identify himself when taken into custody.  <u>Id.</u>

II.  <u>Sentencing and Appeals</u>

After Amuso's conviction at trial, on October 2, 1992 the Honorable Eugene Nickerson sentenced Amuso to life in prison with five years' supervised release, a $250,000 fine and a $2,700 assessment.  <u>See</u> ECF 128.

On November 4, 1992, Amuso appealed his conviction, <u>see</u> ECF 134, which was nonetheless affirmed by the Second Circuit Court of Appeals on April 20, 1994.  <u>See</u> <u>United States v. Amuso</u>, 21 F.3d 1251 (2d Cir. 1994).

III.     The Instant Motion

On January 24, 2023, Amuso, through counsel, filed a request for compassionate release with Warden C. Carter at FCI Cumberland, where Amuso was an inmate.  See Amuso Mot., Exhibit 2.  Amuso argued that he qualified for compassionate release under 18 U.S.C. § 3582(c)(1)(A) (discussed further below) and Bureau of Prisons (BOP) Policy Statement 5050.50 ("BOP 5050.50") § 4(a) because of, amongst other things, his advanced age and deteriorating health, as well as the threats posed to him by the COVID-19 pandemic.  The application was transferred to Warden L.B. Kelly of FCI Butner II after Amuso's transfer to that facility.

On March 14, 2023, Warden L.B. Kelly of FCI Butner II denied Mr. Amuso's application for a sentence reduction.  Warden Kelly stated that Amuso did not meet the guidelines outlined in BOP 5050.50 because he (i) did not have a terminal illness with a life expectancy of less than 18 months, (ii) was independent in his self-care, (iii) did not have a debilitated medical condition, (iv) was independent in his daily living and has his medical conditions under control, and (v) did not meet the time-served criteria of Policy Statement 5050.50.  See Amuso Mot., Exhibit 3.

ARGUMENT

As described below, Amuso's motion fails because (a) the Section 3553(a) factors militate heavily against compassionate release and (b) no "extraordinary and compelling reasons" exist to warrant Amuso's immediate release pursuant to Section 3582(c)(1)(A).

I.     Applicable Law

"'[A] judgment of conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not be modified by a district court except in limited

circumstances." <u>Dillon v. United States</u>, 560 U.S. 817, 824 (2010) (quoting 18 U.S.C. § 3582(b) (alterations in original)).  One such circumstance is set forth in 18 U.S.C. § 3582(c)(1)(A), which states that a court "may reduce the term of imprisonment . . . after considering the factors set forth in section 3553(a) . . . if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . ."  18 U.S.C. § 3582(c)(1)(A).

Section 3582(c)(1)(A) requires that a reduction under that provision be "consistent with applicable policy statements issued by the Sentencing Commission."  However, the Second Circuit has held that, under § 3582(c)(1)(A) as amended by the First Step Act of 2018, United States Sentencing Guidelines ("U.S.S.G.") § 1B1.13—the policy statement "applicable" to Section 3582(c)(1)(A) motions brought by the Director of the Federal Bureau of Prisons—is not "applicable" where, as here, the motion is brought by the defendant.  <u>United States v. Brooker</u>, 976 F.3d 228, 235-36 (2d Cir. 2020).  Under <u>Brooker</u>, district courts are free "to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them."  <u>Id.</u> at 237.  Nevertheless, "[t]he substantive aspects of the Sentencing Commission's analysis in § 1B1.13 and its Application Notes provide a working definition of 'extraordinary and compelling reasons'; a judge who strikes off on a different path risks an appellate holding that judicial discretion has been abused.  In this way the Commission's analysis can guide discretion without being conclusive."  <u>United States v. Gunn</u>, 980 F.3d 1178, 1180 (7th Cir. 2020) (citations omitted); <u>see also</u> <u>United States. v. McGee,</u> 992 F. 3d 1035, 1048 (10th Cir. 2021) (concluding that that Congress intended through 28 U.S.C. § 994(t) "to describe those characteristic or significant qualities or features that typically constitute 'extraordinary and compelling reasons.'").

If a district court finds that extraordinary and compelling reasons warrant a sentencing reduction, the court "may reduce" a defendant's term of imprisonment only "after considering the factors set forth in [18 U.S.C.] section 3553(a) . . . ."  18 U.S.C. § 3582(c)(1)(A)(i); Brooker, 976 F.3d at 235.  A district court may reduce a term of imprisonment under Section 3582(c)(1)(A) only where both extraordinary and compelling reasons warrant it and the § 3553(a) factors support it.  See United States v. Jones, 17 F.4th 371, 374 (2d Cir. 2021) ("[E]xtraordinary and compelling reasons are necessary — but not sufficient — for a defendant to obtain relief under § 3582(c)(1)(A). . . . [A] district court must also consider 'the factors set forth in section 3553(a)' before granting relief.").  As the court in United States v. Gotti explained:

> It is important to note that a defendant who meets all the criteria for compassionate release consideration listed above is not thereby automatically entitled to a sentence modification. He is simply eligible for a sentence modification. The court confronted with a compassionate release motion is still required to consider all the Section 3553(a) factors to the extent they are applicable, and may deny such a motion if, in its discretion, compassionate release is not warranted because § 3553(a) factors override, in any particular case, what would otherwise be extraordinary and compelling circumstances.

2020 WL 497987, at *5 (S.D.N.Y. Jan. 15, 2020).

Pursuant to Section 3553(a), the Court must consider whether, when weighed against the purported "extraordinary and compelling reasons," the following factors, among others, permit release:  (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to (a) reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense; (b) afford adequate deterrence to criminal conduct; and (c) protect the public from further crimes of the defendant; and (3) the need to avoid unwarranted sentence disparities

among defendants with similar records who have been found guilty of similar conduct.  See 18 U.S.C. § 3553(a)(1), (2), and (6).  A district court may deny a motion for compassionate release based solely on the Section 3553(a) factors without reaching the question of whether extraordinary and compelling reasons are present.  The Second Circuit has held that:

> [c]onsistent with Jones, and with the decisions of our sister Circuits, we today make clear that when a district court denies a defendant's motion under § 3582(c)(1)(A) in sole reliance on the applicable § 3553(a) sentencing factors, it need not also determine whether the defendant has shown extraordinary and compelling reasons that might (in other circumstances) justify a sentence reduction.

United States v. Keitt, 21 F. 4th 67, 69 (2d Cir. 2021); see also United States v. Davis, 2023 WL 2639576, at *1 (2d Cir. Mar. 27, 2023) (reaffirming and applying holding of Keitt).

As the proponent of release, the defendant seeking a sentencing reduction bears the burden of showing that the circumstances warrant such decrease.  See Jones, 17 F.4th at 375 (citing United States v. Butler, 970 F.2d 1017, 1026 (2d Cir. 1992)).

II.    Argument

A.    The Section 3553(a) Factors Require that Amuso's Motion Be Denied

The Court need not reach the issue of whether extraordinary and compelling circumstances exist for Amuso's compassionate release because the Section 3553(a) factors militate heavily against such relief, and he has failed to meet his burden to the contrary.  See United States v. Michael Spinelli, No. 97-CR-00209 RJD (E.D.N.Y. May 1, 2023) (declining to reach whether extraordinary and compelling circumstances for release existed where Section 3553(a) factors weighed heavily against early release).  The nature of Amuso's pervasive and heinous crimes, his ongoing affiliation with the Luchese Crime Family, and recent rulings in this district denying compassionate release motions by similarly situated mob leaders like Amuso all indicate that he must serve his life sentence, as imposed, and his motion must be denied.

i. <u>The Serious Nature of Amuso's Crimes Weighs Heavily Against Compassionate Release</u>

First, the serious "nature and circumstances of the offense[s]" here cannot be understated.  <u>See</u> 18 U.S.C. § 3553(a)(1).  Amuso commanded and facilitated the 54 crimes of conviction—including over a dozen murders, attempted murders, or conspiracies to murder— through his position as Boss of the Luchese Crime Family, one of the most violent criminal organizations in the country.  Indeed, Congress has found that murders in furtherance of racketeering, like those for which Amuso was convicted, are so serious that a defendant convicted of even one such offense (no less multiple) must serve the rest of his life in prison.  <u>See</u> 18 U.S.C. § 1959(a)(1) (listing the death penalty or life imprisonment as punishments for murder in aid of racketeering); <u>see also</u> <u>United States v. Gioeli</u>, 2020 WL 2572191, at *5 (E.D.N.Y. May 21, 2020) (describing the defendant's "callous disregard for human life" in finding that the Section 3553(a) factors precluded compassionate release).

Amuso attempts to minimize the underlying offense conduct, which he only briefly summarizes in a footnote as "racketeering, extortion, fraud, bribery, and murder," and only later concedes to be "admittedly serious."  Amuso Mot. at 1, n.1, 16.  Amuso fails to recount, however, that he coordinated a years-long racketeering scheme that pervaded New York City and its industries, while directing the murders of numerous people in furtherance of that scheme.  As such, Amuso's crimes are more than just "admittedly serious"—as described above, Amuso was at the helm of the Luchese Crime Family and commanded the hits to further his own interests, protect the power he held as Boss of the organization, and protect the interests of the organization itself.  As described above, the influence of the Luchese Crime Family yielded Amuso and his associates significant income by means of extortion, threats of violence, and weaving corruption throughout New York City in order to line their own pockets.  The effects of

Amuso's actions are long-standing, as the families of those slain at his command will never be able to obtain the relief that Amuso himself now seeks.[1]

The murderous means that Amuso employed to reach his criminal ends weigh heavily against any form of compassionate release and, in the government's estimation, alone preclude granting the instant motion. See 18 U.S.C. § 3553(a)(1). Moreover, Amuso's significant sentence was consistent with the seriousness of his crimes and reflects the heartlessness that Amuso routinely employed as the Boss of the Luchese Crime Family. It also serves the important need to deter other leaders or organized crime groups from resorting to violent and deadly means to reach their ends. The message must be sent to other criminals and would-be killers that such conduct will be punished severely.

ii. Amuso Remains a Danger to the Community as the Current Boss of the Luchese Crime Family

Amuso must also remain incarcerated because is a danger to the community. See 18 U.S.C. § 3553(a)(2)(C). Contrary to Amuso's assertion that he is a model inmate with a "low recidivism level," Amuso is dangerous both because of his past criminal conduct and also because he is *still* the Boss of the Luchese Crime Family. Indeed, Amuso maintains his role as Boss over 30 years after beginning his incarceration and continues to maintain control over the organization and its affairs. In May 2019, testimony by former Luchese Crime Family soldier John Pennisi revealed that, as recently as 2017, Amuso orchestrated a leadership change in the

---

[1] As discussed below, Amuso seeks compassion, in part, because he relies at times on a wheelchair to navigate his facility. This is both ironic and uncompelling: Amuso left 40-year-old victim Peter Chiodo partially paralyzed and confined to a wheelchair after Amuso's hitmen attempted to murder him to prevent him from cooperating with the government against Amuso. Amuso's actions confined Chiodo to a wheelchair for years after the attack. See Eleanor Randolph, N.Y.'s Don Days Warm Up With Trial of 'The Chin', Los Angeles Times, July 3, 1997, https://www.latimes.com/archives/la-xpm-1997-jul-03-mn-9314-story.html (noting that Chiodo's wounds required his continued use of a wheelchair).

Luchese Crime Family from prison through the exchange of coded letters. <u>See</u> Trial Tr., <u>United States v. Castelle</u>, 18 CR 15 (AKH) (S.D.N.Y.) (excerpts attached hereto as Exhibit A), at 418-19, 430-36. Specifically, the Brooklyn faction of the Luchese Crime Family complained to Amuso that there had been a shift in power to the organization's Bronx faction. <u>Id.</u> In turn, Amuso delivered a letter to Luchese Crime Family Underboss Steven Crea, ordering that Michael DeSantis of Brooklyn take over the role of acting boss from Bronx-based Matthew Madonna. <u>Id.</u> Pennisi further testified that, following Amuso's order, the Brooklyn faction was prepared to kill various members of the Bronx faction in the event they did not comply with the order. <u>Id.</u>

Amuso bears the burden of proving to the Court that his circumstances warrant a reduction in his sentence, yet he fails in any way to disclaim his ongoing role with the Luchese Crime Family. In fact, Amuso' motion contains *no* mention of the Luchese Crime Family or his role therein. Yet, John Pennisi's testimony reveals that Amuso continues to lead the organization even from prison. To that end, Amuso seriously misleads the Court when he touts his "perfect intuitional record" and low likelihood of recidivism, when in actuality he has continues to orchestrate the Luchese Crime Family's affairs.

Amuso's past and his continued and active position in the Luchese Crime Family, through which he has authorized violence to achieve his desired ends, belies his assertion that he is not a danger to the community or other persons and requires that the Court maintain his incarceration to "protect the public from further crimes of the defendant." <u>See</u> 18 U.S.C. § 3553(a)(2)(C). Indeed, Amuso's contention that he has a low risk of recidivism based on his

"advanced age, poor health, exemplary institutional record, and strong family ties"[2] presumes that Amuso might personally commit an act of violence. Amuso Mot. at 8. As described above, however, Amuso did not himself personally commit many of the crimes of conviction. But Amuso's ruthless direction and facilitation of murders and attempted murders—often to protect his own interests and power—demonstrates his utter disregard for human life and willingness to resort to violent ends to serve his interests and the interests of the Luchese Crime Family.

In short, Amuso's danger stems from his past and current position as the Boss of the Luchese Crime Family, a violent organization that still exists today, and his ability to have others commit violent crimes on his behalf, as he did so many times before his arrest. Judge Cogan's opinion in United States v. Gioeli is instructive:

> **[T]he danger posed by mob leaders, like defendant, is not that these leaders will personally engage in acts of violence, but that they "can command others to do so."** See United States v. Gotti, No. 02-cr- 743, 2020 WL 497987, at *9 (S.D.N.Y. Jan. 15, 2020) ("Bosses don't commit violence themselves, they have subordinates to do their bidding."). The record shows that defendant hurt his knee after playing table tennis. Neither that nor his other medical conditions would stop him from picking up a telephone.

Gioeli, 2020 WL 2572191, at *5 (emphasis added) (quoting Gotti, 2020 WL 497987, at *9). The same is true for Amuso. As John Pennisi testified, Amuso retains significant power as Boss of the Luchese Crime Family and can direct others in the organization to commit crimes on his behalf. As such, both Amuso's past and his continued leadership of the Luchese Crime Family

---

[2] Amuso's contention that his "strong family ties" weigh in favor of relief is uncompelling. John Pennisi's testimony in the Castelle trial reveals that Amuso's son-in-law, Joey DiBenedetto, is an active member of the Luchese Crime Family and is instrumental in delivering messages to Amuso in prison. See Exhibit A at 390, 431.

make him a danger to the community and weighs heavily against compassionate release.[3] <u>See</u> 18

U.S.C. § 3553(a)(2)(C).

>   iii.  <u>Amuso Must Remain Incarcerated to Prevent Sentencing Disparities
>         Among Similarly Situated Defendants</u>

Finally, Amuso's motion should be denied because similarly situated mob leaders

who engaged in equally or less egregious and heinous criminal conduct than Amuso's have also

had their requests for compassionate release denied.  For example:

- Anthony "Gaspipe" Casso – as described above, Casso was the consigliere and eventual Underboss of the Luchese Crime Family under Amuso's leadership.  Casso was also charged in the Indictment for crimes stemming from his position in the Luchese Crime Family and pleaded guilty to, among other crimes, several the same murders and attempted murders for which Amuso was convicted.  <u>See</u> Government Opposition to Anthony Casso's Motion for Compassionate Release, <u>United States v. Anthony Casso</u>, 90-cr-00446 (FB), Dkt. No 1867, at 3-7.

  On November 28, 2020, this Court denied Casso's application for compassionate release, finding, even after "carefully consider[ing] the gravity of [Casso's] medical condition . . . in light of the nature and extent of defendants criminal history, that he remains a danger to the community and that the section 3553(a) factors do not justify early termination of his life sentence."  <u>See</u> <u>United States v. Anthony Casso</u>, 90-cr-00446 (FB) (E.D.N.Y. Nov. 28, 2020).

- Victor J. "Little Vic" Orena – Orena served as the acting Boss of the Colombo organized crime family, another one of the five New York Families of La Cosa Nostra.  <u>See</u> Memorandum in Response to Motion for Release from Custody, <u>United States v. Victor J. Orena</u>, 92-cr-00351 (EK), Dkt. No. 1865.  Orena was sentenced to life in prison following his conviction on a number of charges stemming from an internecine war between opposing factions of the organization, which resulted in the attempted assassination, wounding, or successful assassination of 28 individuals, including 12 individuals who were

---

[3] While not applicable in the instant application, §1B1.13 of the U.S. Sentencing Guidelines similarly requires that, for motions brought by the BOP under 18 U.S.C. § 3582(c)(1)(A), courts find that the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g).

actually killed. Orena was further convicted of the murder of Thomas Ocera, an inducted member of the Colombo family, in aid of racketeering.

On October 27, 2021, the Honorable Eric Komitee denied Orena's motion, finding that Orena's "undeniably serious" medical conditions did not outweigh the Section 3553(a) factors that supported his continued imprisonment. <u>See</u> <u>United States v. Victor J. Orena</u>, 92-cr-00351 (EK) (E.D.N.Y. Oct. 27, 2021). Judge Komitee highlighted the "inescapable conclusion that any sentence short of the life term imposed by Judge Weinstein would insufficiently reflect the seriousness of the offense conduct here and fail to provide just punishment." <u>Id.</u> at 8. On August 31, 2022, the Second Circuit Court of Appeals affirmed Judge Komitee's decision. <u>See</u> <u>United States v. Amato</u>, 48 F.4th 61 (2d Cir. 2022).

- Michael Spinelli – Spinelli was an associate of the Luchese Crime Family under Amuso's leadership and worked under Peter Chiodo, a Luchese "soldier." Following Chiodo's attempted assassination, described above, Amuso (fearing that Chiodo may testify against him) ordered Spinelli to murder Chiodo's sister, Patricia Capozzalo, to send a message to Chiodo. <u>See</u> Letter in Opposition to Motion for Compassionate Release, <u>United States v. Spinelli</u>, 97-cr-00209 (RJD), Dkt. No. 289. Capozzalo was the mother of three young children and had no role whatsoever in organized crime. <u>Id.</u> Spinelli led the extensive planning of Capozzalo's murder, and in March 1992, Capozzalo was shot in the neck and behind her ear following an ambush by Spinelli and others. <u>Id.</u> Capozzalo survived but had to undergo surgery to remove the bullet from her neck and was forced into witness protection. <u>Id.</u> Spinelli was charged and found guilty of racketeering charges related to the attempted murder and sentenced to a total effective sentence of 295 months' imprisonment. <u>Id.</u>

On May 1, 2023, the Honorable Raymond J. Dearie denied Spinelli's motion for compassionate release, finding that "justice interjects a non-negotiable no here," and that a reduction of Spinelli's sentence "could not possibly comport with the statutory requirement that a criminal sentence reflect the seriousness of the offense, promote respect for the law, and provide just punishment," as required by Section 3553(a)(2). <u>See</u> <u>United States v. Michael Spinelli</u>, No. 97-CR-00209 (RJD), slip op. at 3 (E.D.N.Y. May 1, 2023). Judge Dearie emphasized that Spinelli's "apparently genuine conversion, and his unfortunately declining health do not and will not outweigh the trauma suffered by Mr. Spinelli's victim and the callous and unprecedented nature of his criminal act, which he carried out to advance his standing as a committed disciple of organized crime." <u>Id.</u>

- <u>Vito Guzzo</u> – Guzzo was the leader of the Giannini Crew, an organized criminal organization with connections to the Colombo, Gambino, and Bonnano Crime Families of La Cosa Nostra. Guzzo personally murdered five individuals and conspired to murder five others for which he organized and

devised strategies for carrying out the crimes. See United States v. Guzzo, No. 95-CR-754 (MKB), 2023 WL 3578246, at *1 (E.D.N.Y. May 18, 2023). Guzzo pled guilty to an eighteen-count superseding indictment that included charges of racketeering, five counts of murder in furtherance of racketeering, and five counts of murder conspiracy and attempted murders in furtherance of racketeering, amongst others. Id. Guzzo was sentenced to 456 months in prison, followed by five years of supervised release.

The Honorable Margo K. Brodie denied Guzzo's motion for compassionate release, finding that "the section 3553(a) factors do not warrant a modification of Guzzo's sentence in light of the seriousness of his offenses," which included "five heinous murders using various weapons as the leader of the Giannini Crew, and conspir[acy] to commit five others." Id. at *4.

As demonstrated by the above-mentioned cases, courts in this district, including this Court, have routinely denied compassionate release to mob leaders who participated in racketeering schemes and resorted to murder or conspiracy to murder in furtherance of those schemes. In the instances of Casso and Spinelli, both defendants were subordinates of Amuso's within the Luchese Crime Family and acted specifically under his leadership and command. Section 3553(a) dictates that, to the extent these defendants were denied compassionate release, Amuso should also be required to serve out his full sentence, as imposed by the Court.

> B. Amuso Has Failed to Establish Extraordinary and Compelling Reasons Warranting Compassionate Release

Amuso has separately failed to meet his burden of demonstrating that his medical and non-medical circumstances are "extraordinary and compelling" and warrant early release under 18 U.S.C. § 3582(c)(1)(A),[4] especially in light of the Section 3553(a) factors discussed above.

---

[4] Amuso improperly cites the Bureau of Federal Bureau of Prisons ("BOP") Policy Statement ("PS") 5050.50 as a partial basis for his requested relief and argues on at least one instance that Section 4 of BOP 5050.50, "overlaps in materials respects with the criteria provided by 18 U.S.C 3582(c)(1)(a)(ii)." Amuso Mot. at 6. This is irrelevant. BOP 5050.50 is an internal BOP policy that outlines the BOP's implementation procedures for compassionate release requests brought to the BOP under 18 U.S.C. 4205(g) and 18 U.S.C. 3582(c)(1)(A). It has no bearing on a court's consideration of a defendant's compassionate release. See generally

Amuso primarily argues that his arthritis, among other ailments, has diminished his quality of life and "rendered him immobile." See Amuso Mot. at 9-11. While the Government does not diminish difficulties faced by elderly inmates, the conditions that Amuso details do not rise to the level of "extraordinary and compelling" circumstances that warrant release. Amuso's conditions, while requiring individualized care, are not terminal and are not of the type that other courts have decided are insufficient to justify early release. See United States v. Rodriguez, No. 22-93, 2023 WL 3001238, at *2 (2d Cir. Apr. 19, 2023) (finding that lower court did not abuse discretion in denying compassionate release on the basis that defendant had no prolonged hospital stays and did not have a terminal diagnosis). See also United States v. Barnett, No. 21-2319-CR, 2023 WL 2375684, at *1 (2d Cir. Mar. 7, 2023) (affirming district court decision denying early release to prisoner who argued that "his age and health conditions—diabetes, hypertension, glaucoma, cataracts, an enlarged prostate, and a persistent cough—placed him at high risk of severe illness from COVID-19"); United States v. Fox, No. 22-10-CR, 2023 WL 379539, at *1-2 (2d Cir. Jan. 25, 2023) (affirming district court decision denying early release to a prisoner who suffered from "obesity, high cholesterol, hypertension and pre diabetes" and noted that "[o]n multiple occasions, we have concluded that a defendant's health condition was not an extraordinary and compelling reason for a sentence reduction despite the COVID-19 pandemic."); United States v. Rojas, No. 19-CR-467 (PKC), 2022 WL 14784607, at

Brooker, 976 F.3d 228. As such, the Court should reject any argument that Amuso's satisfaction of BOP 5050.50 provides a basis for relief. Further, to the extent Amuso seeks relief under pursuant to 18 U.S.C § 3582(c)(1)(A)(ii), such application fails. Relief under this section is available only to defendants who have "served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c)" which, as Amuso concedes, he was not. 18 U.S.C § 3582(c)(1)(A)(ii); see also Amuso Mot. at 7, n.4. As such, the Government's response relates solely to whether "extraordinary and compelling reasons" exist for a sentence reduction, pursuant to 18 U.S.C § 3582(c)(1)(A)(i).

*2 (S.D.N.Y. Oct. 26, 2022) (finding that extraordinary and compelling circumstances did not exist, even where defendant had high blood pressure and a high body mass index and claimed to be "in dire need" of a surgery for a collapsed kidney that had been canceled four times.). As Warden Kelly noted in denying Amuso's motion for compassionate release, Amuso (i) does not have a terminal illness, (ii) is independent with his self-care, (iii) does not have a debilitated medical condition, (iv) is independent in his daily living, and (v) has his current medical conditions under control. See Amuso Mot., Exhibit. 2, Application for Compassionate Release.

Moreover, Amuso does not allege that FCI Butner II is not providing him proper treatment for his conditions or that the facility is unable to accommodate his needs. While Amuso argues that his requests for medical assistance have "become more frequent and alarming," medical records do not reflect—and Amuso does not allege—that he is not receiving proper care in response to his concerns. Indeed, Warden Kelley specifically noted that Amuso is "receiving appropriate medical care and treatment by Health Services staff," which the care the facility is "committed to providing" to Amuso as necessary and appropriate. See id. This, alone, is sufficient to find that extraordinary and compelling circumstances do not exist based on Amuso's medical condition. See Rodriguez, 2023 WL 3001238, at *2 (finding that district court, in denying motion for compassionate release, did not abuse its discretion in finding that defendant receives adequate medical treatment in custody).

Amuso's argument that COVID-19 creates an extraordinary and compelling circumstance also falls flat. Amuso has received both the COVID-19 vaccine and booster, thereby diminishing his likelihood of severe infection, and he does not articulate any unique risks of severe illness that he faces due to COVID-19. Indeed, the Second Circuit has routinely held that documented medical conditions in the face of COVID-19 do not necessarily constitute

"extraordinary and compelling" reasons for release where a defendant is vaccinated. See, e.g., United States v. Williams, 2022 WL 17818625, at *1 (2d Cir. Dec. 20, 2022) (summary order); United States v. Reid, 2022 WL 17684667, at *1 (2d Cir. Dec. 15, 2022) (summary order); United States v. Diaz, 2022 WL 16631169, at *1 (2d Cir. Nov. 2, 2022) (summary order). See also United States v. Needham, No. 22-253-CR, 2023 WL 2172382, at *1 (2d Cir. Feb. 23, 2023) (denying early release despite "repeated outbreaks of COVID-19 at [defendant's] prison facility," her long-term COVID-19 symptoms, and her "many serious medical conditions"); United States v. Sookdeo, 851 F. App'x 263, 264 (2d Cir. Jun. 30, 2021) (rejecting defendant's argument that his heightened vulnerability to COVID-19 warranted sentence reduction); United States v. Bailey, No. 97-CR-0269, 2021 WL 4942954, at *1-2 (S.D.N.Y. Oct. 22, 2021) (holding 69-year-old defendant did not have extraordinary and compelling reason for compassionate release because he was fully vaccinated against COVID-19 and his medical records indicated his chronic health conditions were well-controlled). Nor is Amuso able to articulate any elevated threat of COVID-19 infection at FCI Butner II, which currently has a "Level 1" (low) infection level. See BOP FCI Butner Medium II, https://www.bop.gov/locations/institutions/btf/ (last visited July 10, 2023).

Amuso's remaining arguments are similarly uncompelling. First, for the reasons discussed earlier, his life sentence is warranted by the severity of his crimes and need to reflect the seriousness of his offense. As Judge Komitee emphasized in the Orena decision, "Judge Weinstein surely understood that a life sentence would likely result in Orena's incarceration even as an elderly and infirm inmate, and he would not have imposed the sentence lightly, given that understanding." See United States v. Victor J. Orena, 92-cr-00351 (EK), slip op. at 8, n.7 (E.D.N.Y. Oct. 27, 2021). The same is true here for Amuso, whose heinous crimes similarly

warrant a lengthy sentence like the one imposed.  Further, Amuso's contention that he is a low risk for recidivism is belied by his past and ongoing role as Boss of the Luchese Crime Family, which he continues to lead, even from the confines of prison.  Accordingly, Amuso's motion should be denied, and he should be required to serve out the full term of his sentence.

<u>CONCLUSION</u>

For the foregoing reasons, the government respectfully submits that Amuso's motion for compassionate release should be denied.

Dated:      Brooklyn, New York
            July 14, 2023

Respectfully submitted,

BREON PEACE
UNITED STATES ATTORNEY

By:    <u>/s/ Elias Laris</u>
       Elias Laris
       Assistant United States Attorney
       (718) 254-6599

cc:      Clerk of Court (FC) (by ECF)
        Anthony DiPietro, James R. Frocarro, Mathew J. Mari
        (Counsel for Defendant) (by ECF)