# DEAR CLERK

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

☆   JUN 03 2025   ☆

BROOKLYN OFFICE

Please stamp a
copy of this and
use the prepaid
envelope to return
this to me.

Thank you,

RECEIVED
JUN 03 2025
PRO SE OFFICE

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   JUN 03 2025   ★

BROOKLYN OFFICE

**Filer:**
**Vittorio Amuso**, Pro se
Post Office Box 1500
Butner, NC 27509-4500
(305) 900-6545 (Messages Only)

# UNITED STATES DISTRICT COURT

# EASTERM DISTRICT OF NEW YORK

Case No.:  **1:90-cr-00446-FB**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| Plaintiff, | ) |
| **vs.** | ) |
| **VITTORIO AMUSO,** | ) |
| Defendant. | ) |

**MOTION FOR COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. 3582(c)(1)(A)**



RECEIVED
JUN 03 2025
PRO SE OFFICE

   **COMES NOW**, your **Defendant, VITTORIO AMUSO**, and represents unto this Honorable Court (hereafter "Court") as follows, to-wit:

   **01.** That this Court has jurisdiction in the above-styled cause by virtue of this pending action and the fact that all actions giving rise to the original cause did occur or take place in the jurisdiction of this Court.

   **02.** That your Defendant, Vittorio Amuso (hereafter "Mr. Amuso") has been incarcerated in the federal prison system for more than thirty-three (33) years and his health is failing.

   **03.** That Mr. Amuso is petitioning this Court for an order which would grant immediate release as Mr. Amuso is requesting that this Court **GRANT** the relief sought in this action and reduce Mr. Amuso's sentence from LIFE to time served as new and updated guidance and statute demands this Court issue an order providing the requested relief in this action.

*USA v. Amuso*, **1:90-cr-00446-FB**

# TABLE OF CONTENTS

**INTRODUCTION**

I.  The District Court Has Broad Authority to Grant Mr. Amuso's Application for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A)

II.  Mr. Amuso Has Met the Statutory "Exhaustion" Requirement.

III.  There Exist Extraordinary and Compelling Reasons to Reduce Mr. Amuso's Sentence

    a.  Mr. Amuso's Extreme Age and Profound Deterioration Due to the Aging Process Qualify as an Extraordinary and Compelling Reason for Compassionate Release.

    b.  Inadequate Provision of Long-Term and Specialized Medical Care in a Correctional Setting Qualifies as an Extraordinary and Compelling Reason for Compassionate Release.

    c.  Ongoing Public Health Risks in Correctional Facilities Remain an Extraordinary and Compelling Reason.

    d.  The Totality of Circumstances Constitutes "Extraordinary and Compelling Reasons."

    e.  Mr. Amuso's Unusually Long Sentence and the Potential for Gross Disparity Under Current Law.

IV.  The Section 3553(a) Sentencing Factors Militate in Favor of Compassionate Relief.

    a.  The Nature and Circumstances of the Offense Have Been Addressed by Decades of Confinement.

    b.  Mr. Amuso's History and Characteristics: Unimpeachable Rehabilitation and Total Incapacitation.

    c.  The Demise of "Organized Crime" and "Omertà": Irrefutable Evidence Against Continued Criminal Ties.

    d.  The Goals of Sentencing Have Been Resoundingly Achieved.

    e.  Mr. Amuso Poses No Future Danger to the Community.

    f.  Granting Relief Avoids Unwarranted Sentencing Disparities.

V.  Comprehensive Proposed Release Plan Demonstrates Community Safety and Dignified Care.

VI.  VI. Conclusion

# INTRODUCTION

Defendant **VITTORIO AMUSO**, pro se, respectfully submits this ***Motion for Sentence Reduction, pursuant to 18 U.S.C. § 3582(c)(1)(A)***, seeking an Order reducing his life sentence to time-served. Mr. Amuso has already endured over thirty-three (33) consecutive years of incarceration. This motion is predicated upon the urgent and undeniable reality that Mr. Amuso, now ninety (90) years of age, is in a state of catastrophic physical deterioration, rendering his continued confinement a profound affront to human dignity and a lamentable exercise in futility. His condition, marked by a precipitous decline from 185 pounds upon incarceration to less than 120 pounds today, is illustrative of a man quite

literally disintegrating within the confines of his imprisonment, a plight that can only be characterized as cruel and inhuman punishment.

As will be meticulously demonstrated, Mr. Amuso's advanced age and the severe, irreversible degeneration of his health provide an extraordinary and compelling reason for a sentence reduction under the expanded parameters of the newly effective U.S. Sentencing Guidelines § **1B1.13**. Furthermore, a meticulous re-evaluation of the **18 U.S.C. § 3553(a)** sentencing factors, viewed through the lens of Mr. Amuso's unprecedented and impeccable institutional record, his complete physical incapacitation, and the profound, systemic changes in the landscape of organized crime in America, unequivocally militates in favor of his immediate release.

The immediacy of this request cannot be overstated. Mr. Amuso is at the precipice of his mortality. His continued confinement, in his current state of utter dependence and physical decay, is a sentence to die in prison, devoid of familial comfort and professional, compassionate care. This motion represents his definitive last opportunity to experience a dignified end of life within the embrace of his family and community. If this Court does not grant this motion, Mr. Amuso will, without question, die in prison. He simply does not have the luxury of time to file another request.

## I. The District Court Has Broad Authority to Grant Mr. Amuso's Application for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A)

The **FIRST Step Act** ("FSA") fundamentally reshaped the landscape of compassionate release, empowering district courts with expansive authority to adjudicate motions brought pursuant to **18 U.S.C. § 3582(c)(1)(A)**. This legislative reform underscored the judiciary's role as the ultimate arbiter of whether "***extraordinary and compelling reasons***" warrant a sentence reduction in a given case. The Second Circuit, in ***United States v. Brooker***, 976 F.3d 228, 237 (2d Cir. 2020), affirmed this judicial latitude, unequivocally stating that "*the district court's discretion in this area as in all sentencing matters is broad*". This broad discretion allows courts to "*consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them*".

Crucially, the U.S. Sentencing Commission's recently adopted amendments to **U.S.S.G. § 1B1.13**, effective November 1, 2023, now apply to defendant-initiated motions and significantly expand the delineated categories of "*extraordinary and compelling reasons*". While previous iterations of the policy statement were deemed merely advisory for judge-led motions, the amended guidelines provide clear and binding, yet expansive, criteria that embrace a broader spectrum of circumstances

warranting relief. The Sentencing Commission explicitly reinforced the district court's independent power to determine "*other reasons*" that may compel a sentence reduction beyond those specifically enumerated. This is grounded in the recognition that district courts are "*in a unique position to determine whether the circumstances warrant a reduction*".

This evolution in statutory and guideline interpretation cements the Court's authority to comprehensively assess Mr. Amuso's drastically altered circumstances and to provide the compassionate relief that justice, under these new and dire facts, demands.

## II. Mr. Amuso Has Met the Statutory "Exhaustion" Requirement.

As a threshold matter, Mr. Amuso has fully satisfied the administrative exhaustion requirement mandated by **18 U.S.C. § 3582(c)(1)(A)**. On January 4, 2023, Mr. Amuso submitted an application for a sentence reduction to Warden C. Carter at FCI Cumberland. Following his transfer, this application was subsequently forwarded to Warden L.B. Kelly of FCI Butner II. On March 14, 2023, Warden L.B. Kelly issued a denial of Mr. Amuso's application for a sentence reduction. Mr. Amuso has, again, attempted to submit a request to the current Warden at FCI Butner II and was told that his "*request*" had already been denied, therefore no subsequent response would be provided. Mr. Amuso attempted to file his request with the Warden on or about April 21, 2025.

This sequence of events unequivocally demonstrates that Mr. Amuso either fully exhausted his administrative remedies or waited the requisite thirty (30)-day period from the warden's receipt of his request, whichever was earlier. The Government has previously conceded that Mr. Amuso has satisfied this jurisdictional prerequisite. Therefore, the Court is fully empowered to proceed with the adjudication of the merits of this motion.

## III. There Exist Extraordinary and Compelling Reasons to Reduce Mr. Amuso's Sentence.

Mr. Amuso's current circumstances present a confluence of factors that, individually and collectively, constitute extraordinary and compelling reasons for a sentence reduction under the expanded and updated **U.S.S.G. § 1B1.13**. The severity of his physical deterioration, his extreme advanced age, the inadequacy of care within a correctional setting for his complex needs, and the duration of his confinement, taken together, paint a picture of an individual facing a cruel and inhumane end to life without judicial intervention.

**A. Mr. Amuso's Extreme Age and Profound Deterioration Due to the Aging Process Qualify as an Extraordinary and Compelling Reason for Compassionate Release (U.S.S.G. § 1B1.13(b)(2)).**

At ninety (90) years of age, Mr. Amuso is not merely "*advanced in age*"; he is living at the extreme upper echelon of human longevity, a period marked by profound and irreversible physical decline. He has served over thirty-three (33) consecutive years of his life sentence, an exceptional duration of imprisonment that far exceeds the ten (10) years or seventy-five (75) percent of term of imprisonment benchmark newly established by the Sentencing Commission's recent amendments. This renders him a quintessential candidate for compassionate release under the explicit terms of **U.S.S.G. § 1B1.13(b)(2)**.

The previous denial acknowledged Mr. Amuso's age and time served but dismissed them as merely "*a product of his life sentence, rather than extraordinary and compelling circumstances*". This rationale, while perhaps understandable under prior interpretations, is directly superseded and rebutted by the new guidelines. **U.S.S.G. § 1B1.13(b)(2)** now explicitly identifies that a defendant who is "*at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less*" presents an "*extraordinary and compelling reason*."[1] Mr. Amuso's current state perfectly aligns with and indeed far exceeds these criteria.

His physical deterioration is not merely age-related, but catastrophic. Upon entering federal custody, Mr. Amuso weighed a robust 185 pounds. Today, a harrowing reflection of his terminal decline, he weighs less than 120 pounds. This precipitous and involuntary weight loss reveals a man quite literally wasting away, his body failing under the weight of decades of confinement and the relentless march of age. He is "*literally deteriorating into nothing.*"

Furthermore, Mr. Amuso's mobility has been entirely eradicated. He has "*not walked in years.*" He is entirely "*confined to a wheelchair to ambulate him anywhere*". This is not a temporary setback; it is a permanent state of profound physical impairment. He can "*not even make it to a telephone to call his family,*" underscoring the completeness of his physical collapse and the isolation imposed by his

---

[1] U.S. Sentencing Guidelines Manual § 1B1.13(b)(2) (effective Nov. 1, 2023). Information regarding the effective date of USSG amendments is publicly available on the U.S. Sentencing Commission's website. [2]: A comprehensive analysis of legislative changes in sentencing for racketeering offenses and related violent crimes since 1992, specifically concerning the potential for gross disparity, would require detailed legal research beyond the scope of this document. However, the general trend in federal sentencing has seen increased focus on proportionality and rehabilitation, particularly for elderly inmates. General information about the decline of organized crime and Omertà is derived from widely recognized historical and sociological accounts of organized crime in the United States, as well as publicly available government reports and academic studies on the topic.

condition. This complete inability to ambulate or even access basic communication tools within the prison system represents a "*serious deterioration in physical or mental health because of the aging process*" that "*substantially diminishes his ability to provide self-care within the environment of a correctional facility*" as defined by the new guidelines. His days consist of sitting in a wheelchair from 5:30 AM until 9:00 PM every day, a stark testament to his utterly compromised quality of life. His condition will only continue to deteriorate until his death.

**B. Inadequate Provision of Long-Term and Specialized Medical Care in a Correctional Setting Qualifies as an Extraordinary and Compelling Reason for Compassionate Release (U.S.S.G. § 1B1.13(b)(1)(C)).**

While the previous denial acknowledged Mr. Amuso's myriad chronic medical conditions – including nuclear sclerosis, hypertension, coronary atherosclerosis, severe osteoarthritis of the hips and knees, anemia, cardiac arrhythmia, complete loss of teeth, and more – it erroneously concluded that the Bureau of Prisons ("BOP") was managing these conditions "*adequately*". This conclusion is fundamentally rebutted by the objective reality of Mr. Amuso's deteriorating health, the explicit language of the new guidelines, and the inherent limitations of correctional healthcare for a patient of his age and condition.

The new **U.S.S.G. § 1B1.13(b)(1)(C)** clarifies that an "*extraordinary and compelling reason*" exists if a defendant is "*suffering from a medical condition that requires long-term or specialized medical care, without which the defendant is at risk of serious deterioration in health or death, that is not being provided in a timely or adequate manner*". Mr. Amuso's medical records, which documented his "*severe arthritis of both [Mr. Amuso's] hips*" in March 2023, and the numerous, increasingly frequent calls of distress from him to BOP staff, belie any claim of truly "*adequate*" care. He has repeatedly pleaded for "*cortisone shots in my hip and knee*" due to "*severe pain,*" stating, "*please if there is a God help me with this as I am 90 years old and in severe pain*". Such desperate pleas from a ninety-year-old, wheelchair-bound inmate, indicating persistent, unalleviated agony, unequivocally demonstrate that the care provided, while perhaps existing, is not ***adequate or timely*** to prevent severe deterioration or to meaningfully mitigate his suffering.

Indeed, the BOP itself has designated Mr. Amuso as a "Care-Level-3 inmate," signifying that his condition is "*unstable*" and requires "*complex chronic care*". They have noted his "*decreased mobility*" and that he is "*not coming out of his cell very often anymore,*" and at times, appears "*disheveled*". Furthermore, BOP records indicate that Mr. Amuso "*needs someone to pick up meals*" and "*ICP need to have someone help him make [the] bed, get tray*". These are not mere inconveniences;

they are irrefutable indicators of a complete inability to provide self-care. Even with an assigned inmate companion, he "*still can't take care of himself and function normally.*"

The prison setting is inherently ill-equipped to provide the specialized, long-term, and comprehensive care required by a frail, immobile ninety-year-old suffering from multiple debilitating conditions. The very structure of incarceration, with its lockdowns and bureaucratic hurdles, creates systemic delays and impediments to timely and appropriate medical intervention. Mr. Amuso, debilitated and dependent, cannot effectively advocate for himself within this system. As numerous studies have shown, chronic musculoskeletal conditions like his severe arthritis require multidisciplinary teams rarely accessible within prisons, and prison environments themselves accelerate the aging process, leading to earlier onset of chronic illness and disease.

Therefore, the governmental assertion of "*adequate care*" is a legal fiction when viewed against the backdrop of Mr. Amuso's daily suffering, his physical deterioration, and his utter dependence. His current situation amounts to **cruel and inhuman punishment**, as the BOP, despite its efforts, simply cannot provide the holistic, immediate, and compassionate care necessary to prevent further severe deterioration or to offer him a modicum of dignity in his final days. Mr. Amuso needs to be in the community where he can receive professional healthcare and dedicated caretakers, an environment demonstrably superior and ethically mandated for a person in his terminal condition. The BOP, despite its best intentions, is simply not the optimal place for him to be in his current, dire state.

## C. Ongoing Public Health Risks in Correctional Facilities Remain an Extraordinary and Compelling Reason (U.S.S.G. § 1B1.13(b)(1)(D)).

While the acute phase of the COVID-19 pandemic may have abated, the inherent risks within congregate living settings, particularly for an individual of Mr. Amuso's extreme age and severe health vulnerabilities, persist. The previous denial noted his recovery from COVID-19 and vaccination status, but this overlooks the broader and ongoing threat that any infectious disease outbreak poses to his compromised system.

**U.S.S.G. § 1B1.13(b)(1)(D)** now acknowledges an "*ongoing outbreak of infectious disease or ongoing public health emergency affecting, or at imminent risk of affecting, my correctional facility that, due to personal health risk factors and custodial status, has caused me an increased risk of suffering severe medical complications or death as a result of exposure... and such risk cannot be adequately mitigated in a timely manner*". For a ninety-year-old with multiple severe chronic conditions, including a weakened immune system, even common flu or other viral outbreaks, which

routinely occur in prison populations, present a disproportionate and potentially fatal risk. The prison's capacity to "*adequately mitigate*" such risks for an immobile, utterly dependent inmate like Mr. Amuso is severely limited by its operational constraints.

The collateral hardships of incarceration during a public health crisis, including prolonged lockdowns, limited movement, and curtailed visitations, continue to disproportionately affect elderly and infirm inmates like Mr. Amuso. These conditions amplify the physical and psychological toll of imprisonment, rendering his current sentence "*harsher and more punitive than would otherwise have been the case*".

**D. The Totality of Circumstances Constitutes "*Extraordinary and Compelling Reasons*" (U.S.S.G. § 1B1.13(b)(5)).**

Even if each of the foregoing reasons were considered in isolation, the cumulative impact of Mr. Amuso's circumstances, taken together, presents an "*extraordinary and compelling reason*" under the broad "*other reasons*" catch-all provision of **U.S.S.G. § 1B1.13(b)(5)**. The Sentencing Commission explicitly retained this provision, affirming the district court's expansive discretion to identify and act upon novel combinations of circumstances that warrant release.

Mr. Amuso is a 90-year-old man, dramatically reduced in weight and completely incapacitated, confined to a wheelchair, unable to perform basic self-care, and dependent on others for his very survival. He is experiencing profound, irreversible physical deterioration. He has served over thirty-three (33) years of a life sentence, an unparalleled period of incident-free incarceration within – formally – the federal penitentiary system. His medical needs are complex and inadequately met within the prison structure, leading to sustained and severe pain. He possesses a comprehensive, robust, and immediately executable release plan backed by an exceptionally dedicated family.

The sheer gravity of his current state, combined with the extreme length of his unblemished incarceration, rises to a level of "*extraordinary and compelling*" that demands this Court's intervention. His quality of life in prison is absolutely non-existent, confined as he is to a wheelchair for nearly 16 hours a day, unable to move, unable to connect with his family without assistance, and suffering from unremitting pain. In addition, Mr. Amuso rare, if ever, sees sunlight because he simply can't get outside and certainly can't ambulate himself.

**E. Mr. Amuso's Unusually Long Sentence and the Potential for Gross Disparity Under Current Law (U.S.S.G. § 1B1.13(b)(6)).**

The Sentencing Commission's recent amendments introduce a critical new category: the "*Unusually Long Sentence*". **U.S.S.G. § 1B1.13(b)(6)** now recognizes that "*an unusually long sentence, combined with at least 10 years of the term of imprisonment served, and a change in the law (other than an amendment to the Guidelines Manual that has not been made retroactive) that would produce a gross disparity between the sentence being served and the sentence likely to be imposed on the date the motion is filed*," can constitute an extraordinary and compelling reason for release.

Mr. Amuso's life sentence, imposed in 1992, is inherently "*unusually long*," especially when viewed through the lens of a 90-year-old man who has served over three decades in federal custody. The legal landscape of federal sentencing for complex racketeering cases, including those involving violent predicates, has undergone significant evolution since the early 1990s. This includes changes in prosecutorial discretion, the application of sentencing guidelines, and the overall judicial philosophy toward extremely lengthy sentences, particularly for aging defendants who pose no credible threat.

While a detailed legal analysis demonstrating a "*gross disparity*" requires specific comparison of 1992 sentencing practices to current standards for similar offenses, it is a robust argument that the imposition of a life sentence on a ninety-year-old, physically incapacitated individual today, when compared to the 1992 context, would be approached with a substantially different perspective, particularly regarding the practical implications of such a sentence. The passage of the FSA itself, fundamentally altering who can seek compassionate release, is illustrative of a broader societal and legislative shift towards evaluating punitive measures in light of evolving circumstances and human dignity.[2]

**IV. The Section 3553(a) Sentencing Factors Militate in Favor of Compassionate Relief.**

Even if, *arguendo*, this Court were to find that extraordinary and compelling reasons were not present, a re-evaluation of the **18 U.S.C. § 3553(a)** sentencing factors, viewed in light of Mr. Amuso's profoundly altered circumstances, mandates his compassionate release. The Second Circuit has explicitly stated that a district court may not fulfill its duty to consider the **§ 3553(a)** factors by merely

---

[2] A comprehensive analysis of legislative changes in sentencing for racketeering offenses and related violent crimes since 1992, specifically concerning the potential for gross disparity in similar cases. Moreover, the general trend in federal sentencing has seen increased focus on proportionality and rehabilitation, particularly for elderly inmates.

recounting the considerations that supported the original sentence, as "*§3582(c)(1) necessarily envisions that the section 3553(a) factors may balance differently upon a motion for compassionate release than they did at the initial sentencing*".

## A. The Nature and Circumstances of the Offense Have Been Addressed by Decades of Confinement.

The Court has accurately recounted the gravity of the offenses for which Mr. Amuso was convicted. His alleged role as the boss of the **Luchese Crime Family** and the violence associated with that enterprise are undeniably serious. However, the punitive effect of a sentence is not static. Mr. Amuso has served over thirty-three (33) years of a life sentence. This is an extraordinary period of incarceration, particularly for a man now ninety years old. The punitive objectives of the sentence — reflecting the seriousness of the offense, promoting respect for the law, and providing just punishment — have been resoundingly fulfilled by this extensive period of deprivation and confinement. For a man of his age and physical condition, continued incarceration offers no further penological benefit; it merely serves to perpetuate a cycle of suffering that far exceeds any legitimate retributive or deterrent aim.

## B. Mr. Amuso's History and Characteristics: Unimpeachable Rehabilitation and Total Incapacitation.

Mr. Amuso is not the same individual who was sentenced in 1992. His history and characteristics have been fundamentally transformed by over three decades of unbroken incarceration and the inexorable march of age.

First, his rehabilitation is undeniable and extraordinary. For ***over thirty-three (33) years***, Mr. Amuso has maintained an impeccable institutional record, **without a single disciplinary infraction**. This is not merely commendable; it is, in all likelihood, one of the longest periods of incident-free incarceration within the federal penitentiary system. This astounding record, achieved without any realistic hope of release for most of his confinement, stands as irrefutable proof that Mr. Amuso has utilized his time in custody to better himself and to fully rehabilitate. As courts have recognized, such an exemplary behavioral record, especially under the grim reality of a life sentence, "*can only be viewed as exemplary*". To suggest, as the government has in the past, that this is simply "*insufficient*" disregards the profound testament to personal transformation that such a record embodies.

Second, and perhaps most critically for the public safety analysis, Mr. Amuso is now physically utterly incapacitated. His days consist of sitting in a wheelchair from 5:30 AM until 9:00 PM every

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

day. He cannot walk, cannot care for himself, cannot reach a telephone without assistance, and is entirely dependent on others for all basic needs. He has lost over 65 pounds, a literal physical disintegration. This level of extreme frailty means that Mr. Amuso, in his current condition, *could not operate as a crime boss if he wanted to*, and his condition will only continue to deteriorate until his death. To allege that Mr. Amuso has any ties to criminal activity or organized crime in his current state is a false narrative entirely divorced from reality. The BOP itself has acknowledged his "*minimum recidivism risk*", a finding wholly consistent with his age and physical state.

Third, Mr. Amuso has maintained profound and loving family ties throughout his lengthy imprisonment. His children and grandchildren have submitted deeply moving letters, testifying to his enduring positive influence, his promotion of education, and his steadfast guidance, even from the confines of a prison. They speak of his unwavering faith and his acts of goodwill within the prison. The devastating impact of his continued absence on his family, particularly the inability to bid farewell to his beloved wife, underscores the collateral hardship of his prolonged confinement. This robust family support network ensures that, if released, Mr. Amuso will be nurtured, cared for, and absolutely integrated into a law-abiding, supportive environment.

## C. The Demise of "*Organized Crime*" and "*Omertà*": Irrefutable Evidence Against Continued Criminal Ties.

The government is once again expected to advance the tired, desperate notion that Mr. Amuso— now 90 years old, unable to walk, feed himself, or dial a telephone without assistance—is secretly operating a sprawling organized crime syndicate from his cell in a federal prison. It's not just implausible; it's embarrassing.

For over thirty-three (33) years, Mr. Amuso has maintained a spotless disciplinary record. Not one infraction. No contraband. No unauthorized communication. No out-of-bounds violations. Not even profanity. In BOP terms, he's the model inmate. Yet the U.S. Attorney wants the Court to believe he's Tony Soprano in a wheelchair—minus the mobility, privacy, or means to communicate.

If Mr. Amuso had borrowed another inmate's telephone access code, written a suspicious or coded letter, or attempted to skirt a single rule, the prosecution would have made it headline material in their opposition. But they can't—because it never happened. There are no codes. No calls. No conspiracy. Just a government clinging to a storyline that hasn't been relevant since fax machines were cutting-edge.

Let's put it plainly: Mr. Amuso entered custody before Americans had flat-screen TVs. He's been rule-abiding longer than some prosecutors have been practicing law or maybe even been alive. To claim he's running an international criminal enterprise today is fiction. And not even good fiction. The kind you skim past because it's too far-fetched to believe.

The traditional American Mafia, as it existed in the 20th century, has been irrevocably dismantled. Through decades of relentless and highly successful federal law enforcement efforts, particularly leveraging the potent **Racketeer Influenced and Corrupt Organizations (RICO)** Act, the hierarchical structures of these criminal enterprises were systematically targeted and decimated. The mass incarceration of key leaders and high-ranking figures, fundamentally crippled their operations and eroded their power base. Organized crime in this country, as it was then understood, has went away. While illicit activities persist, the formidable, unified, and pervasive influence of the traditional Mafia as a national threat has been supplanted by more diffuse, often transnational criminal networks focused on different forms of illicit commerce, such as cybercrime and human smuggling. The resources and focus of federal law enforcement have, necessarily, also shifted in response to these evolving threats, particularly in the post-9/11 era. There is no such thing as a "*mafioso*" or "*mafia*" or "*crime family*" in this country anymore.

Central to the mythos of the American Mafia was "*Omertà*," the code of silence and honor. This archaic ideology, steeped in Southern Italian traditions, demanded absolute non-cooperation with law enforcement, and for a time, was indeed the grim "*law of the land*" for those who subscribed to its brutal tenets. However, the relentless pressure of federal prosecutions, particularly the severe penalties under RICO, fundamentally broke this code. Beginning with high-profile cooperators like Joseph Valachi in the 1960s, and accelerating through the 1980s and 1990s, the floodgates of cooperation opened. Faced with the stark choice between decades in prison or providing testimony, many once-loyal members chose survival over silence. This widespread breaking of Omertà was the death knell for the traditional Mafia's power, shattering its mystique and undermining its very foundation.

Thus, we contend, unequivocally, that there is no such thing as Omertà in this country anymore. The government has, indeed, won this particular battle. There is no longer the widespread secrecy or the unyielding code of silence that defined organized crime decades ago. The era of the "*mafioso*" and "*Omertà*" died decades ago, succumbing to the might of the United States' legal system.

Applying this reality to Mr. Amuso, the government's continued allegations of his ties to the Lucchese family are, as stated, frivolous and entirely unsubstantiated. Mr. Amuso has not been accused

of, nor is there any evidence whatsoever to support, any attempt to communicate with or continue any criminal enterprise since he entered prison in 1992. He has spent *over thirty (30) years* in the United States penitentiary system, maintaining an unblemished record, and has never had an incident report. This stands as the most compelling evidence of his complete detachment from any criminal enterprise. His current existence – confined to a wheelchair, physically decaying, and utterly dependent – makes it utterly impossible for him to "*operate*" as a crime boss, even if the organization itself were still a viable entity. His condition, as observed daily by BOP staff and detailed in his medical records, proves this beyond any doubt.

## D. The Goals of Sentencing Have Been Resoundingly Achieved.

The aims of sentencing, as outlined in **18 U.S.C. § 3553(a)(2)**, include the need for the sentence **to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence, protect the public, and provide for the defendant's rehabilitation.** Mr. Amuso's life sentence, and the *over thirty-three years* he has already served, have achieved these goals in full measure.

For a nonagenarian, whose body is succumbing to the ravages of age and severe illness, the concept of further punishment becomes detached from any rational penological purpose. His decades of imprisonment have certainly provided just punishment and promoted respect for the law. No reasonable observer, witnessing the plight of a 90-year-old man who has served over three decades, physically incapacitated and dependent, would fail to appreciate the gravity of the consequences for the offenses committed. Further incarceration offers no additional deterrent effect, either specific to Mr. Amuso (who is clearly beyond any capacity for re-offending) or general to the public. To the contrary, continued incarceration, under these extreme circumstances, becomes an exercise in gratuitous suffering, "*greater than necessary to serve the purposes of 18 U.S.C. § 3553(a)(2)*".

## E. Mr. Amuso Poses No Future Danger to the Community.

The paramount concern in any release decision is the safety of the community. Here, the evidence is overwhelming and irrefutable: Mr. Amuso poses absolutely no danger to any person or the community. This is not merely an assertion; it is a conclusion supported by his physical state, his extensive period of incarceration, and the BOP's own findings.

At 90 years old, weighing less than 120 pounds, confined to a wheelchair, unable to ambulate independently, unable to care for his most basic needs, and in a state of terminal physical deterioration, Mr. Amuso is utterly incapable of committing any crime. His daily existence is one of profound vulnerability and dependence. His condition is such that he could not possibly operate a criminal enterprise or engage in any harmful activity. Mr. Amuso can't even jaywalk.

Furthermore, his *over thirty-three years* of impeccable conduct within the confines of the federal prison system, without a single incident report, objectively demonstrates his complete rehabilitation and his consistent adherence to rules, even under the most arduous circumstances. The BOP's own "*FSA Recidivism Risk Assessment Form*" categorizes Mr. Amuso as having a "*Low Risk Recidivism Level*", a finding fully consistent with the well-established inverse correlation between age and recidivism.

Any argument that Mr. Amuso, in his current physical and temporal state, remains a danger to the community is a speculative abstraction, wholly unsupported by any current fact, and directly contradicted by objective evidence of his profound incapacitation and transformation.

**F. Granting Relief Avoids Unwarranted Sentencing Disparities.**

The Court's compassionate release of Mr. Amuso, in light of his unique and dire circumstances, would be consistent with, and not create unwarranted disparities with, other decisions in this District and across the nation. Federal courts, including those in the Eastern District of New York, have recognized the principle of compassionate release for aging, infirm defendants, even those convicted of serious offenses. For example, in *United States v. Monteleone*, 2023 U.S. Dist. LEXIS 62518 (E.D.N.Y. Apr. 10, 2023), the court reduced **MULTIPLE LIFE SENTENCES** for **RACKETEERING** conspiracy and **MURDER** to time served (amounting to 30 years) for an 83-year-old defendant with health conditions and rehabilitation efforts. Similarly, in *United States v. Wong Chi Fai*, 2019 WL 3428504 (E.D.N.Y. July 30, 2019), compassionate release was granted to a 65-year-old terminally ill defendant who could no longer provide self-care and had served 26 years of a life sentence for extortion and racketeering conspiracies. These cases underscore the judicial recognition that a defendant's physical decline and rehabilitation, combined with substantial time served, can outweigh the gravity of past offenses when considering current proportionality and penological purpose.

*United States v. Wright*, No. 2:96-cr-80876-3, 2020 U.S. Dist. LEXIS 198340, at *11 (E.D. Mich. Oct. 26, 2020) (citing *United States v. Wong Chi Fai*, No. 93-cr-1340, 2019 U.S. Dist. LEXIS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

126774, 2019 WL 3428504, at *4 (E.D.N.Y. July 30, 2019) (granting compassionate release to a 65-year-old, terminally ill defendant who was no longer to provide self-care and had served 26 years of his life sentence for extortion and racketeering conspiracies and related substantive charges, as well as involvement in certain murders in furtherance of those conspiracies); *United States v. McGraw*, No. 2:02-cr-00018-LJM-CMM-01, 2019 U.S. Dist. LEXIS 78370 (S.D. Ind. May 9, 2019) (granting compassionate release to a defendant that "*served much of his sentence while seriously ill and in physical discomfort*"); *United States v. Hansen*, 2020 U.S. Dist. LEXIS 61946, 2020 WL 1703672, at *8 (E.D.N.Y. Apr. 8, 2020) (collecting cases and granting compassionate release where defendant's medical records "*overwhelmingly depict a body and mind besieged with mounting, serious afflictions*").

The Court's current assessment of the § 3553(a) sentencing factors should militate in favor of granting Mr. Amuso compassionate release based on his advanced age, medical circumstances, and rehabilitation. See *United States v. Scarpa*, No. 94-cr-1119-1 (ERK), 2020 U.S. Dist. LEXIS 210904 (E.D.N.Y. Nov. 11, 2020) ("*Where, as here, the defendant 'can do no more harm' due to his physical and mental condition, the 'compassionate thing to do in this case is to release [the defendant] early, consistent with the intent of Congress when it passed the First Step Act.'*" (citing *United States v. Ebbers*, 432 F. Supp. 3d 421, 433 (S.D.N.Y. 2020)); *United States v. Kibble*, 992 F.3d 326 (4th Cir. 2021) (explaining that the district court may not fulfill its duty to consider the § 3553(a) factors by merely recounting the considerations that supported the original sentence because "*Section 3582(c)(1) necessarily envisions that the section 3553(a) factors may balance differently upon a motion for compassionate release than they did at the initial sentencing....If a district court's original section 3553(a) analysis could always prove that a sentence reduction would intolerably undermine the section 3553(a) factors, then 18 U.S.C. Section 3582(c)(1) would, in effect, be a nullity.*").

In the more than three-plus decades since Mr. Amuso was first imprisoned, he has maintained a spotless institutional record and has served as a positive influence to others despite having had no realistic hope of release before the end of his life. He has also maintained the unconditional support and love of his family who will ensure that, if released, he will be well cared for during his final days. Many members of Mr. Amuso's immediate family, including his children and grandchildren, have provided letters to the Court to support the instant request for his compassionate release and an account of Mr. Amuso's good character (See Dkt. 1223, Exhibit 13, Letters of Support).

Perhaps most important in this context, Mr. Amuso has not had a single disciplinary infraction during the 31-plus years of his imprisonment, which strongly evidences his maturation and

rehabilitation. See, e.g., **United States v. Osuna**, Case No. 02-CR-1327 (CPS), 2008 WL 1836943, at *2 (E.D.N.Y. April 22, 2008) (reducing defendant's sentence pursuant to **18 U.S.C. § 3582(c)(2)** where *"[d]efendant has maintained good conduct and has not been subject of disciplinary action during his entire period of incarceration"*); **United States v. Kwok-Ching Yu**, 2020 U.S. Dist. LEXIS 220458, at *14 (S.D.N.Y. Nov. 23, 2020) (granting compassionate release and noting that *"[the defendant's] clean disciplinary record for the last eight years, and the absence of any disciplinary infraction related to violence or drug use, demonstrates that he is unlikely to commit future criminal acts or pose a danger to the community"*); **United States v. Panton**, Case No. 89-CR-346 (LAP), 2020 WL 4505915, at *7 (S.D.N.Y. Aug. 4, 2020) (reducing life sentence to time-served after close to 30 years in prison in part because defendant had *"only six disciplinary infractions over almost thirty years in jail,"* none of which *"involved violence, weapons, gangs, narcotics, alcohol, or BOP staff"*).

Mr. Amuso's good works and exceptional institutional record, which was without any expectation from Mr. Amuso that a Court would one day be able to consider it for his early release, is compelling. **United States v. Fisher**, 493 F. Supp. 3d 231, 238 (S.D.N.Y. 2020) (noting that the defendant *"must be viewed from the present day, after years of rehabilitation he undertook wholly for its own sake and without hope of relief"*).

Furthermore, while Mr. Amuso and his children have suffered a great deal as a result of Mr. Amuso's long imprisonment—profoundly predicated in most recent years on the passing of Mr. Amuso's wife, his significantly failing health and the COVID-19 pandemic—Mr. Amuso has greatly matured and remained guided by his Catholic faith during the past 33-plus years. Indeed, notwithstanding his long imprisonment, Mr. Amuso has always sought to influence others positively. Of significance, all of Mr. Amuso's children and grandchildren report his positive influence and constant promotion of education during their upbringing:

> *Since a little girl, my wish has always been to have my dad back at home where he belongs. Through the years, there are not enough words in this world to describe how supportive he has been to myself and our entire family; his constant support and guidance have given me the tools to stay on a positive path. Because of Dad's wisdom and advice, I successfully received my Bachelor's in Science in Elementary Education (Pre-K-6) and Master's in Science in Literacy (K-12). Being a pillar in my life, Dad has given me the drive to be a dedicated teacher for 17 years; our daily phone calls begin with him asking me if I had a blessed night and wishing me a blessed day. His*

*upbeat attitude, no matter what challenges he may be facing, has always been and continues to be a constant in my life.* Exhibit 13, at *1-2 (Victoria Amuso);

*My father taught me the importance of receiving an education and to walk this world with morals, values, and class....My daughter, Teresa, graduated top of her class and is now a nurse practitioner. My dad's wisdom and guidance for sure helped her on this journey. Dad left shortly after my second child, my son, Gaetano was born, and sadly was not home for my third birth when my son Vittorio, his namesake was born. My boys grew into two honest, trustworthy, hard-working men because of the impact my dad had on their lives.* Id. at p. *3 (Catherine DiBenedetto);

*My dad always pushed me to be a better person each and every day. I graduated from two top tier academic schools: Archbishop Molloy and St. John's University maintaining good grades and always staying out of trouble. Without my father's positivity and guidance I'd have never been able to get through those years, as well as many other tough life choices and experiences thereafter.* Id. at *4-5 (Robert Amuso);

*He has always been a supportive loving father. Always rallying for us to be the best person we could be. Whether it was instilling values like family, manners, church, attending parent /teacher conferences or just a kind ear to listen, he was always there. He wanted nothing but us to be kind and decent people.* Id. at *6 (Michele Vasti);

*One aspect of my grandfather's character that has always stood out to me is his unwavering advocacy for education and his insistence on staying away from negative influences. Despite his circumstances, he consistently emphasized the importance of academic excellence and personal growth. Throughout my educational journey, my grandfather was a pillar of support, constantly encouraging me to pursue my dreams and achieve my goals. His guidance was instrumental in my graduation with Honors from Stevens Institute of Technology.* Id. at *8 (Carl Vasti);

*During my journey through nursing school and becoming a Family Nurse Practitioner, my grandfather was a constant source of support and encouragement. Despite his own difficulties, he never ceased to encourage me to pursue my dreams and helped me in any way he could. One of the most significant ways he supported me was by sending me books related to my studies. He even wrote notes of encouragement in the margins of the books, which motivated me to continue working hard towards my goals.* Id. at *10-11 (Theresa DiBenedetto);

*A grandfather ultimately holds a special place in a person's life, as he played a pivotal role in providing guidance and assurance when I was growing up.*

1
2
3

> *Every time we spoke, he always told me to "stay in school and to keep up the good grades". I have now graduated from Rutgers Business School this past month, and it pains me that he wasn't able to see me walk down the aisle for graduation, because I know he would be so proud.* Id. at \*12 (Thomas Vasti);

4
5
6
7

> *He would remember every little detail of each of our lives and aided us mentally to look past as he would say "This too shall pass", or to make sure the family and friends would stick together....These are the many lessons that my grandfather taught me, and I can say for a fact, I grew up to be an "amazing young man" as he would tell me, and this is because of him.* Id. at \*13-14 (Vittorio DiBenedetto);

8
9
10
11

> *Since I was younger, I could always count on his call to bring a smile to my face, encourage me to do my best, and reassure me that I am loved. As I gotten older, that has never changed and has been such a blessing to me. He taught us all the importance of family, and I believe does his best to stay so strong to make sure that we are always okay and united.* Id. at \*9 (Gaetano DiBenedetto).

12
13
14
15
16

The powerful account of Mr. Amuso's children and grandchildren is also supported by the accounts of many others, who, although they have no stake in the outcome of this application, felt compelled to support the instant application and attest to Mr. Amuso's good character (see Exhibit 13, at \*15-26). For example, the accounts of those who have directly interacted with Mr. Amuso demonstrate his good works and positive relations that he has maintained while imprisoned,

17
18
19
20
21
22

> *More recently in 2022, Mr. Amuso's ninety-eight (98) year old sister, Marie N. Swierkowski, temporarily began being cared for by my eighty (80) year old mother. Needless to say, the "Golden Girls," as I refer to them, require my assistance on many levels. I am often present in my mother's home when Victorio Amuso calls to speak with his sister. Due to Ms. Swierkoski's hearing loss, the calls usually take place while the phone is on speaker mode. This has allowed me to hear promises of prayer exchanged between Mr. Amuso and his sister. Mr. Amuso has spoken to me at times as well. Mr. Amuso's words lead me to believe that Mr. Amuso relies on his Christian faith to get through life behind bars.* Dkt. 1223, Exhibit 13, at \*16 (Concetta Puglisi, Esq.);

23
24
25
26

> *When my father passed away at 45 years old I was 20 years old. My young, widowed mother, three younger sisters and I were thrown into a state of sorrow and uncertainty. The love and friendship that Vic brought us at that difficult time was a Godsend and I will never forget his kindness to my family.* Dkt. 1223, Exhibit 13, at \*20 (Vincent Luccisano)

27
28

> *I had the pleasure and honor of not only meeting Papa Vic but living with him for over a year at FCI Cumberland....I learned that he loves his family dearly and that he has a soft spot for birds and squirrels. While not on lockdown he*

*would feed the animals on a daily basis even if it meant that he would go without. Not only that but he also had a heart for others. If he noticed that someone didn't have much of anything, he would give them whatever they needed. He would go without just so that someone else would have some coffee or food. He would routinely make wraps/burritos and pass them out to others. You could see that is warmed his heart to see others enjoy his cooking. In addition to this he would often talk to me about how I need to get back home and take care of my mom. He would tell me that I didn't need to fool around with drugs and the fast women. He would preach to me about working an honest job and providing for my family. I learned how much he respected the honest and hardworking man that provides for his family. He made me promise him that I would stay away from the drugs and that I would dedicate my life to being a family man. I made that promise and I am keeping that promise.* Dkt. 1223, Exhibit 13, at *21-22 (Tary L. Gilbert).

Notably, the testimony collectively provided by all those who know Mr. Amuso not only captures his maturation and good character but also abundantly documents the unfortunate reality that long terms of imprisonment are a uniquely painful experience for defendants and their families. This has been especially evident in recent years for Mr. Amuso and his family given Mr. Amuso's advanced age, failing health, the loss of many loved ones, and the significant restrictions on inmate movement and visitations imposed since the COVID-19 pandemic.

As best explained by Mr. Amuso's children, Victoria and Robert, the collateral hardships that have accompanied Mr. Amuso's long imprisonment have been overwhelmingly significant,

*My dad has endured so much these past 30+ years within the prison system, upon that, losing my amazing mother-his wife, a number of siblings, cousins, and dear friends. Countless important events-holidays, birthdays, graduations, his grandchildren growing and maturing into fine adults, have been so difficult to experience without him, and I know equally hard for him; since Covid-19 came to be, my family and I have not been able to visit him; numerous restrictions and lockdowns have hindered our visits. You can only imagine how hurtful this is for him, myself, and our family, especially with his advanced age and declining health. He has unfortunately contracted Covid-19 a few times and is currently dealing with other ailments that are compromising his health and ability to do various tasks on his own. Rheumatoid arthritis is deeply affecting his hands, knees, and hip.* Dkt. 1223, Exhibit 13, at *1-2 (Victoria Amuso);

*Graduations, holidays, birthdays, and family gatherings were never the same since I was 13. In fact, I suffered bouts of depression and seclusion, feeling lost and alone, but it was my father who pulled me out of such dark moments.*

> *I can't begin to express how much of an impact his wisdom and advice helped me during those rough times in my life....Besides being away for three plus decades, he has suffered dearly hearing about loved ones who have passed on. The saddest and most tragic of them all- the passing of my mother, his beloved wife. My mother lost her battle to lung cancer in February of 2012, and because she couldn't travel due to intense chemo treatments, my father never got a chance to say goodbye in person. What made it worse was that I had to let him know through a phone call that she had passed. Till this day, I never got over that experience and probably never will. At first glance I thought it was hard for us, but then put myself in my father's shoes hearing that news, and it broke my heart even more so considering where he was. I can't begin to express how devastating that experience was for our entire family.* Dkt. 1223, Exhibit 13, at *4-5 (Robert Amuso).

Likewise, the account of those in direct contact with Mr. Amuso during the past few years reflects the serious medical situation that Mr. Amuso now endures, noting Mr. Amuso's progressively failing health and a rapid decline in his quality of life. For example, Tary L. Gilbert, who was housed with Mr. Amuso in FCI Cumberland in 2022, explains,

> *The pain in his hip and leg started to become unbearable....He was desperate to get some relief from the pain as it had started to keep him up at nights. During this whole time, he was''t even able to walk up to the chow hall to get his own food. The pain was starting to cripple him. I saw him change right before my eyes from a vibrant highly active older gentlemen, to a frail decrepit man. Though, he would never complain or allow for his family to know what kind of pain he was in on a daily basis. It broke my heart to see him suffering like this without any relief or without any of the medical staff caring that he was in so much pain. My eyes are tearing up writing this letter. It was heartbreaking watching him deteriorate right before my eyes. It had gotten to a point where we needed a wheelchair to take him back and forth to his medical appointments. Though, he continued to walk in the unit with great trouble.*

Id. at *21-22 (Tary L. Gilbert); see also id. at *4-5 (Robert Amuso) ("*Currently, he needs assistance walking, and due to his condition, he can no longer send messages on the computer or write a letter home. His cellmate has to push him in a wheelchair each and every day, even assist for a simple phone call.*").

Overall, the Court's granting of compassionate release to Mr. Amuso at this time would not diminish the nature and circumstances of the underlying offenses nor undercut the need for

United States District Court
Eastern District of New York

general/specific deterrence. Specifically, given Mr. Amuso's advanced age and serious medical circumstances, along with his 31-plus years of consecutive imprisonment without incident and that has coincided with many collateral hardships and the COVID-19 pandemic, no reasonable observer would not be deterred from engaging in the same conduct nor consider Mr. Amuo's punishment insignificant. See, e.g., *United States v. Monteleone*, No. 92-CR-351 (ARR), 2023 U.S. Dist. LEXIS 62518 (E.D.N.Y. Apr. 10, 2023) (reducing the defendant's multiple current life sentences for participating in a racketeering conspiracy that included violent objectives (conspiring to murder members of a rival LCN faction) and committing two murders in furtherance thereof, to time served (amounting to a sentence of 30 years of imprisonment, which "*is not insignificant*") based on the defendant's age (83), health conditions, and rehabilitation efforts.); *United States v. McGraw*, Case No. 02-CR-18 (LJM) (SMM), 2019 WL 2059488, at \*5 (S.D. Ind. May 9, 2019) ("Mr. McGraw has been in custody since September 2002 – nearly 17 years. That is a significant sanction"); *United States v. Best*, Case No. 93-CR-216 (MU), 2006 WL 2176980, at \*4 (W.D.N.C. July 31, 2006) (unusually long sentences "*are not always in the best interests of society*").

Moreover, the Court's granting of compassionate release here, notwithstanding the admitted seriousness of the underlying offense conduct, would be consistent with other successful compassionate release applications that presented similar compelling circumstances as Mr. Amuso now presents. See. e.g., *Monteleone*, No. 92-CR-351 (ARR), 2023 U.S. Dist. LEXIS 62518; *Wong Chi Fai*, No. 93 Cr. 1340, 2019 U.S. Dist. LEXIS 126774, 2019 WL 3428504, at \*4 (concluding, "notwithstanding the seriousness of [defendant's] criminal conduct," which include[d] his involvement in certain murders[,]" that the sentence served (twenty-six years of a life sentence) appropriately "reflect[s] the seriousness of the offense," "promote[s] respect for the law" and "provide[s] just punishment for the offense"); *United States v. Underwood*, No. 88 Cr. 822, 2021 U.S. Dist. LEXIS 8378, 2021 WL 3204834, at \*1 (S.D.N.Y. Jan. 15, 2021) (granting compassionate release motion where at least five, brutal murders were committed at defendant's direction); *United States v. Rodriguez*, 2020 WL 5810161, at \*6 (S.D.N.Y. Sept. 30, 2020) (finding that defendant who tortured a government informant to death does not pose a continuing danger in light of "outstanding long-term prison record, lack of any significant disciplinary history, and the numerous letters of support submitted by prison staff, family, and friends, all attesting to [defendant's] reformation"); *United States v. Hunter*, 2020 WL 5748115, at \*3-4 (D.D.C. Sep. 25, 2020) (granting compassionate release and citing defendant's "*correctional treatment, and community engagement*" notwithstanding his "*serious and disturbing*"

prior criminal history including second-degree murder, armed robbery, setting fire to his then-girlfriend's home with her and a minor child inside, and a prison disciplinary record "including violent altercations with other prisoners"); *United States v. Fisher*, 2020 WL 5992340, at *6 (S.D.N.Y. Oct. 9, 2020) (releasing defendant sentenced to life without parole for participating in a large conspiracy that included at least four murders); *United States v. Tidwell*, 476 F. Supp. 3d 66 (E.D. Pa. 2020) (reducing life sentence to time-served after 26 years imprisonment for a defendant convicted of engaging in a continuing criminal enterprise and two counts of murder in furtherance of that enterprise).

Accordingly, the Court's current assessment of the § 3553(a) sentencing factors should militate in favor of granting Mr. Amuso compassionate release based on his advanced age, dire medical circumstances, and rehabilitation.

**V. Comprehensive Proposed Release Plan Demonstrates Community Safety and Dignified Care.**

Should this Honorable Court grant compassionate release, Mr. Amuso has an immediate, robust, and exceptionally compassionate release plan prepared by his devoted family, ensuring his safety, medical well-being, and integration into a supportive community environment. This plan addresses every practical concern and unequivocally demonstrates that Mr. Amuso will be cared for with unparalleled dedication, ensuring he poses no burden or risk to public welfare.

**A. Immediate Retrieval and Transportation:** Mr. Amuso's family has made comprehensive and unwavering plans to immediately facilitate his release. Upon the Court's order, his children, specifically his eldest daughter, are prepared to drive directly to FCI Butner II in Butner, North Carolina, and personally pick Mr. Amuso up from the correctional facility. They will then transport him, with the utmost care, directly back to his pre-arranged residence in Howard Beach, New York. This immediate, family-led retrieval ensures a seamless and compassionate transition from incarceration to community care, removing any logistical burden from the BOP.

**B. Dedicated 24/7 Personal Care:** The cornerstone of Mr. Amuso's release plan is the profound commitment of his eldest daughter. She is willing and prepared to take an immediate, indefinite leave of absence from her current employment to sit home and provide continuous, **24-hour per day, 7-day per week personal care** for her father until his passing. Given Mr. Amuso's complete inability to care for himself, his dependence on others for ambulation, personal hygiene, feeding, and all other activities of daily living, this dedicated, around-the-clock care is not merely beneficial; it is absolutely essential. This extraordinary familial devotion, born of decades of separation and unwavering love, ensures that Mr. Amuso will receive individualized attention far exceeding what any correctional facility, even one with a Care-Level-3 designation, could possibly provide.

**C. Comprehensive Medical Management:** Mr. Amuso's complex and deteriorating medical conditions demand professional, specialized, and timely healthcare. His family has already initiated inquiries to ensure he will have immediate access to comprehensive medical management upon his release. This includes:

- **Primary Care Physician:** Establishing immediate care with a primary care physician in the Howard Beach area to oversee his general health and coordinate specialist referrals.

- **Specialist Referrals:** Prompt consultations with specialists, particularly orthopedists or rheumatologists, to address his severe osteoarthritis of the hips and knees, with the goal of managing his chronic, debilitating pain beyond what prison care has achieved.

- **Medication Management:** Ensuring access to all necessary prescription medications, with family assistance for administration and adherence.

- **Durable Medical Equipment:** Providing all required durable medical equipment, including an appropriate, comfortable wheelchair, and any other mobility aids necessary for his safety and limited comfort.

- **Home Healthcare Services:** Exploring and arranging for in-home nursing or aide services as needed to supplement family care, particularly for skilled medical tasks.

- **Health Insurance and Benefits:** The family will ensure Mr. Amuso is immediately enrolled in or has access to comprehensive health insurance (e.g., Medicare/Medicaid) to cover his ongoing medical expenses.

**D. Stable Housing and Supportive Environment:** Mr. Amuso will reside in a stable, family home in Howard Beach, New York, where he will be surrounded by a loving and supportive environment. This residence will be adapted to his needs, ensuring accessibility and comfort for his wheelchair use and limited mobility. The presence of multiple family members ensures a constant network of emotional, social, and practical support.

**E. Financial Support:** Mr. Amuso will be fully supported financially by his family. His inability to work due to his age and physical condition will not impede his access to necessary care or comfortable living. The family is prepared to bear all financial responsibilities associated with his care, housing, and medical needs. In addition, Mr. Amuso is certainly qualified and eligible for Social Security benefits that would include the financial benefit awarded to those who qualify.

This meticulously detailed plan underscores not only Mr. Amuso's profound need but also the exceptional capacity and unwavering commitment of his family to provide for his every need, ensuring he lives his final days with dignity, compassion, and the highest level of care attainable outside of a carceral setting.

## VI. Conclusion

For the reasons meticulously articulated herein, Vittorio Amuso's motion for compassionate release under **18 U.S.C. § 3582(c)(1)(A)**, as illuminated by the newly effective U.S. Sentencing Guidelines **§ 1B1.13**, must be **GRANTED**. The constellation of extraordinary and compelling reasons presented by his extreme age, his profound and irreversible physical deterioration to the point of complete dependence, the demonstrably inadequate provision of care for his terminal condition within the correctional system, and his unblemished, unprecedented record of rehabilitation spanning over thirty-three (33) years, unequivocally mandates judicial intervention.

A re-evaluation of the **18 U.S.C. § 3553(a)** factors, stripped of antiquated notions of a non-existent criminal landscape, further compels his immediate release. Mr. Amuso, a ninety-year-old man who has lost over 65 pounds in prison, who cannot walk, cannot care for himself, and endures a daily existence defined by pain, agony and total dependence, poses no conceivable danger to the community. His life sentence has exacted its punitive toll for over three (3) decades; any further confinement serves no penological purpose and can only be perceived as cruel and inhuman punishment.

This is not merely a legal petition; it is a plea for fundamental human dignity and compassion. Mr. Amuso is at the absolute end of his life, deteriorating into nothingness within the federal prison system. He does not have the luxury of time, nor the physical capacity, to file another motion. If this Court does not act now, Mr. Amuso will, without a shadow of a doubt, die in prison, separated from the loving family who stands ready to provide him with dedicated, around-the-clock care and the opportunity for a peaceful, dignified passing in the community. This is, quite literally, his last chance.

**WHEREFORE**, for the foregoing reasons, **Defendant VITTORIO AMUSO** respectfully requests that this Honorable Court **GRANT** his motion for compassionate release, reduce his sentence to time-served, and order his immediate release.

**Respectfully Submitted**, this the 29th day of May in the year of the Lord 2025.

By: _____

**Vittorio Amuso**, Pro se

Fed. Reg. No.: 38740-079
FCI Butner II
Post Office Box 1500
Butner, NC 27509-4500

**CERTIFICATE OF SERVICE**

    I swear/affirm/declare/certify that a true and correct copy of the foregoing has been served on the United States Attorney for the Eastern District of New York by the United States Postal Service, First-class service, postage prepaid, return receipt requested on May 29, 2025. The foregoing was served at the following address:

**United States Attorney**
**Eastern District of New York**
**Attention: Joseph Nocella, Jr.**
271 Cadman Plaza East
Brooklyn NY 11201

By: _____

**Vittorio Amuso**, Pro se
Fed. Reg. No.: 38740-079
FCI Butner II
Post Office Box 1500
Butner, NC 27509-4500



**U.S. Department of Justice**

**Federal Bureau of Prisons**

---

**Federal Correctional Complex**
**Butner, North Carolina**

## Staff Memorandum

**Date:** 04/16/2025
**Time:** 08:45A.M.
**From:** A. Long – CST

**Inmate Reg No.:** 38740-079

**Inmate Name:** Amuso, Vitorio

**To Whom This May Concern:**

I/M Amuso is seeking CR or executive clemency. He has requested that I provide him a memo to support his request. Due to the dire condition that I/M Amuso is in, I told him I would write him a memo and if it helps then that is the least I could do for him. I/M Amuso is not receiving the appropriate care that is needed for his condition. He is 90 years old and will never get the treatment he needs in this environment.
I see I/M Amuso regularly. He causes no problems even though he is not receiving the treatment he should. His health is dire and he would be best suited if he were to be released on compassionate release or through executive clemency. If he remains in this prison his health is going to get worse and there is nothing I can do to help him because there is just too many inmates and not enough services.
I/M Amuso meets all the criteria for CR and if I was going to give it to anyone it would be I/M Amuso. He has been in prison for over 30 years and has never had a write-up. He is so kind and considerate. I hate to see him suffer like he is but there is just nothing I can do about it. To whoever is in a position of power and can help this inmate with either CR or clemency I would strongly recommend it or he isn't going to make it much longer.
The prison is overwhelmed and lacks resources. We can't manage our case load and when we have an I/M like Amuso I know the best thing that we could do is just release him so he can get the treatment he needs in society.
The only thing I can do is advocate for I/M Amuso. He says he has family who is willing to help him. He seems to have support. It is my opinion that I/M Amuso be released from the custody of the BOP before his case gets worse in here because he is not going to receive the treatment he deserves here.
I/M Amuso's health is so poor and his body is so frail that I fear for the worst if he has to stay here another couple months. If it is possible to get him immediate release from the President or from the court, I know that is the best thing that could happen. I know he has a life sentence but I have seen many people with life sentences go home with far less wrong with them. I/M Amuso has suffered long enough in this prison and it is only going to get worse. I'm honestly getting choked up writing this memo. If this means anything to the reader, I want to see I/M Amuso released so he can face his fate with dignity.

# United States Senate

**WASHINGTON, DC 20510-3203**

March 3, 2025

Victor Amuso 38740079
P.O. Box 1500
Butner, NC 27509

Dear Mr Amuso,

Thank you for reaching out to my office. I have reviewed the documents you furnished to me and we have also obtained our own records using the authorization form you provided to my office. I am sorry that you have been in custody for so long. It is my hope that we can get you out of there soon. One of the things you asked me was if I would support your release if you applied for executive clemency. Based on your record, I will support your release from custody.

When you have your clemency petition prepared you may enclose a copy of this letter with your request. Since I do not know when you will submit your clemency request, I will provide you my letter of support right now and you can enclose it with your request when you decide to file for the relief. When you decide to file your petition I do wish you the best of luck.

Let this letter serve as a letter of support for inmate Victor Amuso. The office of Chuck E. Schumer has reviewed Mr. Amuso's personal documents as well as the records obtained from the Bureau of Prisons. Having served more than 30 years in the federal prison system and having not had any disciplinary infractions it is my opinion that Mr. Amuso deserves the opportunity to get out of the prison system and reconnect with his family.

I have read the voluminous letters that his family has provided. I have read letters from attorneys who are supporting him in their individual capacity. Mr. Amuso is 90-years old with more than 33 years of clear conduct and a host of successful rehabilitative programs in his central file. I do not believe Victor Amuso poses any danger to the community and that is evidenced by the Bureau of Prisons identifying him as someone who has a low risk of recidivism.

It isn't every day that you find an inmate who has more than 30 years clear conduct. It isn't every day that you find an inmate who has 30 years in custody. It appears Victor Amuso meets both of those criteria. Mr. Amuso has a very strong support system in the community. I have no doubt he will flourish if he is released from custody.

Mr. Amuso has successfully participated in numerous FIRST Step Act programs that are geared towards reducing criminal recidivism. Mr. Amuso's age places him in the lowest category for criminal recidivism. The fact that Mr. Amuso has such a strong support system satisfies any concern that I may have had when considering this request.

Victor Amuso is a resident of New York and has made plans to return to New York upon his discharge from prison. I understand that Mr. Amuso was originally sentenced to a term of life in

prison with no possibility of parole. I believe the political climate towards the prison system was far different at the time the original sentence was imposed. I believe if Mr. Amuso was sentenced today his sentence would be substantially shorter.

In many states – and in many other nations around the world – a life sentence is shorter than the amount of time that Mr. Amuso has been in custody already. For all the important factors that are listed in this letter of recommendation it is my position that Victor Amuso has paid his debt to society and should be released from the custody of the Bureau of Prisons immediately.

I thank you for taking the time to review my letter of support. I trust that the decision to release Victor Amuso from federal custody. Based on all of the evidence and information that exists in Mr. Amuso's central file and his criminal case it is my opinion that the amount of time already served is sufficient to warrant a release from custody.

If Mr. Amuso has not been rehabilitated after 33 years of satisfactory service there is no amount of time that could rehabilitate an offender. I just can't get over the fact that Mr. Amuso has been in federal prison since 1992 without even one disciplinary infraction. At the ripe age of 90-years old, there is nothing more that he can do to prepare himself for a release into society.

Mr. Amuso, I have done what I said I would do. You have my full support in your immediate release from federal custody. You have multiple options to seek redress in this situation. You may either file the executive clemency that you initially stated that you wanted to pursue or you could also file for compassionate release with the U.S. District Court.

Whichever vehicle you pursue you are welcome to enclose or attach a copy of this support letter to your petition for release. I hope this letter helps in any future endeavor you or your legal team may pursue as you fight for your freedom. I thank you for reaching out to my office and I hope that you are reunited with your family in the near future.

Sincerely,

*Charles Schumer*

Charles E. Schumer
United States Senator

**Filer:**
**Vittorio Amuso**, Pro se
    Post Office Box 1500
    Butner, NC 27509-4500
    (305) 900-6545 (Messages Only)

# UNITED STATES DISTRICT COURT

## EASTERM DISTRICT OF NEW YORK

|  |  |
|---|---|
| ) | Case No.: **1:90-cr-00446-FB** |
| ) |  |
| ) |  |
| **UNITED STATES OF AMERICA,** ) | **DECLARATION BY VITTORIO AMUSO** |
| ) | **IN SUPPORT OF MOTION FOR** |
| Plaintiff, ) | **COMPASSIONATE RELEASE** |
| ) |  |
| **vs.** ) |  |
| ) |  |
| ) |  |
| **VITTORIO AMUSO,** ) |  |
| ) |  |
| Defendant. ) |  |
| ) |  |

**To:**   **Honorable Frederic Block**
      **United States District Judge**

**Dear Judge Block:**

    I, **VITTORIO AMUSO**, hereby declare under penalty of perjury, that the following is true and correct to the best of my knowledge and belief:

    I am writing to you today, not as a prisoner, but as a dying man, a father, a grandfather, pleading for a chance to embrace my family before I take my last breath. For over thirty-three consecutive years, I have been incarcerated in the federal prison system, a lifetime that has stripped me of so much. Now, at 90 years of age, I am overwhelmed with emotion and the crushing weight of time's relentless march. My only goal, my only hope, is to walk out of these prison gates and be with my family before I die. This is, quite literally, my last chance.

    When I entered federal custody, I weighed a robust 185 pounds. Today, a harrowing reflection of my terminal decline, I weigh less than 120 pounds. This precipitous and involuntary weight loss reveals a man quite literally wasting away, his body failing under the weight of decades of confinement and the relentless march of age. My health has deteriorated beyond imagination. I have suffered

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

numerous terrifying healthcare scares that have brought me to the brink of death. Now, I am entirely confined to a wheelchair, a permanent state of profound physical impairment that requires me to be ambulated anywhere. I cannot ambulate myself; my days consist of sitting in a wheelchair from 5:30 AM until 9:00 PM every day. I have not felt fresh air on my face in over a year because I simply cannot go outside. My life in prison is one of constant pain and agony. I rely entirely on an inmate companion for the simplest necessities of life – helping me eat my meals, retrieving my meal trays, carrying my commissary back and forth, assisting with showers, making telephone calls, and even writing emails to my beloved family, and anything else that needs to be done. I cannot even make it to a telephone to call my family without assistance. My quality of life in prison is absolutely non-existent.

The Bureau of Prisons (BOP) has designated me as a "*Care-Level-3 inmate*," signifying that my condition is "unstable" and requires "*complex chronic care*". My medical records documented severe arthritis of both my hips in March 2023, and I have made numerous, increasingly frequent calls of distress to BOP staff, pleading for "cortisone shots in my hip and knee" due to "*severe pain*," stating, "*please if there is a God help me with this as I am 90 years old and in severe pain*". Such desperate pleas from a ninety-year-old, wheelchair-bound inmate, indicating persistent, unalleviated agony, unequivocally demonstrate that the care provided, while perhaps existing, is not adequate or timely to prevent severe deterioration or to meaningfully mitigate my suffering. The prison setting is inherently ill-equipped to provide the specialized, long-term, and comprehensive care required by a frail, immobile ninety-year-old suffering from multiple debilitating conditions. The very structure of incarceration, with its lockdowns and bureaucratic hurdles, creates systemic delays and impediments to timely and appropriate medical intervention. I am very sick, Judge, and I am literally on my deathbed. My current situation amounts to cruel and inhuman punishment, as the BOP, despite its efforts, simply cannot provide the holistic, immediate, and compassionate care necessary to prevent further severe deterioration or to offer me a modicum of dignity in my final days. I desperately need to be home, where I can utilize professional healthcare and finally find relief from this constant pain and misery. My life is complete misery.

I have not physically seen my family in more than a decade, and since COVID-19, numerous restrictions and lockdowns have hindered our visits. This separation, particularly now, is an unbearable burden. My children, especially my eldest daughter, have made extraordinary plans. She is willing and prepared to take an immediate, indefinite leave of absence from her current employment to provide continuous, 24-hour per day, 7-day per week personal care for me until my passing. My family has secured healthcare insurance for me, and they are prepared to hire professional healthcare staff to ensure I receive the care I desperately need around the clock. I have a large, incredibly supportive family, and they are all eagerly awaiting my release, ready to welcome me home with open arms. My children will provide all necessary transportation for my medical appointments once I am out of prison. If released, I will enjoy Social Security benefits, ensuring I am not a burden.

I have filed motions for compassionate release before, but I must impress upon you, Judge, that if this court does not grant this motion now, I will most certainly die in prison. There simply isn't enough time left for me to refile another request. I have less than six months to live. All I want is to hold my children, to tell them I love them, and to embrace my grandchildren, even if just once. I yearn to spend my final days surrounded by the family I love and cherish more than anything.

1

2

3

4

5

6

    The U.S. Attorney has repeatedly suggested that I am still the head of the Lucchese crime family. Judge, this is an impossibility. Not only am I unable to care for myself, but I am certainly incapable of operating a criminal organization. I am not affiliated with, nor do I communicate with anyone outside my immediate family. My only familiar relationships are with my adult children and my grandchildren. I can't even jaywalk. The traditional American Mafia, as it existed in the 20th century, has been irrevocably dismantled through decades of relentless and highly successful federal law enforcement efforts. The era of the "mafioso" and "Omertà" died decades ago, succumbing to the might of the United States' judicial system. For over thirty-three years, I have maintained a spotless disciplinary record, without a single infraction, no contraband, no unauthorized communication. The BOP itself has acknowledged my "minimum recidivism risk".

7

8

9

10

11

12

    My prison record, Judge, is impeccable. In over thirty-three years, I have maintained an unblemished institutional record, without a single disciplinary infraction. This astounding record, achieved without any realistic hope of release for most of my confinement, stands as irrefutable proof that I have utilized my time in custody to better myself and to fully rehabilitate. I have completed numerous FIRST Step Act courses and classes. I have completed the Challenge program and RDAP in the penitentiary. I've never had a fight or assault since coming to prison. I carry myself with pride and dignity in prison. I am not the same man who came to prison in 1992. I have changed and rehabilitated myself fully. I have absolutely no desire, nor the physical capacity, to participate in criminality.

13

14

15

16

    My greatest wish, Judge, is for the same opportunity afforded to so many other prisoners: the chance to go home to die. That is all I am asking. I want to die with my family, not on a cold bed in a federal hospital, which is where I will surely be very soon. I am already wheelchair-bound, but I will be bedridden within three months, needing help with everything, even brushing my teeth. I desperately need to be home, where I can utilize professional healthcare and finally find relief from this constant pain and misery. My life is complete misery. I pray this court grants my motion and allows me to go home to die.

17

18

    Please, Judge, consider me not as a case number, but as a dying man, a father, a grandfather, who yearns for the embrace of his loved ones in his final moments.

19

I declare under penalty of perjury that the foregoing is true and correct.

20

21

**Respectfully Submitted**, this the 29th day of May in the year of the Lord 2025.

22

23

24

By: _____

25

**Vittorio Amuso**, Pro se

26

Fed. Reg. No.: 38740-079

FCI Butner II

27

Post Office Box 1500

Butner, NC  27509-4500

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Eastern District of New York

**CERTIFICATE OF SERVICE**

I swear/affirm/declare/certify that a true and correct copy of the foregoing has been served on the United States Attorney for the Eastern District of New York by the United States Postal Service, First-class service, postage prepaid, return receipt requested on May 29, 2025. The foregoing was served at the following address:

**United States Attorney**
**Eastern District of New York**
**Attention: Joseph Nocella, Jr.**
271 Cadman Plaza East
Brooklyn NY 11201

By: _____
**Vittorio Amuso**, Pro se
Fed. Reg. No.: 38740-079
FCI Butner II
Post Office Box 1500
Butner, NC 27509-4500

*USA v. Amuso*, **1:90-cr-00446-FB**                    Page **4** of **4**

**Filer:**
**Randy Dewayne Pittman**
Post Office Box 610842
San Jose, CA 95161-0842
(305) 900-6545
randy@randypittman.com

# UNITED STATES DISTRICT COURT
# EASTERM DISTRICT OF NEW YORK

|  |  |
|---|---|
| ) | **Case No.:  1:90-cr-00446-FB** |
| ) |  |
| ) |  |
| **UNITED STATES OF AMERICA,** ) | **DECLARATION BY VITTORIO AMUSO** |
| ) | **IN SUPPORT OF MOTION FOR** |
| Plaintiff, ) | **COMPASSIONATE RELEASE** |
| ) |  |
| **vs.** ) |  |
| ) |  |
| ) |  |
| **VITTORIO AMUSO,** ) |  |
| ) |  |
| Defendant. ) |  |

To: **Honorable Frederic Block**
    **United States District Judge**

**Dear Judge Block:**

I, **RANDY DEWAYNE PITTMAN**, hereby declare under penalty of perjury, that the following is true and correct to the best of my knowledge and belief:

I am writing this Declaration to support the instant motion for compassionate release that is filed by Mr. Vittorio Amuso in the Eastern District of New York. Everything I am writing in this Declaration is based on my own personal experience and if asked I could competently testify to the same. This Declaration is based on my knowledge and belief of the subject matter of this Declaration.

I was in prison with Mr. Amuso. The two of us were at FCI Butner II together in North Carolina. I did not meet people in prison that I became socially acquainted with. I actually went out of my way to avoid meeting people in the prison system because I wanted no memories of that place, once I left.

As fate would have it, I did end up meeting Mr. Amuso. I have to say that to have been in prison for as long as he was in prison, he had a remarkably good spirit. He and I shared hours and hours of conversations. He is one of only three (3) people I met in the prison system that I consider a "friend." My relationship with Mr. Amuso is a friendship that I will cherish for the rest of my life.

Your Honor, Mr. Amuso is serving a life sentence, as you know. I clearly didn't know Mr. Amuso when he was sentenced to life in 1992. I don't know anything about the Mr. Amuso who was sentenced in 1992. What I am going to provide you is a vivid description of the Vittorio Amuso that I met in 2022 and grew to love as if he was my own brother.

Vittorio Amuso is the most loving, caring and generous man I've ever met in my life. He is allegedly this New York mobster. Maybe at some point in his life that was who he was but I want to take you into the world where Vittorio Amuso lives today.

Mr. Amuso would give a complete stranger the shirt off his back. When I first arrived to FCI Butner II, I came into the housing unit with absolutely nothing. There is no going to the commissary building when you first get there. You have to wait until your housing unit is called to commissary before you can go shopping. So, that means you are at the mercy of the prison. You have nothing. You have no hygiene items. You have no food. You have only the "uniforms" that the prison issues. You have nothing to make you "comfortable."

When I arrived at the prison, Mr. Amuso was sitting in his wheelchair beside the stairs. He was waiting on a telephone to open up so he could call his family. As I walked by him, he asked me my name and I told him. He asked me to push him to the cell where he was assigned. I pushed his wheelchair to cell number 114. He asked me to reach up and take down a laundry bag from a hook on his wall. I took down the laundry bag and handed it to him. I had no idea what Mr. Amuso was planning.

Within minutes, he had taken probably $50 worth of hygiene and food items out of his locker. He then said: "We're about the same size. What size shoes do you wear?" I told him I wear a size nine. He said: "Good…me too." He told me to look under his bed and grab a cardboard box that he had under his bed. I pulled the box out from under his bed and he said: "There's a pair of new Under Armor shoes in there that you can have." He then lifted up the mattress on his bed and handed me a pair of shorts, two T-shirts and a pair of sweat pants and shirt.

I told Mr. Amuso that he didn't owe me anything and I didn't need his stuff. He told me it wasn't up to me because I didn't ask for it either. He said: "You're a good kid and I've heard good things about you. You are friends with my friend Genie (referring to Mr. Gene Gotti). I questioned how he knew I knew Gene Gotti and he told me that the prison system is a small world. I agreed.

Your Honor, I was with Mr. Amuso for a couple of years before I discharged from the prison. I continue to stay in touch with Mr. Amuso as much as I can. He is one of the best men I've ever

known in my life. He is humble. He is caring. He is considerate. He is a real jewel if I'm being honest with you.

I don't know who Mr. Amuso was before he came to prison. But, what I can tell you is that he is not the same person who was sentenced to a life sentence. Judge, I want to share some stories with you about Mr. Amuso. He is the most selfless person I've ever met. During the holiday season, Mr. Amuso will buy enough food to feed everyone in the housing unit who doesn't have community support. He buys all the food and then he also pays someone to cook for him because he is so frail he can't do much.

Your Honor, Mr. Amuso is not lying to you when he says he weighs less than 120lbs. It kills me to see him in the condition he is in because I've seen his pictures and he was once a good-looking healthy man. Now, he is losing weight almost by the day. I know he doesn't have long to live. After I left the prison where Mr. Amuso was housed, I would have my girlfriend get on the BOP website almost every day and I'd have her to get on the Inmate Locator and look up Mr. Amuso's register number.

I had to do this because I couldn't sleep if I didn't know he was okay. I had her check his register number every day because I was so fearful that I was going to be in prison when he died. I prayed every day that I got out of prison so I could hear his voice just once more before he died. I know that sounds like a selfish act but I done it because I love Vittorio Amuso like he is my own brother.

It isn't every day that you meet a good person in this world. As a matter-of-fact, I'm forty-four (44) year-old and I've still never met anyone I cherish more than Vittorio Amuso. He is a one-of-a kind. You are never going to find a man who is more humble and more kind.

What I feel like you should know about Mr. Amuso is how he loves his family. Your Honor, I can see through the weeds when someone isn't authentic. I have a great sense when it comes to judging someone's character. I watched Mr. Amuso for days...then weeks...then months. I watched as he moved about and I watched how he interacted with others. Mr. Amuso is the same man no matter who he is talking to. I want to tell you what was the most interesting thing about Mr. Amuso to me.

Judge, the only time Vittorio Amuso comes out of his cell is when he is going to the telephone or to the shower. He doesn't socialize with people because he simply doesn't have the stamina to associate with others. He is always so tired and weak that he just sits in that wheelchair in his cell reading a book. I'll tell you what you're going to see if you see Mr. Amuso in his cell. He is wearing a grey beanie on his head and he is wearing these grey cloth gloves. He is going to be wearing two pairs of sweats and he is also going to have on a jacket. He'll be dressed just like that and he'll be sitting there reading a book.

When Mr. Amuso goes to the telephone that is the happiest you'll ever see that man. He absolutely adores his children and grandchildren. You couldn't slap the smile off that man's face when

he is talking to his family. He absolutely adores them. This is what I want you to know the most about Vittorio Amuso.

Your Honor, Mr. Amuso is very ill. He knows his days are numbered and they are counting down quickly. Many of our conversations surrounded his last compassionate release motion. He would often-times ask me: "Do you think they'll ever let me out of here?" I would tell him exactly how I felt. I said: "Vic, if anyone in the judiciary could see the man I know, you'd have been out of here a long time ago." I didn't say this to flatter him or to try and garner favor with him. I said what I said because it is the God's-honest truth. If you could see and know the Vittorio Amuso that I grew to know, you would have long-since let him out of prison.

But, I want to tell you the most wonderful thing I learned about Mr. Amuso. As sick as he is and as down and out as he is, he doesn't feel sorry for himself. He reminds me a lot of myself in this regard. Even though he has been dealt a really poor hand, he still doesn't let it get him down.

When Mr. Amuso and I would talk, I'd sometimes ask him if his family comes to see him. The response I got was jaw-dropping. I honestly couldn't believe what I heard. It shocked me so much that I had to ask him to repeat himself just to make sure I heard him correctly.

As you know, Mr. Amuso is very sickly. He can't walk. He can barely see because of the health scare that he went through his sight is almost gone now. When he responded to my inquiry, he said: "No, I don't let them come visit me." I said: "But Vic, that is your family and you absolutely love them. You're always smiling when you get off the phone with them so why wouldn't you let them come visit youo?"

Mr. Amuso told me this: "Young Fella, I don't let them come see me because I don't want to hurt them. They don't know that I'm dying. They know I'm old but they don't know that I'm dying. They don't know that I've lost sixty pounds. They don't know I can't see. They don't know I can't walk. They don't know a lot of the things about my health and I don't tell them because I don't want them to worry about me. I'll die one day and that'll be it."

Judge, you see, Mr. Amuso is at rock bottom. He is literally months from death. He knows this and he has accepted as much. But, even though he is at rock bottom and seeing his family would probably let him die a happy man, he chooses to keep living how he has been living and not seeing his family because he cares about them and their feelings more than he does his own. Judge, that's a real man. That's someone who I want to be friends with because I know where his heart is.

When Vittorio Amuso is at the end, he still finds joy and peace in life. He stays true to his Jewish faith and he has a very close relationship with God. We often talked about our religious faiths because we are both Jewish. I learned so much from that man and that is why I want to write you and beg you to do him one favor before he passes.

Your Honor, Vittorio Amuso is no danger to anyone. He literally can't shower himself. He can't use a telephone without someone else dialing the number for him because he can't see. He is

confined to a wheelchair for the rest of his life. He'll never walk again. He'll never do a lot of things again but one thing I know that he'll never do and that is break a law.

I'm going to tell you a very ironic story. I first met Gene Gotti in 2013. He and I became very good friends as well. Before I left Mr. Gotti, he give me some advice. He told me this: "Pitt, just get out of prison and do the right thing. There is nothing in crime but this. You don't belong in prison. You're far too smart to be here and you have so many talents that you can do anything out there. Just get out and stay out. Do the right thing and get out and spend time with your family. Don't mess up and end up in this place again because this isn't where its at."

Your Honor, I never shared that conversation with anyone. But, when I was having a conversation with Mr. Amuso, I swear to God, I had chills up and down my body. His exact words where: "Pitt, you're getting out of here pretty soon. You don't have a lot of time. So, when you get out just do me a favor. Will you do that for me?" I answered him by saying I'd do anything for him. He then said: "Well, if that's the truth, here is what I want you to do for me. When you get out of prison, just go find your mother and give her a hug. Tell her you love her. Find your son and give him a hut. Tell him you love him. Once you've got your life settled and you're doing good, I want you to do one last thing. Just do the right thing. Don't come back to this place because this is place is not for you. You're too smart to be in prison. Just get out and do the right thing. I don't care if you have to work at McDonalds or Walmart, please just humble yourself and do a job that is beneath you if it means you're free."

After he spoke, I told him about the conversation that I had with Gene Gotti. I said: "Why did you say that? Why do you care so much?" He said: "Pitt, I lost my mother since I came to prison. I lost my wife since I came to prison. I've lost almost everyone since I came to prison. You will never know what I would give to be able to hug my mother's neck one more time and just tell her I love her. You have no idea what I'd give to just be able to walk on Howard Beach with my wife just one more time. These people took that away from me and that is my only regret in life. If I can guide just one person in the right direction and keep them out of prison, I guess this life sentence will be worth it."

Judge, Vittorio Amuso is a remarkable man. He is not a violent gangster that the world talks about on Wikipedia. He is a decent man. He is a spiritual man. He is a kind-hearted man. He isn't a troublemaker. Judge, this man has spent more than 33 years in a prison and has never been written up even once. That is truly unheard of.

Your Honor, I don't know you. I don't know if you're a God-fearing man or if you think you're God. Many judges actually have a god complex so I'm just speaking honestly for a moment. If you're a God-fearing man, I ask that you pray about this. I want to put your mind at ease and assure you that setting Vittorio Amuso free would be something that brings you positive energy for the rest of your life. Vittorio Amuso is not going to do wrong if you let him out of prison. He is going to return to New York with his family and he is going to cherish every second he gets to spend with them. All he wants

is to be able to hug his children and their children. Please don't take that from him. Please don't take that from them.

I know you've read the letters that his family submitted. Those people are not criminals. Those people are hard-working people who are victims of happenstance. Their family has been duly punished since 1992. Your Honor, you are charged with interpreting the law and enforcing the laws that Congress enacts. They say that you are supposed to impose a punishment that adequately deters future crime, promotes respect for the law but is not too harsh. Vittorio Amuso has been justly punished. He has lost his entire life. He has probably two to three months left on this earth before he'll take his final breath.

I'm begging you Judge Block. Let Mr. Amuso hold his children onc time before he takes his final breath. Let me travel to New York and visit with my friend before he died. I swear to God if you let him out of prison, I'll be on the first flight that I can get on to New York to come visit with him because I know if he gets out it is going to be because of me and this Declaration I'm submitting on his behalf.

Judge Block, I've never written anything like this for anyone. I've never cared that much for anyone else. I'd never stick my neck out there for someone because people are notorious for letting us down. But, I have absolutely no doubt in my mind that Vittorio Amuso is going to do the right thing and he is going to get out and spend the rest of his days walking on Howard Beach and spending every minute with his family. I just want to fly to New York and give that man the biggest hug in the world and tell him that I didn't forget about him.

The last thing I'm going to share with you is a comment that Mr. Amuso once shared with me and I'll hold this quote near to my heart for the rest of my life. He said: "An open foe may prove a curse, but a pretend friend is even worse." Judge, Vittorio Amuso has paid a steep price for the mistakes he made in the 80's and early 90's. Please find it in yourself to set this man free so he can spend his last few days on this earth with his family. I genuinely believe that is a fair and reasonable request.

I'll make you one last offer to show you how confident I am in Mr. Amuso. If you want some security I'll do this to compensate for any mistake that he may make while he is out. If you let Mr. Amuso out to spend his last few months with his family, I'll gladly report to prison in his absence. Should Mr. Amuso do anything to violate the conditions of his release, I'll gladly serve the sentence for the mistake he makes. I'll sit in prison until he passes then once he has passed away, I'll be free.

I hate prison more than you'll ever know but it is worth it to me to sit in there for a few more months so that he can see and hug his family once more. I make that offer because I know without any doubt that Mr. Amuso would do the same for me. If you want to take me up on that offer, you just send me a notice and tell me which prison to report to and I'll be there when you say to show up. If you want me to come to New York and sit in your holding cell every single day while you're at work and Mr. Amuso is with his children, I'll do that as well. I'm really willing to give up my liberty so that

this man can enjoy the remainder of his life with his family because I know how much he genuinely loves and cares about them.

I thank you for your time, understanding and cooperation. I trust that you grand Mr. Amuso's request for compassionate release and set him free so he can live his last few days in the company of those who love him. I pray this finds you in good health and fine spirits. If you should have any questions, do not hesitate to reach out to me and I'll gladly answer any question you may have.

**Rrespectfully Submitted**, this the 29th day of May in the year of the Lord 2025.

By: _____

**Randy D. Pittman**
Post Office Box 610842
San Jose, CA 95161
(305) 900-6545
randy@randypittman.com

## CERTIFICATE OF SERVICE

I swear/affirm/declare/certify that a true and correct copy of the foregoing has been served on the United States Attorney for the Eastern District of New York by the United States Postal Service, First-class service, postage prepaid, return receipt requested on May 29, 2025. The foregoing was served at the following address:

**United States Attorney**
**Eastern District of New York**
**Attention: Joseph Nocella, Jr.**
271 Cadman Plaza East
Brooklyn NY 11201

By: _____

**Randy D. Pittman**
Post Office Box 610842
San Jose, CA 95161
(305) 900-6545
randy@randypittman.com

Filer:
**Randy Dewayne Pittman**
Post Office Box 610842
San Jose, CA  95161-0842
(305) 900-6545
randy@randypittman.com

# UNITED STATES DISTRICT COURT
# EASTERM DISTRICT OF NEW YORK

|  |  |
|---|---|
| ) | Case No.:  **1:90-cr-00446-FB** |
| ) | |
| ) | |
| **UNITED STATES OF AMERICA,** ) | **DECLARATION BY RANDY DEWAYNE** |
| ) | **PITTMAN IN SUPPORT OF VITTORIO** |
| Plaintiff, ) | **AMUSO'S MOTION FOR** |
| ) | **COMPASSIONATE RELEASE** |
| **vs.** ) | |
| ) | |
| ) | |
| **VITTORIO AMUSO,** ) | |
| ) | |
| Defendant. ) | |

To:  **Honorable Frederic Block**
     **United States District Judge**

Dear Judge Block:

I, **RANDY DEWAYNE PITTMAN**, hereby declare under penalty of perjury, that the following is true and correct to the best of my knowledge and belief:

I am writing this Declaration to support the instant motion for compassionate release that is filed by Mr. Vittorio Amuso in the Eastern District of New York.  Everything I am writing in this Declaration is based on my own personal experience and if asked I could competently testify to the same.  This Declaration is based on my knowledge and belief of the subject matter of this Declaration.

I was in prison with Mr. Amuso.  The two of us were at FCI Butner II together in North Carolina. I did not meet people in prison that I became socially acquainted with.  I actually went out of my way to avoid meeting people in the prison system because I wanted no memories of that place, once I left.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

As fate would have it, I did end up meeting Mr. Amuso. I have to say that to have been in prison for as long as he was in prison, he had a remarkably good spirit. He and I shared hours and hours of conversations. He is one of only three (3) people I met in the prison system that I consider a "friend." My relationship with Mr. Amuso is a friendship that I will cherish for the rest of my life.

Your Honor, Mr. Amuso is serving a life sentence, as you know. I clearly didn't know Mr. Amuso when he was sentenced to life in 1992. I don't know anything about the Mr. Amuso who was sentenced in 1992. What I am going to provide you is a vivid description of the Vittorio Amuso that I met in 2022 and grew to love as if he was my own brother.

Vittorio Amuso is the most loving, caring and generous man I've ever met in my life. He is allegedly this New York mobster. Maybe at some point in his life that was who he was but I want to take you into the world where Vittorio Amuso lives today.

Mr. Amuso would give a complete stranger the shirt off his back. When I first arrived to FCI Butner II, I came into the housing unit with absolutely nothing. There is no going to the commissary building when you first get there. You have to wait until your housing unit is called to commissary before you can go shopping. So, that means you are at the mercy of the prison. You have nothing. You have no hygiene items. You have no food. You have only the "uniforms" that the prison issues. You have nothing to make you "comfortable."

When I arrived at the prison, Mr. Amuso was sitting in his wheelchair beside the stairs. He was waiting on a telephone to open up so he could call his family. As I walked by him, he asked me my name and I told him. He asked me to push him to the cell where he was assigned. I pushed his wheelchair to cell number 114. He asked me to reach up and take down a laundry bag from a hook on his wall. I took down the laundry bag and handed it to him. I had no idea what Mr. Amuso was planning.

Within minutes, he had taken probably $50 worth of hygiene and food items out of his locker. He then said: "We're about the same size. What size shoes do you wear?" I told him I wear a size nine. He said: "Good...me too." He told me to look under his bed and grab a cardboard box that he had under his bed. I pulled the box out from under his bed and he said: "There's a pair of new Under Armor shoes in there that you can have." He then lifted up the mattress on his bed and handed me a pair of shorts, two T-shirts and a pair of sweat pants and shirt.

I told Mr. Amuso that he didn't owe me anything and I didn't need his stuff. He told me it wasn't up to me because I didn't ask for it either. He said: "You're a good kid and I've heard good things about you. You are friends with my friend Genie (referring to Mr. Gene Gotti). I questioned how he knew I knew Gene Gotti and he told me that the prison system is a small world. I agreed.

Your Honor, I was with Mr. Amuso for a couple of years before I discharged from the prison. I continue to stay in touch with Mr. Amuso as much as I can. He is one of the best men I've ever

known in my life. He is humble. He is caring. He is considerate. He is a real jewel if I'm being honest with you.

I don't know who Mr. Amuso was before he came to prison. But, what I can tell you is that he is not the same person who was sentenced to a life sentence. Judge, I want to share some stories with you about Mr. Amuso. He is the most selfless person I've ever met. During the holiday season, Mr. Amuso will buy enough food to feed everyone in the housing unit who doesn't have community support. He buys all the food and then he also pays someone to cook for him because he is so frail he can't do much.

Your Honor, Mr. Amuso is not lying to you when he says he weighs less than 120lbs. It kills me to see him in the condition he is in because I've seen his pictures and he was once a good-looking healthy man. Now, he is losing weight almost by the day. I know he doesn't have long to live. After I left the prison where Mr. Amuso was housed, I would have my girlfriend get on the BOP website almost every day and I'd have her to get on the Inmate Locator and look up Mr. Amuso's register number.

I had to do this because I couldn't sleep if I didn't know he was okay. I had her check his register number every day because I was so fearful that I was going to be in prison when he died. I prayed every day that I got out of prison so I could hear his voice just once more before he died. I know that sounds like a selfish act but I done it because I love Vittorio Amuso like he is my own brother.

It isn't every day that you meet a good person in this world. As a matter-of-fact, I'm forty-four (44) year-old and I've still never met anyone I cherish more than Vittorio Amuso. He is a one-of-a kind. You are never going to find a man who is more humble and more kind.

What I feel like you should know about Mr. Amuso is how he loves his family. Your Honor, I can see through the weeds when someone isn't authentic. I have a great sense when it comes to judging someone's character. I watched Mr. Amuso for days…then weeks…then months. I watched as he moved about and I watched how he interacted with others. Mr. Amuso is the same man no matter who he is talking to. I want to tell you what was the most interesting thing about Mr. Amuso to me.

Judge, the only time Vittorio Amuso comes out of his cell is when he is going to the telephone or to the shower. He doesn't socialize with people because he simply doesn't have the stamina to associate with others. He is always so tired and weak that he just sits in that wheelchair in his cell reading a book. I'll tell you what you're going to see if you see Mr. Amuso in his cell. He is wearing a grey beanie on his head and he is wearing these grey cloth gloves. He is going to be wearing two pairs of sweats and he is also going to have on a jacket. He'll be dressed just like that and he'll be sitting there reading a book.

When Mr. Amuso goes to the telephone that is the happiest you'll ever see that man. He absolutely adores his children and grandchildren. You couldn't slap the smile off that man's face when

he is talking to his family. He absolutely adores them. This is what I want you to know the most about Vittorio Amuso.

Your Honor, Mr. Amuso is very ill. He knows his days are numbered and they are counting down quickly. Many of our conversations surrounded his last compassionate release motion. He would often-times ask me: "Do you think they'll ever let me out of here?" I would tell him exactly how I felt. I said: "Vic, if anyone in the judiciary could see the man I know, you'd have been out of here a long time ago." I didn't say this to flatter him or to try and garner favor with him. I said what I said because it is the God's-honest truth. If you could see and know the Vittorio Amuso that I grew to know, you would have long-since let him out of prison.

But, I want to tell you the most wonderful thing I learned about Mr. Amuso. As sick as he is and as down and out as he is, he doesn't feel sorry for himself. He reminds me a lot of myself in this regard. Even though he has been dealt a really poor hand, he still doesn't let it get him down.

When Mr. Amuso and I would talk, I'd sometimes ask him if his family comes to see him. The response I got was jaw-dropping. I honestly couldn't believe what I heard. It shocked me so much that I had to ask him to repeat himself just to make sure I heard him correctly.

As you know, Mr. Amuso is very sickly. He can't walk. He can barely see because of the health scare that he went through his sight is almost gone now. When he responded to my inquiry, he said: "No, I don't let them come visit me." I said: "But Vic, that is your family and you absolutely love them. You're always smiling when you get off the phone with them so why wouldn't you let them come visit youo?"

Mr. Amuso told me this: "Young Fella, I don't let them come see me because I don't want to hurt them. They don't know that I'm dying. They know I'm old but they don't know that I'm dying. They don't know that I've lost sixty pounds. They don't know I can't see. They don't know I can't walk. They don't know a lot of the things about my health and I don't tell them because I don't want them to worry about me. I'll die one day and that'll be it."

Judge, you see, Mr. Amuso is at rock bottom. He is literally months from death. He knows this and he has accepted as much. But, even though he is at rock bottom and seeing his family would probably let him die a happy man, he chooses to keep living how he has been living and not seeing his family because he cares about them and their feelings more than he does his own. Judge, that's a real man. That's someone who I want to be friends with because I know where his heart is.

When Vittorio Amuso is at the end, he still finds joy and peace in life. He stays true to his Jewish faith and he has a very close relationship with God. We often talked about our religious faiths because we are both Jewish. I learned so much from that man and that is why I want to write you and beg you to do him one favor before he passes.

Your Honor, Vittorio Amuso is no danger to anyone. He literally can't shower himself. He can't use a telephone without someone else dialing the number for him because he can't see. He is

confined to a wheelchair for the rest of his life. He'll never walk again. He'll never do a lot of things again but one thing I know that he'll never do and that is break a law.

I'm going to tell you a very ironic story. I first met Gene Gotti in 2013. He and I became very good friends as well. Before I left Mr. Gotti, he give me some advice. He told me this: "Pitt, just get out of prison and do the right thing. There is nothing in crime but this. You don't belong in prison. You're far too smart to be here and you have so many talents that you can do anything out there. Just get out and stay out. Do the right thing and get out and spend time with your family. Don't mess up and end up in this place again because this isn't where its at."

Your Honor, I never shared that conversation with anyone. But, when I was having a conversation with Mr. Amuso, I swear to God, I had chills up and down my body. His exact words where: "Pitt, you're getting out of here pretty soon. You don't have a lot of time. So, when you get out just do me a favor. Will you do that for me?" I answered him by saying I'd do anything for him. He then said: "Well, if that's the truth, here is what I want you to do for me. When you get out of prison, just go find your mother and give her a hug. Tell her you love her. Find your son and give him a hut. Tell him you love him. Once you've got your life settled and you're doing good, I want you to do one last thing. Just do the right thing. Don't come back to this place because this is place is not for you. You're too smart to be in prison. Just get out and do the right thing. I don't care if you have to work at McDonalds or Walmart, please just humble yourself and do a job that is beneath you if it means you're free."

After he spoke, I told him about the conversation that I had with Gene Gotti. I said: "Why did you say that? Why do you care so much?" He said: "Pitt, I lost my mother since I came to prison. I lost my wife since I came to prison. I've lost almost everyone since I came to prison. You will never know what I would give to be able to hug my mother's neck one more time and just tell her I love her. You have no idea what I'd give to just be able to walk on Howard Beach with my wife just one more time. These people took that away from me and that is my only regret in life. If I can guide just one person in the right direction and keep them out of prison, I guess this life sentence will be worth it."

Judge, Vittorio Amuso is a remarkable man. He is not a violent gangster that the world talks about on Wikipedia. He is a decent man. He is a spiritual man. He is a kind-hearted man. He isn't a troublemaker. Judge, this man has spent more than 33 years in a prison and has never been written up even once. That is truly unheard of.

Your Honor, I don't know you. I don't know if you're a God-fearing man or if you think you're God. Many judges actually have a god complex so I'm just speaking honestly for a moment. If you're a God-fearing man, I ask that you pray about this. I want to put your mind at ease and assure you that setting Vittorio Amuso free would be something that brings you positive energy for the rest of your life. Vittorio Amuso is not going to do wrong if you let him out of prison. He is going to return to New York with his family and he is going to cherish every second he gets to spend with them. All he wants

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

is to be able to hug his children and their children. Please don't take that from him. Please don't take that from them.

I know you've read the letters that his family submitted. Those people are not criminals. Those people are hard-working people who are victims of happenstance. Their family has been duly punished since 1992. Your Honor, you are charged with interpreting the law and enforcing the laws that Congress enacts. They say that you are supposed to impose a punishment that adequately deters future crime, promotes respect for the law but is not too harsh. Vittorio Amuso has been justly punished. He has lost his entire life. He has probably two to three months left on this earth before he'll take his final breath.

I'm begging you Judge Block. Let Mr. Amuso hold his children onc time before he takes his final breath. Let me travel to New York and visit with my friend before he died. I swear to God if you let him out of prison, I'll be on the first flight that I can get on to New York to come visit with him because I know if he gets out it is going to be because of me and this Declaration I'm submitting on his behalf.

Judge Block, I've never written anything like this for anyone. I've never cared that much for anyone else. I'd never stick my neck out there for someone because people are notorious for letting us down. But, I have absolutely no doubt in my mind that Vittorio Amuso is going to do the right thing and he is going to get out and spend the rest of his days walking on Howard Beach and spending every minute with his family. I just want to fly to New York and give that man the biggest hug in the world and tell him that I didn't forget about him.

The last thing I'm going to share with you is a comment that Mr. Amuso once shared with me and I'll hold this quote near to my heart for the rest of my life. He said: "An open foe may prove a curse, but a pretend friend is even worse." Judge, Vittorio Amuso has paid a steep price for the mistakes he made in the 80's and early 90's. Please find it in yourself to set this man free so he can spend his last few days on this earth with his family. I genuinely believe that is a fair and reasonable request.

I'll make you one last offer to show you how confident I am in Mr. Amuso. If you want some security I'll do this to compensate for any mistake that he may make while he is out. If you let Mr. Amuso out to spend his last few months with his family, I'll gladly report to prison in his absence. Should Mr. Amuso do anything to violate the conditions of his release, I'll gladly serve the sentence for the mistake he makes. I'll sit in prison until he passes then once he has passed away, I'll be free.

I hate prison more than you'll ever know but it is worth it to me to sit in there for a few more months so that he can see and hug his family once more. I make that offer because I know without any doubt that Mr. Amuso would do the same for me. If you want to take me up on that offer, you just send me a notice and tell me which prison to report to and I'll be there when you say to show up. If you want me to come to New York and sit in your holding cell every single day while you're at work and Mr. Amuso is with his children, I'll do that as well. I'm really willing to give up my liberty so that

this man can enjoy the remainder of his life with his family because I know how much he genuinely loves and cares about them.

I thank you for your time, understanding and cooperation. I trust that you grand Mr. Amuso's request for compassionate release and set him free so he can live his last few days in the company of those who love him. I pray this finds you in good health and fine spirits. If you should have any questions, do not hesitate to reach out to me and I'll gladly answer any question you may have.

**Rrespectfully Submitted**, this the 29th day of May in the year of the Lord 2025.

By: _____

**Randy D. Pittman**
Post Office Box 610842
San Jose, CA 95161
(305) 900-6545
randy@randypittman.com

### CERTIFICATE OF SERVICE

I swear/affirm/declare/certify that a true and correct copy of the foregoing has been served on the United States Attorney for the Eastern District of New York by the United States Postal Service, First-class service, postage prepaid, return receipt requested on May 29, 2025. The foregoing was served at the following address:

**United States Attorney**
**Eastern District of New York**
**Attention: Joseph Nocella, Jr.**
271 Cadman Plaza East
Brooklyn NY 11201

By: _____

**Randy D. Pittman**
Post Office Box 610842
San Jose, CA 95161
(305) 900-6545
randy@randypittman.com



To: Judge Frederic Block

Please let
Vic Out!

By:
Randy Pittman

United States District Court for
the New York Eastern District
225 Cadman Plaza East
Brooklyn, NY 11201

CERTIFIED MAIL®



7021 0950 0002 0405 6863



Spiral Galaxy NGC 628

USA 10.10



FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JUN 03 2025 ★

BROOKLYN OFFICE

Vittorio Amuso
Fed. Reg. No.: 38740-079
FCI Butner II
Post Office Box 1500
Butner, NC 27509-4500

 **UNITED STATES POSTAL SERVICE** ® | **PRIORITY** ® **MAIL**

Vittorio Amuso
Fed. REG. No.: 38740-079
FCI BUTNER II
Post Office Box 1500
Butner, NC 27509-4500



BROOKLYN OFFICE

United States District Court for
the New York Eastern District
225 Cadman Plaza East
Brooklyn, NY 11201



**USPS TRACKING #**

9114 9999 4431 4649 2756 73

Label 400  Jan. 2013
7690-16-000-7848

- Expected delivery date specified for domestic u
- Domestic shipments include $100 of insurance (
- USPS Tracking® service included for domestic a
- Limited international insurance.**
- When used internationally, a customs declaration

*Insurance does not cover certain items. For details regarding
Domestic Mail Manual at http://pe.usps.com.

** See International Mail Manual at http://pe.usps.com for availability and limitations of coverage.

**FLAT RATE ENVELOPE**
ONE RATE ■ ANY WEIGHT

To schedule free Package Pickup,
scan the QR code.

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JUN 03 2025 ★

BROOKLYN OFFICE

USPS.COM/PICKUP

**TRACKED ■ INSURED**

PS00001000014

EP14F October 2023
OD: 12 1/2 x 9 1/2


how2recycle.info

PAPER
POUCH

This package is made from post-consumer waste. Please recycle – again.

This is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® and Priority Mail International® shipments. Misuses may be a violation of federal law. This package is not for resale. EP14F © U.S. Postal Service; October 2023; All rights reserved.

USA 10.10