THE LAW OFFICES OF

# ANTHONY DIPIETRO, P.C.

15 CHESTER AVENUE          **(914) 948 3242**
WHITE PLAINS, NY 10601      **(914) 948 5372 FAX**
                                DIPIETROLAW@YAHOO.COM

April 24, 2026

**By ECF**
Hon. Frederic Block
United States District Judge
United States Courthouse
225 Cadman Plaza East
Brooklyn, NY 11201

         Re:      *United States v. Vittorio Amuso*, 90-cr-00446
                 Motion for Reduction in Sentence under § 3582(c)(1)(A)

Dear Judge Block:

Defendant Vittorio Amuso, by and through undersigned counsel, respectfully submits this letter motion, seeking, for the second time, an order granting his compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A).

Mr. Amuso is 91 years old and has served more than 34 consecutive years of imprisonment. He is immobile, medically fragile, and dependent on chronic, ongoing end-of-life care. During his imprisonment, almost all of Mr. Amuso's immediate family have passed away, including his parents, wife, and sixteen siblings. His four children, once young, are now grown, having endured more than three decades without their father. They remain, waiting—with hope, but also with the painful uncertainty of whether they will be afforded the most basic human dignity: the chance to be present at the end of their father's life.[1]

The First Step Act was enacted to end precisely this kind of retributive punishment of elderly and infirm prisoners, where legitimate penological purposes have long since dissipated, and what remains is the unnecessary infliction of human suffering under the veneer of a once-lawful punishment. Simply put, there remains no convincing reason as to why an elderly and ailing prisoner, after serving an extremely long term of imprisonment, must medically suffer and ultimately perish in a prison cell when the court possesses the perfect power, provided by the First Step Act, to compel the end-of-life care of such a prisoner to his family.

Accordingly, the Court should grant Mr. Amuso's compassionate release.

---

[1] Undersigned counsel is, regrettably, personally familiar with what is at stake here for Mr. Amuso's children—the profound and enduring pain of watching a father spend decades in prison and ultimately pass away while still in custody. *See supra*, Part III: § 3553(a) Factors, at p. 18.

## Relevant Procedural Background

On August 8, 2023, the Court denied Mr. Amuso's first motion for compassionate release. ECF No. 1232 ("Order") (A. 1-12). In sum, the Court found that Mr. Amuso's medical circumstances did not then satisfy the threshold requirement of "extraordinary and compelling" circumstances under the applicable legal standard (*i.e.,* prior to the November 2023 amendments to U.S.S.G. § 1B1.13), and that the balance of the § 3553(a) factors did not warrant release. *Id.*

On April 14, 2025, Mr. Amuso, by and through undersigned counsel, submitted a new request for compassionate release to Warden David Leu at FCI Butner Medium II (A. 13-18).

In June 2025, Mr. Amuso received verbal notice from the Warden's Office that his compassionate release request was going to be <u>granted</u>. *See* Joint Letter of Mr. Amuso's Children (A. 19-21) ("Specifically, in the beginning of June of 2025, Warden Leu of FCI Butner had notified our father that he had approved his attorney's request for compassionate release.")

During this timeframe, Mr. Amuso's children were contacted by a social worker at FCI Butner to provide information regarding Mr. Amuso's release plan. Probation officers from the Eastern District of New York also conducted an inspection of Mr. Amuso's residence and verbally advised his children that both the residence and the provided release plan were approvable:

> On June 10th, 2025, a social worker of FCI Butner, Mr. Jones, contacted Victoria Amuso (youngest daughter) to discuss various matters upon our father's release, including his medical care, doctors, and living arrangements. A few weeks later, Parole Officer Stacks and another officer from the Probation Office (EDNY) visited our father's residence (where Victoria and Robert reside) to observe the premises and discuss his future living situation. Officer Stacks toured the house with Victoria, observing where our father would sleep, shower, as well as what we would be making handicapped accessible, as the other officer made conversation with Robert. Officer Stacks approved of the home and explained it will be perfect for Dad. He also explained that Dad would be monitored for some time and would have to check in at times with the probation office.

Joint Letter of Mr. Amuso's Children (A. 19).

On September 22, 2025, undersigned counsel contacted, by email, Mr. Amuso's assigned Case Manager at FCI Butner Medium II, J. Glancy, to confirm that the Warden had actually approved Mr. Amuso's application for compassionate release and to obtain clarification regarding the status of such approval (A. 22).

On September 25, 2025, Ms. Glancy confirmed that Warden Leu had approved Mr. Amuso's application for compassionate release at the institutional level, but that the approval had been forwarded to "the Central Office in DC" for further review (A. 22). Specifically, Ms. Glancy reported:

> The application was approved at the institution level by the Warden. From there, it was sent to Central Office in DC for approval. I have not received any updates as of yet.

A. 22 (emphasis added).

On December 18, 2025, the Office of General Counsel ("OGC") issued a memorandum to Warden Leu advising that it was denying his approval of Mr. Amuso's request for compassionate request (A. 23-24). While the memo acknowledged that Mr. Amuso qualified for compassionate release under section 4(a) of BOP Program Statement 5050.50,[2] it claimed that Mr. Amuso's release would minimize the severity of the offense and could pose a danger to the community:

> Mr. Amuso is 91 years old and has served over 34 years of his life sentence, which was imposed for offenses committed after November 1, 1987. He therefore meets the criteria for a RIS under section 4(a). However, due to the serious nature and circumstances of Mr. Amuso's offenses, his release would minimize the severity of his offense and could pose a danger to the community. Accordingly, his RIS request is denied.

A. 23 (emphasis added).

This motion follows.

### Discussion

### The Court Should Grant Mr. Amuso's Motion
### for Compassionate Release under 18 U.S.C. § 3582(c)(1)(A)

### I.    Exhaustion

To seek relief under the First Step Act, the defendant must first exhaust "all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or wait 30 days after "the receipt of such a request by the warden of the defendant's facility." 18 U.S.C. § 3582(c)(1)(A). *See, e.g., United States v. Haney,* 454 F. Supp. 3d 316, 318 (S.D.N.Y. 2020); *United States v. Gonzalez*, 2021 U.S. Dist. LEXIS 27106 (S.D.N.Y. Feb. 11, 2021) ("Gonzalez submitted a request for compassionate release to the CI Rivers Facility Administrator on July 22, 2021. His application was denied on August 7, 2020. The Government concedes that Gonzalez has exhausted his administrative remedies.")

Here, Mr. Amuso has satisfied this requirement by virtue of his April 14, 2025 application to the Warden at Butner FCI Medium II (A. 13), which, although such application was functionally approved by the Office of the Warden (A. 22), was denied by memo of the Office of General Counsel on December 18, 2025 (A. 23).

---

[2] Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g) ("New Law' Elderly Inmates").

## II.    Extraordinary and Compelling Reasons

### A.  Relevant Law

It is well settled that the "district court's discretion in this area—as in all sentencing matters—is broad." *United States v. Brooker,* 976 F.3d 228, 237 (2d Cir. 2020). When adjudicating a prisoner's motion under § 3582(c)(1)(A), the district court is free "to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release." *Id.*

In considering whether "extraordinary and compelling reasons" warrant a reduction under 18 U.S.C. § 3582(c)(1)(A), district courts look to the Sentencing Commission's policy statement in U.S.S.G. § 1B1.13, as amended effective November 1, 2023. The amended provision identifies several categories of circumstances that may qualify, including: (1) medical conditions, (2) age, (3) family circumstances, (4) victimization by abuse, (5) other comparable reasons, and (6) the imposition of an unusually long sentence. U.S.S.G. § 1B1.13(b). Each category is further defined within the policy statement and provides a structured framework for evaluating whether relief may be warranted.

While a defendant's rehabilitation alone shall not be considered an extraordinary and compelling reason, *United States v. Rios*, No. 24-673-cr, 2025 LX 232331, at *4 (2d Cir. Mar. 18, 2025), it can be considered in combination with other reasons that, when considered collectively, provide an extraordinary reason for a sentence reduction. *See United States v. Vasquez*, 735 F. Supp. 3d 124, 133 (E.D.N.Y. 2024); *United States v. Qadar*, No. 00-CR-603 (ARR), 2021 U.S. Dist. LEXIS 136980, at *29 (E.D.N.Y. July 22, 2021).

Notably, the Sentencing Commission's most recent amendments to the applicable policy statement, U.S.S.G. § 1B1.13, reconfirms that district courts are to retain broad authority in deciding prisoner-based motions, which includes having wide discretion to decide "other reasons" that may compel a sentence reduction beyond those enumerated explicitly by policy or otherwise—based on "any circumstance or combination of circumstances" that are "similar in gravity" to those enumerated under U.S.S.G. § 1B1.13(b). *See United States v. Cromitie*, No. 09 CR 558-01 (CM), 2024 U.S. Dist. LEXIS 12253, at *12-13 (S.D.N.Y. Jan. 19, 2024). In this regard, the Sentencing Commission explained that district courts remain "in a unique position to determine whether the circumstances warrant a reduction" and "[g]uidance beyond that provided in the amended policy statement regarding what circumstances or combination of circumstances are sufficiently extraordinary and compelling to warrant a reduction in sentence is best provided by reviewing courts, rather than through an effort by the Commission to predict and specify in advance all of the grounds on which relief may be appropriate." *Id*. (citing The United States Sentencing Commission, Amendments to the Sentencing Guidelines, Effective November 1, 2023, https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202305_RF.pdf.)

"The Commission's recognition of its limitations in this regard, and the deference to be shown to the courts who must ultimately decide whether

extraordinary and compelling circumstances exist in any given case, is wholly consistent with the Second Circuit's unqualified declaration in *Brooker* that: 'District courts have discretion to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before [the court] in motions for compassionate release.'" *Cromitie*, No. 09 CR 558-01 (CM), 2024 U.S. Dist. LEXIS 12253, at *13 (*citing Brooker*, 976 F.3d at 237).

### B. Relevant Facts

Mr. Amuso is 91 years old. He has been imprisoned since July 28, 1991, for a present total of 34 years, 8 months, and 27 days of consecutive imprisonment. He remains in federal custody in Butner, NC, and is immobile, wheelchair dependent, with diminished hearing and eyesight, and suffering from a cluster of serious, chronic, and worsening medical conditions that substantially diminish his ability to function within a prison environment.

Indeed, since Mr. Amuso's first application for compassionate release was decided on August 10, 2023 (A. 1-12), his medical circumstances have not improved—they have materially worsened. Mr. Amuso's current medical records, along with the firsthand accounts of his children and fellow prisoners, confirm that reality. *See, e.g.,* Letter of Cletis Warren (A. 25) ("He is awake at night in pain and when he sleeps it's in his wheelchair. I'm not a doctor by any means but I think this is something that his family should be doing for him with his needs. He is in bad shape."); Joint Letter of Mr. Amuso's Children (A. 20) ("Our father will be 92 this coming November; he is confined to a wheelchair 24/7. Losing mobility in his legs has led him to be confined to either his bed or wheelchair—causing many sores on his backside. His legs and knees have deteriorated to the point that it is impossible to even make it in and out of bed without the assistance of someone else."); Letter of James Pridgen (A. 26) ("I only know the caregiving of his self and have seen him extend himself to people he can help, with kind words or advice to help guide them in a positive direction. All this was, and is being through all the pain he has and continually is feeling each day although he does his best trying to hide it so many of us won't worry about him….I don't know how much punishment the court wants to inflict, but I can see this has changed and completely been rehabilitated.")

Since 2023, Mr. Amuso has continued to decline due to the aging process, including significant loss of body mass. *See, e.g.,* Clinical Encounter—Administrative Notes, Fed. Bureau of Prisons Health Servs. (03/04/2024 and 03/05/2024) (A. 35-36) (Mr. Amuso has suffered "30lb weight loss over the past year" and is "unable to do much…due to his age, and he's in [ ] severe pain constantly."); Clinical Encounter—Administrative Note, Fed. Bureau of Prisons Health Servs. (3/06/2024) (A. 37) (reporting that Mr. Amuso is "in [a] wheelchair with chronic, severe pain…."); Clinical Encounter—Administrative Note, Fed. Bureau of Prisons Health Servs. (3/14/2024) (A. 39) (reporting that Mr. Amuso suffers from "visually significant cataract OS…."); Clinical Encounter—Administrative Note, Fed. Bureau of Prisons Health Servs. (5/15/2024) (A. 40) (reporting inmate suffers from "bilateral knee osteoarthritis….pain keeps him up at night. Reports using a walker sometimes in his cell for short distances/transfers. Otherwise, he uses his wheelchair.")

As previously documented, the BOP assigned Mr. Amuso a Care Level 3 classification as of January 2023, describing his condition as "unstable" and requiring "complex chronic care." *See* Order at 7 (A. 7). As of today, Mr. Amuso continues to suffer "from several chronic medical conditions: nuclear sclerosis, hypertension, hyperlipidemia, coronary atherosclerosis, cardiac arrhythmia, anemia, an eyelid disorder, a conjunctiva disorder, teeth loss, hematuria, benign hypertrophy of the prostate, enthesopathy, hearing loss, osteoarthritis of the knees, and severe osteoarthritis of the hips." Order at 7 (A. 7); *See* Clinical Encounter, Fed. Bureau of Prisons Health Servs. (9/25/2025) (A. 51); Clinical Encounter, Fed. Bureau of Prisons Health Servs. (12/04/2025) (A. 53); Clinical Encounter, Federal Bureau of Prisons Health Services (1/12/2026) (A. 31) ("AIC is a 91 yo male with PMH: significant for CAD s/p 2 vessel CABG, HTN, HLD, BPH, osteoarthritis and BCC of skin presenting to CCC."); Health Summary, Fed. Bureau of Prisons Health Servs. (Generated 03/13/2026) (A. 57-64) (detailing extensive chronic conditions including coronary artery disease s/p CABG, hypertension, dyslipidemia, osteoarthritis, chronic pain, urinary dysfunction, and other multi-system comorbidities); Clinical Encounter—Administrative Note, Fed. Bureau of Prisons Health Servs. (9/30/2025) (A. 52) (biopsy-confirming basal cell carcinoma).

Mr. Amuso still "requires assistance from other inmates or Bureau of Prisons ("BOP") staff to pick up his food trays and make his bed" (Order at 7 (A. 7)) and also now requires the assistance of his cellmate to perform all other daily tasks of self-care, including dressing and shaving. *See* Letter of Cletis Warren (A. 25) ("I have been his clinical helper because he is unable to get his pants or shoes on as well shaving and getting to and from medical appointments, etc. He is unable to walk so assistance is needed all the time."). Mr. Amuso's children, who stay in frequent contact with him, further report:

> Losing mobility in his legs has led him to be confined to either his bed or wheelchair—causing many sores on his backside. His legs and knees have deteriorated to the point that it is impossible to even make it in and out [of] bed without the assistance of someone else. His knees are so swollen; all day, every day he must wear compression socks making it impossible to sleep in peace. Even sitting in a chair to read is an impossible, painful, daily task due to his glaucoma.

> The BOP memo that Dad received claims his release poses 'a danger to the community.' Your Honor, he is only a danger to himself because he cannot walk, eat, or shower without assistance. If Your Honor could see him, you would surely understand.

Joint Letter of Mr. Amuso's Children (A. 20-21).

Furthermore, Mr. Amuso has recently suffered from shingles, burn-related injuries, and the effects of skin atrophy. *See, e.g.,* Clinical Encounter—Devices & Equipment, Fed. Bureau of Prisons Health Servs. (03/07/2024) (A. 55) (reapproving wheelchair and noting need for wheelchair cushion "due to very frail/thin with decreased coverage on sacrum"); Clinical Encounter, Federal Bureau of Prisons Health Services (1/06/2026) (A. 27) ("Inmate with complaints of a rash that is spread across his right breast through his back that started about a week and a half ago. He

reports itching and redness but denies stinging/tingling or burning pain. He reports he has been using cortisone cream without much relief. Also, with complaints of bilateral knee pain and stated he is unable to sleep with his legs stretched out. He states he was previously getting steroid injections but has not had any recently."); Joint Letter of Mr. Amuso's Children (A. 21) ("Every week and month that passes, a new ailment arises. Dad recently had a bad case of the shingles, where the pain was so unbearable that he was unable to properly sleep and to a point that it affected his ability to eat."); Clinical Encounter, Fed. Bureau of Prisons Health Servs. (8/26/2025) (A. 49) (documenting that the inmate suffered second/third degree burns from spilling coffee on himself and did not report to medical until several days later).

Mr. Amuso's arthritis of the hips continues to "cause him severe pain and he requires a wheelchair to move around his facility." Order at 7 (A. 7); Clinical Encounter, Fed. Bureau of Prisons Health Servs. (8/08/2025) (A. 45) ("my lower legs are swollen and leaking fluid x 1 week with 10/10 pain"). In this regard, Mr. Amuso has continued to endure significant bilateral lower-extremity swelling and severe pain without meaningful intervention. For example, in a clinical encounter on August 8, 2025, it was noted:

> 90 y/o male w/a PMH that includes CAD s/p 2 vessel CABG s/p MI, HTN, Dyslipidemia, BPH, and OA seen today d/t reporting bilateral lower extremity pain and swelling that started ~ 2 months ago. Inmate stated "I didn't come down here because I thought it would get better but now it's 10/10 (R>L).

> Reports that his R leg swelling is the worse and it started ~ 1 month ago and the pain starts at his anterior R knee and goes down to the plantar aspect of his right foot. Reports that this leg has 10/10 pain that is constant and sharp. Denies anything making pain better.

> Reports his L leg swelling and pain started approximately 2 months ago and is not as bad (5/10 sharp pain w/ palpation), but continues to have constant pain. Reports that pain on his LLE starts at his distal lower leg and goes down to the plantar aspect of his left foot.

Clinical Encounter, Fed. Bureau of Prisons Health Servs. (Aug. 8, 2025) (A. 41).

The underlying medical files further demonstrate the BOP's general inability to provide adequate elderly care, including timely medical attention, pain management (beyond Tylenol), therapy, and end-of-life support as would be required here. *See id.* (A. 41) (90 y/o male w/a PMH that includes CAD s/p 2 vessel CABG s/p MI, HTN, Dyslipidemia, BPH, OA seen today d/t reporting bilateral lower extremity pain and <u>swelling that started ~ 2 months ago</u>) (emphasis added); Clinical Encounter, Federal Bureau of Prisons Health Services (1/06/2026) (A. 30) ("Inmate states he was told he is not a surgical candidate, will order Tylenol for pain."); Clinical Encounter, Federal Bureau of Prisons Health Services (1/06/2026) (A. 27) ("He states he was previously getting steroid injections <u>but has not had any recently</u>."); Clinical Encounter—Administrative Note, Fed. Bureau of Prisons Health Servs. (8/08/2025) (A. 47) (self-reporting by Mr. Amuso concerning diagnosis of carcinoma in March 2025 with an advised intervention target date of May 11, 2025;

however, as of August 8, 2025, the inmate has still not been seen by staff and was then advised "we no longer have a dermatologist in-house… will change the consult to off-site."); *see also* Letter of Cletis Warren (A. 25) ( "He has to get shots for the pain which wear off about every 8 weeks and shots are every 6 months. He is awake at night in pain and when he sleeps it's in his wheelchair….He is in bad shape….The man isn't going to be around much longer"); Letter of James Pridgen (A. 26) ("Allow me a moment to try to express just one of the condition he and everyone here has to live with, the unit we live in has no heat, or very little. I was told the institution is waiting for a part, that has been three weeks ago, and the weather keeps getting colder."); Joint Letter of Mr. Amuso's Children (A. 21) ("A prison is not properly equipped or staffed to provide the level of care an elderly person in our father's condition needs, nor the emotional support required at the end of life. It is difficult to understand how a facility known for its medical services can provide adequate care when doctors rarely see him. He is in pain every single day and is steadily fading.")

Even the most basic daily needs, critical to the safety and well-being of a sick 91-year-old and immobile prisoner, as Mr. Amuso presents, are not addressed by the BOP with any urgency. *See* Inmate Request to Staff / BOP Physical Therapy Email (10/18/2025; response 10/22/2025, 08:30) (A. 65) (Mr. Amuso reporting wheelchair failure—"the whole seat is blown and is shaking to the point of it feels like its going to fall off and the back is about to fall out of it too"—and being advised that he would be placed on callout four days later); Inmate Request to Staff / BOP Pharmacy (8/12/2025; response 8/14/2025) (A. 66) (advising Mr. Amuso—91-year-old critical inmate—to initiate another sick call visit after staff failure to document attendant doctor's prescription of furosemide (medication used to treat heart failure and help the body get rid of excess fluid by increasing urine production.)); Clinical Encounter, Fed. Bureau of Prisons Health Servs. (8/8/2025) (A. 44) ("Did report that he ran out of Metoprolol a week ago").

Notably, the BOP's inability to render both timely and adequate medical/elderly care is not an isolated issue. The Office of the Inspector General has recently found that the Federal Bureau of Prisons suffers from chronic deficiencies in medical staffing, delays in care, and critical breakdowns in emergency response that have contributed to preventable deaths and remains subject to ongoing investigation and congressional scrutiny:

> For decades, the Federal Bureau of Prisons (BOP) has insisted it can meet its legal and moral obligation to provide adequate medical care to those in its custody. Yet a growing body of evidence from court rulings, whistleblowers, and repeated Department of Justice Office of the Inspector General (OIG) reports tells a different story. Chronic staffing shortages, especially in medical positions, have created a system where delayed diagnoses, inadequate treatment, and preventable suffering are not rare exceptions but predictable outcomes.

Walter Pavlo, Bureau of Prisons *Continues to Have Issues with Medical Care: OIG*, Prisonology (Jan. 14, 2026), https://www.prisonology.com/blog/bureau-of-prisons-continues-to-have-issues-with-medical-care; *Investigation and Review of the Federal*

*Bureau of Prisons' Conditions of Confinement and Medical Treatment of Frederick Mervin Bardell and Related Representations to the Court, Upon Referral by Senior U.S. District Judge Roy B. Dalton, Jr.* (Report No. 26-007, Jan. 6, 2026); Letter from J. Raskin, Ranking Member, H. Comm. on the Judiciary, et al., to W. Marshall III, Dir., FBOP (Feb. 20, 2026), https://democrats-judiciary.house.gov/sites/evo-subsites/democrats-judiciary.house.gov/files/evo-media-document/2026-02-20-raskin-mcbath-et-al-to-marshall-bop-re-staffing-issues.pdf; Devlin Barrett, *Prisons Bureau Failed to Screen Inmates for Colorectal Cancer, Watchdog Says*, Wash. Post (May 20, 2025), https://www.washingtonpost.com/national-security/2025/05/20/prisons-bureau-failed-screen-inmates-colorectal-cancer-watchdog-says/ (reporting systemic screening failures and delayed follow-up care in BOP facilities, including inmate deaths tied to missed diagnoses); Ramon Antonio Vargas, *'Devastating': Troubled Federal Correctional Center Failed to Prevent Death of Man in Medical Crisis*, Guardian (Aug. 12, 2025), https://www.theguardian.com/us-news/2025/aug/12/cibola-county-correctional-center-james-ramirez-death

## C. <u>Law Applied</u>

### i. Age (U.S.S.G. 1B1.13(b)(2))

Mr. Amuso's circumstances clearly satisfy the threshold requirement of establishing an "extraordinary and compelling" reason for compassionate release under U.S.S.G. § 1B1.13(b)(2). Specifically, the Sentencing Commission's policy statement provides that the "Age of the Defendant" constitutes an extraordinary and compelling basis for relief where the "defendant (A) is at least 65 years old; (B) is experiencing a serious deterioration in physical or mental health because of the aging process; and (C) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less." *United States v. Trucchio*, No. 8:04-cr-348-CEH-TGW, 2024 U.S. Dist. LEXIS 212632, at *19–20 (M.D. Fla. Nov. 22, 2024).

Here, Mr. Amuso satisfies each of these criteria: (A) he is over the age of 65; (B) he is experiencing a severe deterioration in physical health due to the aging process; and (C) he has served more than 10 years of imprisonment. *See, e.g., Trucchio*, 2024 U.S. Dist. LEXIS 212632, at *20–22 (finding that "Trucchio's age (73) constitutes an extraordinary and compelling circumstance warranting a reduction in sentence because he is older than 65 years, he is experiencing a serious deterioration in physical health because of the aging process, and he has served at least 10 years of his sentence") (*citing* U.S.S.G. § 1B1.13(b)(2)).

Mr. Amuso's satisfaction of the foregoing criteria is beyond dispute. His age (91) and the length of his imprisonment (more than 34 years) are not subject to debate. Likewise, the record conclusively establishes that Mr. Amuso—now 91 years old and immobile—is experiencing a serious deterioration in physical health due to the aging process. That reality was already recognized in the Court's prior decision, *see* Order at 4 (A. 4) ("Now 88 years old, Amuso suffers from a litany of age-related health conditions"), and it has only intensified as his condition has continued to worsen with advancing age. (*See supra*, Relevant Facts (documenting Mr. Amuso's current medical condition and ongoing physical deterioration).)

Courts have consistently found this standard satisfied under comparable—and often less severe—circumstances. *See, e.g., United States v. Campbell*, No. 09-CR-119-24 (ARR), 2023 U.S. Dist. LEXIS 191801 (E.D.N.Y. Oct. 25, 2023) (finding that the defendant (68) had satisfied the Section 1B1.13(b)(2) standard based on his back condition that had degenerated from 'mild' lower back pain in September 2022, to 'sharp pain at a scale of 8' by April 2023"); *United States v. Carter*, No. 13-CR-900 (JMF), 2025 U.S. Dist. LEXIS 290752, at *2-3 (S.D.N.Y. July 7, 2025) (finding that the defendant (67) was experiencing a serious deterioration in physical or mental health because of the aging process under U.S.S.G. § 1B1.13(b)(2) due to his debilitating arthritis); *United States v. Castillo*, 2025 U.S. App. LEXIS 915 (2d Cir. Jan. 15, 2025) (summary order) (holding that a defendant need only show a "serious deterioration" in health due to the aging process, not impairment of "basic human functions," to satisfy Section 1B1.13(b)(2)).

Furthermore, a defendant's satisfaction of the enumerated criteria under U.S.S.G. § 1B1.13(b)(2) does not depend on whether the Government can adequately manage the defendant's medical conditions, whether the defendant has received a terminal diagnosis, or whether the defendant has required prolonged hospitalization. See Order at 7–8 (A. 7–8). Put simply, such considerations are not prerequisites to establishing an "extraordinary and compelling" basis for relief under § 1B1.13(b)(2). *See, e.g., Castillo*, 2025 U.S. App. LEXIS 915, at *5 ("If, however, the district court's denial was based on the view that Note 1(B) applies only to defendants whose health conditions impair basic human functions, the court erred; the plain text of the Note contains no such requirement."); *Campbell*, No. 09-CR-119-24 (ARR), 2023 U.S. Dist. LEXIS 191801, at *7; *Trucchio*, No. 8:04-cr-348-CEH-TGW, 2024 U.S. Dist. LEXIS 212632, at *20-22; *United States v. Cunningham*, No. CR 12-60-GF-BMM, 2024 U.S. Dist. LEXIS 2223, at *5-6 (D. Mont. Jan. 4, 2024) ("The new amendments also make clear that where a defendant is at least 65 years of age and has completed ten years of their sentence, 'a serious deterioration in physical or mental health because of the aging process' constitutes an extraordinary and compelling reason for reduction of the defendant's sentence.") (*citing* USSG § 1B1.13(b)(2)).

For example, in *United States v. Archer*, the district court rejected the Government's attempt to defeat relief under U.S.S.G. § 1B1.13(b)(2) based on its contention that the defendant was receiving—and could continue to receive—adequate medical care within the Bureau of Prisons. No. 2:93-CR-259 JCM, 2024 U.S. Dist. LEXIS 62760 (D. Nev. Apr. 5, 2024). The court explained:

> Archer is at least 65, has served approximately 85 percent of his term of imprisonment, and is indeed experiencing deterioration in physical and mental health due to the aging process. He suffers from hypertension, chronic obstructive pulmonary disease, shoulder pain, obesity, a urinary system disorder, prostatic hypertrophy, neuropathy, and anxiety. Archer claims he has not been able to see a urologist and is not receiving adequate treatment to address his torn ACL. The government does not dispute any of this. Rather, it argues that the BOP should be given time to address Archer's medical concerns, and that inadequate medical care is not a proper basis for early release. But

10

> the government's argument ignores Section 1B1.13(b)(2) of the Sentencing Guidelines, which clearly indicates that Archer has satisfied his burden of showing an extraordinary and compelling reason for release, due to his advanced age.

2024 U.S. Dist. LEXIS 62760, at *6 (record citations omitted) (emphasis added).

Accordingly, Mr. Amuso's circumstances fully satisfy the "extraordinary and compelling" standard set forth in U.S.S.G. § 1B1.13(b)(2). His age, length of incarceration, and severe physical deterioration place him squarely within its scope.

### ii. Medical (U.S.S.G. § 1B1.13(b)(1)(B))

Although no further showing of an extraordinary and compelling reason is required, Mr. Amuso's circumstances independently satisfy the enumerated medical criteria set forth in U.S.S.G. § 1B1.13(b)(1)(B)(i)–(iii). Under that provision, a defendant qualifies where he is (i) suffering from a serious physical or medical condition; (ii) suffering from a serious functional or cognitive impairment; or (iii) experiencing age-related deterioration in physical or mental health that substantially diminishes his ability to provide self-care within a correctional facility and from which he is not expected to recover.

For many of the reasons set forth above, Mr. Amuso's circumstances independently satisfy the criteria enumerated in U.S.S.G. § 1B1.13(b)(1)(B)(i)–(iii), although satisfaction of any one prong would suffice. Specifically, Mr. Amuso (i) suffers from a serious physical condition; (ii) suffers from a serious functional impairment; and (iii) is experiencing age-related deterioration in physical health that substantially diminishes his ability to provide self-care within the correctional environment and from which he is not expected to recover.

The present record reflects that Mr. Amuso is a 91-year-old inmate who is wheelchair-dependent and suffers from a complex and significant medical profile, including hearing and vision loss, edentulism, coronary artery disease, hypertension, hyperlipidemia, an enlarged prostate, osteoarthritis, and a history of skin cancer. He is also classified by the Bureau of Prisons as Care Level 3. *See United States v. Cupp*, 2021 U.S. Dist. LEXIS 54521, at *6 ("Defendant's BOP care level of 3 further supports the conclusion that he has presented extraordinary and compelling circumstances.")

The record further demonstrates that these conditions pose significant safety risks and reduce Mr. Amuso's quality of life to a severely diminished level, reflecting profound functional impairment. BOP clinicians have deemed specialized mobility support medically necessary, including a wheelchair and a pressure-relief gel cushion prescribed due to his "very frail/thin" condition and heightened risk of skin breakdown—further underscoring his extreme frailty and vulnerability to injury even while seated. He is also identified as a fall risk, presenting an ongoing safety concern.

Consistent with this decline, Mr. Amuso has, at times, been unable to adequately manage his own medication regimen, resulting in lapses that further compromise his already fragile condition. Most tellingly, he is no longer able to safely care for himself in custody. A routine act—drinking a hot beverage—resulted

in a burn injury to his leg that went untreated for several days before he presented to medical, where it was ultimately assessed as a possible second- to third-degree burn requiring continued care. Taken together, these circumstances underscore both his profound physical deterioration and the real and ongoing risk he faces in performing even the most basic activities of daily living.

In this regard, the record makes abundantly clear that Mr. Amuso is experiencing age-related deterioration in physical health that has substantially diminished his ability to provide self-care within the correctional environment and from which he is not expected to recover. As of today, he is fully reliant on his cellmate for basic activities of daily living. *See* Letter of Cletis Warren (A. 25) ("I have been his clinical helper because he is unable to get his pants or shoes on, as well as shave and get to and from medical appointments… He is unable to walk, so assistance is needed at all times."); Joint Letter of Mr. Amuso's Children (A. 20–21) ("Your Honor, he is only a danger to himself because he cannot walk, eat, or shower without assistance.")

Further, despite documented, chronic, and debilitating bilateral knee pain in a 91-year-old man who is immobile, sleep-deprived, and deemed not a surgical candidate by the Bureau of Prisons, the only daily treatment provided is over-the-counter Tylenol—an intervention plainly inadequate to address the severity of his condition, particularly where more effective pain management options and therapeutic measures exist but are not meaningfully available in custody.

Accordingly, Mr. Amuso's medical condition satisfies the "extraordinary and compelling" standard set forth in U.S.S.G. § 1B1.13(b)(1)(B).

### iii. Other Reasons (U.S.S.G. 1B1.13(b)(5))

An additional independent basis for relief exists under the "other reasons" provision, as the collective weight of Mr. Amuso's advanced age, serious medical conditions, more than 34 years of imprisonment, and demonstrated rehabilitation constitutes an extraordinary and compelling circumstance. The Guideline expressly contemplates such a showing, providing that relief may be warranted where a defendant "presents any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are similar in gravity to those described in paragraphs (1) through (4)." U.S.S.G. § 1B1.13(b)(5).

Here, the cumulative weight of Mr. Amuso's present circumstances is comparable in gravity to the enumerated categories and therefore satisfies the threshold for an extraordinary and compelling reason warranting relief. *See United States v. Newton*, 996 F.3d at 489 (holding that a district court abuses its discretion when it fails to consider a defendant's medical conditions in the aggregate in assessing whether extraordinary and compelling reasons exist).

Indeed, the more than 34 years Mr. Amuso has served is significant by any measure. Three decades of imprisonment—without a single infraction—would be extraordinary in any case, and even more so here, where much of that time was spent in high-security facilities and, in later years, while he has been elderly, infirm, immobile, and subjected to harsh conditions, including prolonged lockdowns and the

COVID-19 pandemic. *See, e.g., United States v. Tellier*, 2023 U.S. Dist. LEXIS 149994, at \*12 (S.D.N.Y. Aug. 25, 2023) ("The almost thirty-five years Defendant has served is just punishment for the extremely serious offenses [at least four murders] for which he was convicted.") (*citing United States v. Vargas*, 502 F. Supp. 3d 820, 826–27 (S.D.N.Y. 2020) (collecting cases); *United States v. Lora*, 2022 U.S. Dist. LEXIS 65734, at \*5 (S.D.N.Y. Apr. 8, 2022) ("[P]andemic-induced conditions of confinement may constitute 'extraordinary and compelling' circumstances warranting compassionate release, particularly for defendants who have (i) served long sentences and (ii) been detained for the entirety of the pandemic.")).

Moreover, it is significant that the Warden of FCI Butner effectively approved Mr. Amuso's request for compassionate release, concluding that he satisfied the criteria set forth in Section 4(a) of BOP Program Statement 5050.50 (A. 22). The Office of General Counsel likewise determined that Mr. Amuso met those criteria, even though it ultimately denied the application on other grounds (A. 23).

Section 4(a) of Program Statement 5050.50 provides that an inmate is eligible for compassionate release if he (1) was sentenced for an offense committed on or after November 1, 1987; (2) is 70 years of age or older; and (3) has served at least 30 years of his term of imprisonment (Ex. 4 at 6). Mr. Amuso satisfies each of these criteria. That both the Warden and OGC reached that conclusion—thereby recognizing that his circumstances meet the BOP's own threshold for extraordinary and compelling relief—strongly supports a finding that the same threshold is satisfied here under U.S.S.G. § 1B1.13(b)(5).

Indeed, had OGC approved the Warden's recommendation, the Bureau would have been required to move for compassionate release on Mr. Amuso's behalf. *See* 28 C.F.R. § 571.62(a). There is, therefore, no principled basis to conclude that the same showing lacks comparable weight simply because the motion is brought by the defendant rather than the Bureau itself.

To be sure, the eligibility criteria set forth in Section 4(a) of BOP Program Statement 5050.50 differ from those in 18 U.S.C. § 3582(c)(1)(A)(ii), which applies to defendants sentenced under 18 U.S.C. § 3559(c). But that distinction does not diminish the comparable gravity of the underlying circumstance: an elderly prisoner who has served more than 30 years of imprisonment. *See United States v. Grecco*, 2022 U.S. Dist. LEXIS 209668, at \*10–11; *United States v. Linsley*, 2020 U.S. Dist. LEXIS 127488, at \*5–6 ("The government does not challenge the premise that PS 5050.50 can serve as a basis for a defendant's compassionate release motion.")

Accordingly, the combined weight of Mr. Amuso's advanced age, severe medical condition, and more than three decades of imprisonment—circumstances the Bureau itself has recognized as meeting its criteria for compassionate release—establishes an extraordinary and compelling basis for relief.

III. **Section 3553(a) Factors**

For many of the same reasons discussed *supra*, an order granting compassionate release would be consistent with the factors set forth in 18 U.S.C. § 3553(a), particularly in light of Mr. Amuso's present circumstances—his advanced

age, serious medical condition, and more than 34 years of consecutive imprisonment without incident.

The Court's analysis at this stage is not whether the original sentence was warranted under § 3553(a), but whether Mr. Amuso's continued incarceration remains necessary in view of those same factors as they exist today. *See United States v. Kibble*, 992 F.3d at 331–32 (explaining that a court may not simply rely on its original § 3553(a) analysis because "Section 3582(c)(1) necessarily envisions that the section 3553(a) factors may balance differently upon a motion for compassionate release… [and] if a district court's original section 3553(a) analysis could always prove that a sentence reduction would undermine those factors, § 3582(c)(1) would, in effect, be a nullity"); *United States v. Gallego*, 2025 U.S. Dist. LEXIS 40743, at *2 (S.D.N.Y. Mar. 6, 2025) ("Although the heinous nature of Gallego's crime still demands a severe sentence, the Court finds that continued incarceration for life is no longer necessary to serve the purposes of justice.")

While the Court has acknowledged the seriousness of the offense conduct (Order at 2–4, 10–11 (A. 2–4, 10–11)), that consideration should not, standing alone, justify continued incarceration at this stage.[3] The Government's effort to treat it as dispositive (ECF No. 1225, at 10–17) is inconsistent with the growing body of decisions nationwide granting relief under the First Step Act—even to defendants who engaged in similarly serious conduct, including leaders of violent enterprises, and who did not present the same end-of-life considerations present here. That principle applies with even greater force in this case, where Mr. Amuso is of advanced age, suffers from serious medical conditions, and has served more than 34 years of imprisonment without incident.

For example, in *United States v. Underwood*, the court granted compassionate release to a sixty-seven-year-old defendant who had led a heroin trafficking enterprise and was responsible for at least five "brutal and calculated" murders aimed at eliminating competitors, informants, and actual or potential witnesses. No. 88-Cr-822 (SHS), 2021 U.S. Dist. LEXIS 8378 (S.D.N.Y. Jan. 15, 2021). The court described Underwood's offense conduct as follows:

---

[3] Mr. Amuso acknowledges that he is bound by the jury's verdict, but he continues to maintain his innocence as to many of the offenses of conviction, which were attributed to him largely through the testimony of cooperating witnesses whose reliability was inherently compromised and whose incentives to inculpate him were undeniable. Notably, the Government itself has, at times, attributed much of this conduct to Anthony Casso in connection with Casso's own compassionate release application (*see* ECF No. 1219, at 3–10, 18–24), only to shift its characterization when opposing Mr. Amuso's request for similar relief.

Nor is it coincidental that, once Casso ceased to occupy a leadership role in the alleged enterprise—and later sought to cooperate—the pattern of violence ended. And while Casso continued to engage in criminal conduct during that period, Mr. Amuso, by contrast, has not committed a single crime or incurred any institutional infraction in nearly four decades of incarceration.

> [D]efendant Underwood organized 'the Vigilantes,' a street-level heroin-distribution operation based in West Harlem. Over the next decade, the Vigilantes grew under Underwood's leadership, forming retail operations across New York City, importing heroin, and consigning wholesale quantities of heroin to other distributors. The organization sold between 3 and 5.5 kilograms of heroin per week, and at least 40 individuals were identified as participants in Underwood's criminal enterprise over the course of its operation. The Vigilantes, moreover, were 'extremely violent.' The group was responsible for at least five murders, and one attempted murder, committed at Underwood's direction. These murders were brutal and calculated, aimed specifically at 'eliminating and intimidating competitors, informants, and actual or potential witnesses.'

No. 88-Cr-822 (SHS), 2021 U.S. Dist. LEXIS 8378, at *2 (emphasis added).

Notwithstanding that Underwood directed at least five "brutal and calculated" murders as the leader of a violent, self-organized heroin enterprise, the district court concluded that his rehabilitation—coupled with more than three decades of imprisonment served without any realistic hope of release—went well beyond "ordinary" rehabilitation and constituted extraordinary and compelling reasons warranting a reduction to time served. *Id.* The court further emphasized that Underwood's perfect disciplinary record reinforced that conclusion. *Id.* at *20 ("After more than three decades without an infraction for so much as an unkempt cell or speaking back to a prison employee—and in light of the various ways, limned above, that he has served the community he once endangered—Underwood now demonstrates that he is fit to reenter society and rejoin his family.").

Likewise, in *United States v. Tellier*, the court granted early release to a sixty-three-year-old defendant who had led a criminal organization and was responsible for at least four murders and an attempted murder. 2023 U.S. Dist. LEXIS 149994, at *1–2 (S.D.N.Y. Aug. 25, 2023). The court described Tellier's offense conduct as follows:

> Defendant helped lead a criminal organization known as the 'Tellier Organization' that operated in the tri-state area at least through the late 1970s through the early 1990s. Defendant committed four murders and one attempted murder in connection with his role in the Tellier Organization. Defendant and his co-conspirators also committed 'smash and grab' robberies of commercial establishments, driving cars or vans through the front windows or doors of stores selling luxury goods, or broke into stores or warehouses by other means. Defendant fired a handgun at security guards on multiple occasions. And to divert the police's attention from the robberies, Defendant placed calls falsely reporting crimes at other locations.

2023 U.S. Dist. LEXIS 149994, at *1-2 (emphasis added).

15

Notably, the district court granted Tellier a reduction in sentence based on his rehabilitation, the harsh conditions of his confinement, and the extraordinary length of his imprisonment—despite his leadership of a violent criminal enterprise and his involvement in at least four murders. This was so even though, at the original sentencing, the court expressed particular concern that "[m]any, many people have been seriously hurt by [Defendant's] antisocial activity," especially "all of the young men who followed [his] brother and to some extent followed [Defendant]." *Id*. at *17.

Beyond *Underwood* and *Tellie*r, numerous other courts have granted sentence reductions under the First Step Act—effectively affording defendants a second chance at life—despite convictions for participation in violent enterprises involving multiple murders and acts of violence. *See, e.g., United States v. Wong Chi Fai,* No. 93-CR-1340 (RJD), 2019 U.S. Dist. LEXIS 126774 (E.D.N.Y. July 30, 2019) (reducing three life sentences to time served after 26 years of imprisonment for defendant who was the leader of a gang deeply entrenched in killings and gang warfare, and responsible for multiple murders)*; United States v. Fisher*, 493 F. Supp. 3d 231 (S.D.N.Y. 2020) (granting release after thirty-eight years of imprisonment for 73-year-old defendant who served as a "drug kingpin" and committed at least four murders during course of leading a significant drug trafficking conspiracy); *United States v. Cheng*, 678 F. Supp. 3d 312 (E.D.N.Y. 2023) (reducing five life sentences to time served  after 31 years of imprisonment notwithstanding that defendant participated in three planned murders with fellow Green Dragon gang members, committed two armed robberies, and raped one of the robbery victims); *United States v. Luke Jones*, No. 99-CR-264-1 (VAB), 2020 U.S. Dist. LEXIS 94041 (D. Conn. May 29, 2020) (reducing four life sentences to thirty-seven years for defendant who led a violent narcotics trafficking enterprise, murdered three people, including shooting a man in front of small children for being rude to his girlfriend, and attempted to murder several others); *United States v. Miller*, 92-CR-91 (NGG), 2024 U.S. Dist. LEXIS 160865 (E.D.N.Y. Sept. 6, 2024) (granting reduction in sentence for leader of the "Supreme Team" enterprise, which was a violent crack cocaine distribution organization responsible for committing multiple murders and acts of intimidation under the defendant's command and expansion efforts); *United States v. Rodriguez*, 00 Cr. 761-2 (JSR), 2020 U.S. Dist. LEXIS 181004 (S.D.N.Y. Sept. 30, 2020) (granting release for 54-year-old defendant who ran a cocaine and heroin racketeering enterprise and participated in the torture and murder of a government confidential informant); *see also United States v. Chan,* 645 F. Supp. 3d 71 (E.D.N.Y. 2022); *United States v. Russo*, 643 F. Supp. 3d 325, 335 (E.D.N.Y. 2022); *United States v. Birkett,* No. 90-CR-1063-24, 2023 U.S. Dist. LEXIS 112714 (E.D.N.Y. June 29, 2023)*; United States v. Leonard Jones,* No. 99-CR-264-5 (VAB), 2019 WL 6907304 (D. Conn. Dec. 19, 2019); *United States v. Powell*, No. 99-CR-264-18 (VAB) 2019 WL 4889112 (D. Conn. Oct. 3, 2019).

With respect to deterrence, no reasonable observer could fail to be deterred by the reality here: Mr. Amuso has served more than 34 years in federal custody. Nor can it be said that granting compassionate release at this juncture—given his advanced age and serious medical condition—would undermine just punishment or respect for the law. To the contrary, a sentence of this magnitude, marked by decades

of harsh imprisonment, including prolonged lockdowns and pandemic conditions, has already achieved any legitimate deterrent effect. Whatever second chances life might have once afforded are long gone; Mr. Amuso will be 91 years old, wheelchair-dependent, and in end-of-life care if released to his children.

As the Court is further aware, Mr. Amuso's institutional record over more than three decades of imprisonment is unblemished (*see* Order at 9 (A. 9)). Throughout that time, Mr. Amuso has conducted himself with consistent discipline and has been regarded as a stabilizing, positive presence among those around him— despite serving his sentence under circumstances that offered no meaningful prospect of release. *See Russo*, 643 F. Supp. 3d at 332 ("In the past 21 of his 29 years served, Russo has not committed a single disciplinary infraction. Given the realities of incarceration in a federal penitentiary, particularly under the specter of a life sentence, this record can only be viewed as exemplary."); *id.* at 338 ("Moore, like Russo, also has an exemplary behavioral record in prison, with no disciplinary infractions in the past 18 years…. Given the hopeless reality of a life sentence, this disciplinary history should not be understated.")

Mr. Amuso has also retained the steadfast support of his family, who have remained actively involved in his life and have made clear that, if released, he will be cared for with dignity in his remaining years. Members of his immediate family and friends previously submitted letters attesting to his character and their enduring relationship (A. 67–94), and his children have now provided an updated letter reaffirming their unwavering support:

> Your Honor, please send our father home. Please let us care for him at home to live out whatever years he has left in dignity. He won't even leave the house if that is how you prefer it. A prison is not properly equipped or staffed to provide the level of care an elderly person in our father's condition needs, nor the emotional support required at the end of life. It is difficult to understand how a facility known for its medical services can provide adequate care when doctors rarely see him. He is in pain every single day and is steadily fading. Our father has been incarcerated for 35 years—since we were children. The prior Warden recognized the reality of his condition and graciously approved his release, acknowledging that his advanced age and circumstances warranted it. We respectfully ask that you grant this request. Our family will be forever grateful for your mercy of allowing our father to come home.

Joint Letter of Mr. Amuso's Children (A. 19-21).

In this regard, the Court should give significant weight to the impact of Mr. Amuso's decades-long imprisonment on his children, who are more than mere spectators to these proceedings. *Cf. United States v. Cox*, 271 F. Supp. 3d at 1089–90 ("[C]hildren of defendants are as much stakeholders in a sentence as the victims, the public, and the defendants themselves."). Mr. Amuso's more than 34 years of imprisonment were not borne by him alone; his family—his wife and children—have carried that burden alongside him.

17

Now, as Mr. Amuso's life nears its end, the need for closure through a dignified passing assumes profound importance—not only for Mr. Amuso, but for his children as well. *See United States v. Bari*, 2024 U.S. Dist. LEXIS 8462, at *3–4 ("Compassionate release recognizes that no criminal defendant is only the worst thing he has done in his life… [and] that some defendants… should be allowed to die with dignity surrounded by loved ones."); *United States v. Salazar-Rodriguez*, 2022 U.S. Dist. LEXIS 221380, at *11 (granting compassionate release notwithstanding "shocking and egregious" conduct, recognizing that there are circumstances in which continued incarceration loses its value and imposes costs—both financial and human—greater than it is worth).

To be sure, the pain of losing a father is profound under any circumstance. But for children to receive a call from a government official informing that their father has died—while imprisoned, alone, seeking medical attention that never came in time, and without his children by his side—knowingly inflicts a pain that is immeasurable and impossible to capture in words.[4] It is the kind of pain that settles into the bones, that lingers in silence, that no passage of time will soften. No child, whatever the age, should be required to carry such a cross when preventable, and no worthy justice system should be wanting to produce more of such a draconian result.

For undersigned counsel to carry that same, exacting pain—while standing before this Court and asking that other children be spared it—is both a solemn responsibility, sustained by faith in Jesus Christ, and a profound personal cost. It is a cost borne quietly: invisible wounds, enduring scars, and the weight a father's long imprisonment and death place upon the children who love him. If the Court could fully apprehend that burden—what it means for a child to wait decades for a father's

---

[4] On January 22, 2026, undersigned's father, Angelo DiPietro (age 69), passed away unexpectedly at FCI Danbury after having served approximately 22 years of imprisonment. Undersigned became a lawyer to advocate on his father's behalf, who, in 2006, received what was effectively a life sentence driven by the then-draconian sentencing framework under 18 U.S.C. § 924(c). In 2020, however, Mr. DiPietro's sentence was reduced in proceedings in which undersigned served as counsel of record, and his projected release date fell within the ensuing years (A. 95-116).

On the night of his passing, Mr. DiPietro experienced acute respiratory distress—he struggled to breathe and could not speak in full sentences. Rather than immediately summoning emergency medical services, Bureau of Prisons staff directed him to self-ambulate to the facility's "nurses' station," requiring him to traverse a substantial distance from his housing unit without a wheelchair or escort despite his condition. Upon arrival, he was administered a nebulizer and oxygen treatment, but not the urgent emergency intervention his condition required. Only after those measures failed—and after Mr. DiPietro collapsed and went into cardiac arrest—was an ambulance finally called. Within approximately one hour of his death (around 10:00 p.m.), most of his personal belongings were discarded at the direction of staff, without regard for their apparent sentimental value to his family, and undersigned was not notified of his father's death until approximately 9:00 a.m. the following morning.

return, only to lose that hope in death—there would be little doubt that mercy should prevail in circumstances such as these.

These once small children—now grown—have carried their own extraordinary burdens through years of separation, still waiting, still hoping, still seeking nothing more than the chance to spend whatever time remains with their father and to lay him to rest with dignity. That opportunity, once lost, cannot be restored. There is no remedy. No appeal. No second chance.

Overall, the balance of the sentencing factors must reflect the present reality before the Court: an elderly and infirm prisoner, now in his nineties, who has spent more than three decades in custody, separated from his four children, and who now stands in need of mercy through compassionate release. His parents, wife, and siblings have all passed away. He is not the man he once was; his youth is long gone. Time alone has done what nothing else could—stripping away youth, strength, and any meaningful opportunity to reclaim what has been lost.

Compassionate release exists for this very moment—when continued incarceration no longer advances the purposes of punishment, and when mercy serves a greater end. Granting relief here does not diminish the seriousness of the past; it recognizes the reality of the present. There is no just need for an elderly and ailing prisoner, after serving an extraordinarily long term of imprisonment, to endure medical suffering and ultimately die in a prison cell—nor for his children, after decades of waiting, to be denied the dignity of closure.

Mercy, in this moment, is a treasure—and perhaps more notably, a true grace not only to those who may receive it, but also to those, like the Court, entrusted by God in this earthly realm with the authority to bestow it. And while the Government may strenuously object, and the noise of negative media coverage may be loud in the immediate news cycle that follows, the mercy granted here will endure as both just and lasting—alleviating the unnecessary infliction of continued suffering on an elderly and infirm prisoner, and prompting other courts to reflect when they are called upon to extend similar compassion to those in equally dire need.

### Conclusion

For the foregoing reasons, we pray that the Court grant Mr. Amuso's motion for compassionate release.

Respectfully submitted,

*Anthony DiPietro*

Anthony DiPietro, Esq.