KCB:EL
F. #2023V02186

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

VITTORIO AMUSO,

              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - -X

Docket No.  90–CR-446 (FB)

## MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANT'S SECOND MOTION FOR SENTENCE REDUCTION

JOSEPH NOCELLA, JR.
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Elias Laris
Assistant U.S. Attorney
    (Of Counsel)

## PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in opposition to defendant Vittorio Amuso's second motion for a sentence reduction pursuant to 18 U.S.C. § 3582(c)(1)(A). See ECF No. 1236 (motion dated April 24, 2026) (the "Second Motion"). Amuso engaged in a years-long pattern of serious criminal conduct as the Boss of the Luchese organized crime family of La Cosa Nostra (the "Luchese Crime Family" or the "Family"), including by ordering the murders of many people. After initially fleeing from justice, he only ceased his criminal conduct upon incarceration after a jury convicted him of all counts of a 54-count superseding indictment that included racketeering and racketeering conspiracy, nine counts of conspiracy to commit murder or attempted murder in-aid-of racketeering and six counts of substantive murder in-aid-of racketeering, among other charges.

Now, for the second time in three years, Amuso requests that the Court take the extraordinary step of releasing him from the life sentence of imprisonment imposed on him, arguing that "extraordinary and compelling" circumstances exist due to his "advanced age, serious medical conditions, more than 34 years of imprisonment, and demonstrated rehabilitation," among other things. But Amuso's motion simply repackages the same arguments that he made in his first motion, which this Court already denied. See ECF No. 1223 (the "Initial Motion"). Those arguments did not justify a reduction in sentence before, and they do not do so now. Indeed, as this Court has already found, the applicable sentencing factors in Title 18, United States Code, Section 3553(a) cannot justify the defendant's release when considering the extent of the defendant's criminal conduct as the head of the Luchese Crime Family, which included ending the lives of many people. Amuso should continue to serve the sentence originally contemplated, required by statute, and imposed by the sentencing Court—life in prison.

<u>BACKGROUND</u>[1]

I.     <u>The Offenses of Conviction</u>

On June 15, 1992, following an over-one-month long trial, a jury found the defendant guilty of all counts of a 54-count superseding indictment (the "Indictment").  <u>See</u> ECF No. 85.  Amuso committed and facilitated the crimes outlined in the Indictment through his position as the Boss of the Luchese crime family, one of the five major organized crime families in New York making up "La Cosa Nostra."  As proven at trial, Amuso's conduct was heinous, and included, among other things, several murders and attempted murders, racketeering, extortion, bribery, and fraud.

A.  <u>The Luchese Crime Family</u>

Amuso joined the Family in approximately 1978 and, after rising through its ranks, he was chosen by former Boss Anthony Corallo to succeed Corallo as Boss in late 1986. <u>See</u> Presentence Investigation Report, dated August 26, 1992 ("PSR") ¶ 30.  Soon after, Amuso promoted Anthony Casso from the position of Captain to Consigliere in 1988 and Underboss in 1990.  <u>Id.</u>

The mission of the Luchese Crime Family was to generate income for the Family, which each member shared with Amuso and Casso.  PSR ¶ 33.  Under Amuso's pre-Indictment leadership, the Luchese Crime Family contained between 500 and 1,000 "associates" and at least 120 "made members."  PSR ¶ 31.  The Luchese Crime Family earned substantial income through narcotics distribution, loansharking, gambling, and exercising influence over unions in the trucking, garment, and construction industries, which increased following Amuso's rise to

---

[1]     The government previously outlined the defendant's conduct in its response to the defendant's Initial Motion for compassionate release.  <u>See</u> ECF No. 1225 at 1-6.  The government does so again here for ease of the Court's reference, and because its heinous and violent nature compels continued imposition of the original life sentence.

power.  PSR ¶ 34.  These groups paid kickbacks to corrupt union officials—of which the Luchese Crime Family received a cut—to avoid threatened bodily harm and economic injury. Id.

B.  Window Replacement Industry

The Luchese Crime Family exercised particular control over the New York City Housing Authority ("NYCHA") window replacement industry, which racket was central to the underlying prosecution.  PSR ¶ 35.  Through this scheme, Amuso was able to extort payoffs from window manufacturers and exercise his influence to inflate bids for NYCHA projects by determining in advance which company would obtain the contract, thereby presenting New York City with exaggerated estimates for the planned work.  Id.  Between 1987 and 1989, the Luchese Crime Family received $1,000,000 in kickbacks from the scheme, 75% of which went to Amuso and Casso.  Id.

C.  Murders and Conspiracies to Murder

Amuso demanded complete obedience from his subordinates and frequently employed murder to protect his position in the Luchese Crime Family.  PSR ¶ 37.  As proven at trial, and detailed further below, Amuso ordered the murder of over a dozen individuals, nine of whom were in fact murdered:

- Murder of Sorecho Nalo (Racketeering Acts 1A and 1B, Counts 5 and 6): Sorecho Nalo threatened to kill an associate of the Luchese Crime Family and attempted to take over the associate's gambling establishments in Astoria, New York, from which Amuso received approximately $1,000 per week.  In Fall 1988, the associate asked Amuso to have Nalo murdered.

  On October 25, 1988, Nalo was lured to the associate's travel agency in Astoria, where Nalo was shot to death by members of the Luchese Crime Family.  PSR ¶ 38.

- Murder of Thomas Gilmore (Racketeering Acts 2A and 2B, Counts 7 and 8): Thomas Gilmore was an associate of the Luchese Crime Family.  Amuso believed that Gilmore was an informant and ordered his murder in late 1988.

On February 6, 1989, Gilmore was shot to death in an alley behind his home. PSR ¶ 39.

- <u>Murder of Michael Pappadio</u> (Racketeering Acts 3A and 3B, Counts 9 and 10): Michael Pappadio was a soldier in the Luchese Crime Family and oversaw Amuso's lucrative interests in the garment industry until Amuso suspected that Pappadio was keeping large amounts of money for himself. When Pappadio refused to vacate his position in the garment industry and began avoiding other members of the Luchese Crime family, Amuso ordered his murder in 1988.

  On May 13, 1989, Pappadio was lured to a bagel shop in Howard Beach, New York, where he was bludgeoned to death with a cable and shot in the head with a small caliber pistol. PSR ¶ 40.

- <u>Murder of John Petrucelli</u> (Racketeering Acts 4A and 4B): After Gus Ferace, an associate of the Bonnano Crime Family, killed Special Agent Everett Hatcher of the Drug Enforcement Administration in February 1989, a national manhunt ensued. During a commission of La Cosa Nostra, it was ruled that no one was to aid in Ferace's escape. John Petrucelli, a soldier in the Luchese Crime Family, bragged that he was hiding Ferace, at which time Amuso ordered Petrucelli to kill Ferace. When Petrucelli failed to do so, Amuso ordered Petrucelli's execution.

  On September 13, 1989, Petrucelli was shot to death outside of his apartment in Yonkers, New York. PSR ¶ 41.

- <u>Murder of John Morrissey</u> (Racketeering Acts 5A and 5B): John Morrissey was a shop steward in Local 580 of the Architectural and Ornamental Iron Workers Union. Morrissey collected Amuso's payoffs from various window replacement manufacturers for several years and delivered the money to Peter Chiodo, a captain of the Luchese Crime Family. Following Morrissey's indictment for the above-mentioned activities, Amuso was concerned that he would cooperate with the government.

  At Amuso's command, Morrissey was driven to a secluded area of New Jersey on September 17, 1989 for an alleged meeting with Amuso. Morrissey was shot to death and buried there. Amuso hoped that law enforcement would think that Morrissey was a fugitive from justice. PSR ¶ 42.

- <u>Attempted Murder of Joseph LaMorte and Conspiracy to Murder Anthony Accetturo, Sr. and Anthony Accetturo, Jr.</u> (Racketeering Acts 6A and 6B): Anthony Accetturo Sr. was a captain in the Newark, New Jersey, faction of the Luchese Crime Family. Amuso believed that he was an informant and grew very upset when Accetturo, Sr. refused to meet with him (Accetturo, Sr. feared that he would be executed). Amuso demanded that Accetturo's entire crew, which included Accetturo Jr. and Joseph La Morte, be murdered.

After several unsuccessful attempts to locate Accetturo Sr., LaMorte was observed in Florida where he owned a house.  Amuso initially wanted LaMorte to be kidnapped and tortured until he divulged the whereabouts of Accetturo, Sr. (who was incarcerated at the time).  However, LaMorte proved to be elusive, and Amuso subsequently ordered that he be murdered.  LaMorte was shot in the neck and shoulder outside his Florida home on November 10, 1989.  He was able to drive himself to a nearby medical facility following the attack and recovered from his injuries.  PSR ¶ 43.

- Attempted Murder of Joseph Martinelli (Racketeering Acts 7A and 7B, Counts 11 and 12): Joseph Martinelli was the principal owner of North Berry Concrete, a large company under the Luchese Crime Family's control.  In 1989, Amuso had Martinelli's life threatened when he stopped paying Amuso kickbacks.  Martinelli's brothers subsequently drove to Amuso's home armed with shotguns, warning Amuso's family that Amuso should leave Martinelli alone.  Amuso demanded that Martinelli be killed.

  In early 1990, Martinelli was lured to a video store parking lot in Staten Island, where his would-be killers planned to shoot him.  On that date, a gun was placed to Martinelli's head, but it failed to fire.  Martinelli was told that the incident was a practical joke and his life was later spared when he purchased supplies from companies associated with the Luchese Crime Family.  PSR ¶ 44.

- Murder of Michael Salerno (Racketeering Acts 8A and 8B): Michael Salerno was a prominent member of the Luchese Crime Family's Bronx faction, with ambitions of becoming a Boss.  He was closely associated with Anthony Corallo and grew resentful when Corallo promoted Amuso to leader, especially since the majority of the family's Bosses were traditionally chosen from the Bronx division (whereas Amuso belonged to the Brooklyn group).  Amuso, knowing of Salerno's hostility, thought he might be an informant and ordered Salerno's murder.

  In June 1990, the Salerno was shot through the heart and stabbed in the throat.  PSR ¶ 45.

- Murder of Bruno Facciola (Racketeering Acts 9A and 9B, Counts 13 and 14): Bruno Facciola was a long-time soldier in the Luchese Crime Family.  Amuso feared that Facciola was coopering with the government and ordered him to be murdered.  On August 24, 1990, Facciola was lured to an auto-body shop but attempted to escape when he realized he was going to be killed.  Facciola was dragged back inside where he was shot and stabbed to death.  A dead canary was placed in his mouth, which served as Amuso's warning to potential informants.  PSR ¶ 46.

- Murders of Larry Taylor and Al Visconti (Racketeering Acts 10 and 11, Counts 15 and 16): Larry Taylor and Al Visconti were both associates of the

Luchese Crime Family and close friends of Bruno Facciola. Visconti was also in a common-law relationship with Facciola's sister. Upon learning that Taylor and Visconti planned to avenge Facciola's death, Amuso demanded their executions.

Taylor was shot to death on February 5, 1998, while sitting in his car in the Canarsie section of Brooklyn. Visconti was shot in the head and groin (the latter because Amuso had heard a rumor that Visconti was bisexual) in the lobby of his apartment building in Bensonhurst, New York, on March 26, 1991. PSR ¶ 47.

- Attempted Murder of Peter Chiodo (Racketeering Acts 12A and 12B, Counts 18 and 19): Peter Chiodo was a made member of the Luchese Crime Family from 1987 to 1991. Prior to his elevation to captain in 1988, he was a soldier in Anthony Casso's crew. Chiodo participated in the Luchese Crime Family's monopolization of the New York window replacement industry (described further below), for which he was indicted in May 1990.

  After Chiodo pleaded guilty to the indictment without Amuso's permission, Amuso feared that Chiodo was cooperating with the government and wanted Chiodo dead. The Luchese Crime Family tapped Chiodo's phone to learn when Chiodo would be travelling alone. On May 8, 1990, Chiodo was approached by several individuals at a gas station and shot 12 times throughout his body. Chiodo was left partially paralyzed and confined to a wheelchair at the time of the writing of the PSR. Later, at Amuso's command, Chiodo's father was grabbed in the street and warned that he would be killed if Chiodo ever testified against Amuso. PSR ¶ 49.

D. Flight from Justice

After learning from corrupt law enforcement officers that he was going to be arrested for his illegal monopolization of the window replacement industry, Amuso fled from justice in May 1990. PSR ¶ 36. In January 1991, Amuso named a temporary acting Boss of the Luchese Crime Family but retained most of his power, including the sole right to initiate new members and approve murders. Id. On July 28, 1991, FBI agents located Amuso in Scranton, Pennsylvania, and placed him under arrest. PSR ¶ 49. On Amuso's person was a New York State driver's license containing the name Joseph LaStrada. Id. Amuso refused to identify himself when taken into custody. Id.

II.    Sentencing and Appeal

On October 2, 1992, following Amuso's trial conviction, the Honorable Eugene Nickerson sentenced Amuso to life in prison with five years' supervised release, a $250,000 fine and a $2,700 assessment.  See ECF No. 128.

On November 4, 1992, Amuso appealed his conviction, see ECF 134, which was nonetheless affirmed by the Second Circuit Court of Appeals on April 20, 1994.  See United States v. Amuso, 21 F.3d 1251 (2d Cir. 1994).

III.    Amuso's Initial Compassionate Release Motion

On June 9, 2023, Amuso filed a motion for compassionate release, pursuant to 18 U.S.C. § 3582(c)(1)(A).  See Initial Motion.  In the Initial Motion, the defendant argued that, among other things, his "advanced age and failing health, along with his long imprisonment and exceptional institutional record," constituted "extraordinary and compelling" circumstances that warranted compassionate release.  Id. at 6-9.  The government opposed, arguing that Amuso's medical circumstances did not meet the threshold "extraordinary and compelling reason" requirement of 18 U.S.C. § 3582(c)(1)(A) and that his release was not warranted when considering the 18 U.S.C. § 3553(a) factors.  See ECF No. 1225.

On August 10, 2023, the Court denied Amuso's petition for compassionate release.  See ECF No. 1232 (the "2023 Opinion").  The Court found that Amuso's various age-related ailments were being treated and managed by the Bureau of Prisons and "are a product of his life sentence, rather than extraordinary and compelling circumstances."  Id. at 8-9 (citing United States v. Victor J. Orena, 92-cr-00351 (EK), at *8 n. 7 (E.D.N.Y. Oct. 27, 2021) (noting, in denying compassionate release for an elderly inmate and the former boss of another one of the five families of La Cosa Nostra: "Judge Weinstein surely understood that a life sentence would

7

likely result in Orena's incarceration even as an elderly and infirm inmate, and he would not have imposed the sentence lightly, given that understanding.")).

Notably, the Court found that even if it had found that extraordinary and compelling reasons existed to reduce Amuso's sentence, "it could not find that a reduced sentence is justified by the § 3553(a) factors" and that, like Orena, Amuso's offense conduct "gives rise to a scenario in which a reduced sentence would not be appropriate." 2023 Opinion at 10. The Court recognized Amuso's leadership role in the Luchese Crime Family, emphasizing that his reign was "replete with bloodshed," having ordered numerous murders in furtherance of the Family "while amassing illicit wealth at the expense of New York City and its surrounding areas, including its legitimate business owners, taxpayers, and members of industries and unions corrupted by its influence." Id. at 10-11. In denying the Initial Motion, the Court concluded:

> Given the depth and breadth of Amuso's role in the Luchese Family, and the harm exacted on both individuals and the community, the Court cannot in good conscience reduce his sentence. His conduct was simply too serious, too disrespectful of the law, and too destructive to the fabric of society to warrant anything other than a life sentence.

Id. at 11.

IV.   The Instant Compassionate Release Motion

Less than two years after the Court's determination, on April 14, 2025, Amuso filed a request for compassionate release with Warden David Leu at FCI Butner Medium II, where Amuso is an inmate. See Second Motion, Exhibit A at 13-18. Amuso argued that he qualified for compassionate release under 18 U.S.C. § 3582(c)(1)(A) (discussed further below) and Bureau of Prisons ("BOP") Policy Statement 5050.50 ("BOP 5050.50") Section 4(a) because of, among other things, his advanced age and deteriorating health. Id.

On September 24, 2025, a BOP representative informed Amuso's counsel that the application was approved at the institution by the Warden. Id. at 22. On December 18, 2025, however, the BOP Office of the General Counsel ("OGC") denied Amuso's application for reduction in sentence pursuant to Section 4(a) of BOP 5050.50 ("New Law Elderly Inmates"). Id. at 23. In denying Amuso's application, the OGC memorandum noted that while Amuso was eligible for consideration for a sentence reduction under Section 4(a) because he was more than 65 years old and he had served more than 30 years' imprisonment—the requirements of that section—nonetheless, "due to the serious nature and circumstances of the Mr. Amuso's offenses, his release would minimize the severity of his offense and could pose a danger to the community." Id.

## ARGUMENT

The circumstances have not materially changed since the Court's denial of Amuso's Initial Motion less than three years ago. Amuso's Second Motion provides no valid basis for the Court to disturb its prior denial of compassionate release. Specifically, as described below, Amuso's application fails because, even if "extraordinary and compelling reasons" exist, which the government does not concede is the case, the Section 3553(a) factors militate heavily against compassionate release pursuant to Section 3582(c)(1)(A).

I.    Applicable Law

"A district court lacks the authority to alter a sentence after the time of sentencing, except where Congress has provided otherwise." United States v. Petit, 541 F. Supp. 3d 304, 309 (S.D.N.Y. 2021) (citing United States v. Addonizio, 442 U.S. 178, 189 (1979)). Section 3582(b) provides that, subject to certain narrowly prescribed exceptions, "a judgment of conviction that includes [a sentence to imprisonment] constitutes a final judgment." One of the exceptions is the compassionate release provision found in Section 3582(c)(1)(A), which allows

9

a court to, upon the defendant's motion, "reduce the term of imprisonment (and . . . impose a term of probation or supervised release . . . that does not exceed the unserved portion of the original term of imprisonment)."

A court may modify a term of imprisonment upon a defendant's showing of "extraordinary and compelling reasons." See 18 U.S.C. § 3582(c)(1)(A)(i). A defendant may move for compassionate release "after the defendant has fully exhausted all administrative rights to appeal a failure of the BOP to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." See id. at § 3582(c)(1)(A). Any such reduction must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). The applicable policy statement is set forth in U.S.S.G. § 1B1.13.[2]

The existence of extraordinary and compelling reasons, however, does not per se compel compassionate release. Rather, courts must consider whether the factors under Section 3553(a), on balance, override the extraordinary and compelling reasons. If so, release will not be warranted. See United States v. Jones, 17 F.4th 371, 374 (2d Cir. 2021) ("[E]xtraordinary and compelling reasons are necessary — but not sufficient — for a defendant to obtain relief under

---

[2]    Although the Second Circuit held in United States v. Brooker, 976 F.3d 228 (2d Cir. 2020) that a prior version of U.S.S.G. § 1B1.13 was not "applicable" in light of subsequent statutory amendments and thus did not limit courts' discretion, the most recent amendments to U.S.S.G. § 1B1.13 "have harmonized the Policy Statement with the" statute. United States v. Feliz, No. 16-CR-809 (VM), 2023 WL 8275897, at *4 (S.D.N.Y. Nov. 30, 2023). Brooker thus no longer controls and compliance with U.S.S.G. § 1B1.13 is once again mandatory. Id.; see also United States v. Messina, No. 11-CR-31 (KAM), 2024 WL 2801717, at *3 (E.D.N.Y. May 31, 2024) (ruling that the "'amended guidance as to what constitutes extraordinary and compelling reasons now controls a court's analysis of a defendant- or BOP-initiated petition for compassionate release.'" (quoting United States v. Saez, No. 16-CR-317 (PAE), 2024 WL 303847, at *3 (S.D.N.Y. Jan. 26, 2024))).

§ 3582(c)(1)(A). . . . [A] district court must also consider 'the factors set forth in section 3553(a)' before granting relief."). As the court in <u>United States v. Gotti</u> explained:

> It is important to note that a defendant who meets all the criteria for compassionate release consideration listed above is <u>not thereby automatically entitled</u> to a sentence modification. He is <u>simply eligible</u> for a sentence modification. The court confronted with a compassionate release motion is still required to consider all the Section 3553(a) factors to the extent they are applicable, and may deny such a motion if, in its discretion, compassionate release is not warranted because Section 3553(a) factors override, in any particular case, what would otherwise be extraordinary and compelling circumstances.

433 F. Supp. 3d 613, 615 (S.D.N.Y. 2020) (emphases added).

Pursuant to Section 3553(a), the Court must consider whether, when weighed against the purported "extraordinary and compelling reasons," the following factors, among others, permit release: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to (a) reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense; (b) afford adequate deterrence to criminal conduct; and (c) protect the public from further crimes of the defendant; and (3) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. <u>See</u> 18 U.S.C. § 3553(a)(1), (2), and (6).

A district court may deny a motion for compassionate release based solely on the Section 3553(a) factors without reaching the question of whether extraordinary and compelling reasons are present. <u>See</u> <u>United States v. Keitt</u>, 21 F. 4th 67, 69 (2d Cir. 2021) ("[W]hen a district court denies a defendant's motion under § 3582(c)(1)(A) in sole reliance on the applicable § 3553(a) sentencing factors, it need not also determine whether the defendant has shown extraordinary and compelling reasons that might (in other circumstances) justify a

11

sentence reduction."); see also United States v. Davis, No. 21-1136, 2023 WL 2639576, at *1

(2d Cir. Mar. 27, 2023) (reaffirming and applying holding of Keitt).

A defendant seeking relief bears the burden of proving that extraordinary and

compelling reasons exist to justify early release. See United States v. Butler, 970 F.2d 1017,

1026 (2d Cir. 1992) ("If the defendant seeks decreased punishment, he or she has the burden of

showing that the circumstances warrant that decrease."); see also Gotti, 433 F. Supp. 3d at 619

(defendant "has the burden of showing that 'extraordinary and compelling reasons' to reduce his

sentence exist").

II.     The Section 3553(a) Factors Require that Amuso's Motion Be Denied

As with Amuso's Initial Motion, the Court need not reach the issue of whether

extraordinary and compelling circumstances exist for Amuso's compassionate release because

the Section 3553(a) factors militate heavily against such relief, and he has failed to meet his

burden to the contrary. See 2023 Opinion at 6 (finding that a "balancing of the § 3553(a) factors

would not justify [Amuso's] release"); see also United States v. Michael Spinelli, No. 97-CR-

00209 RJD (E.D.N.Y. May 1, 2023) (declining to reach whether extraordinary and compelling

circumstances for release existed where Section 3553(a) factors weighed heavily against early

release). As the Court has already found, the nature of Amuso's pervasive and heinous crimes,

his history and characteristics and recent rulings in this district denying compassionate release

motions by similarly situated mob leaders like Amuso give "rise to a scenario in which a reduced

sentence would not be appropriate." 2023 Opinion at 10. He must serve his life sentence, as

imposed, and his motion must be denied.

A. The Serious Nature of Amuso's Crimes Weighs Heavily Against Compassionate Release

First, the serious "nature and circumstances of the offense[s]" here cannot be overstated. See 18 U.S.C. § 3553(a)(1). Amuso commanded and facilitated the 54 crimes of conviction—including over a dozen murders, attempted murders, or conspiracies to murder—through his position as Boss of the Luchese Crime Family, one of the most violent criminal organizations in the country. Indeed, Congress has found that murders in furtherance of racketeering, like those for which Amuso was convicted, are so serious that a defendant convicted of even one such offense (no less multiple) must serve the rest of his life in prison. See 18 U.S.C. § 1959(a)(1) (listing the death penalty or life imprisonment as punishments for murder in aid of racketeering); see also United States v. Gioeli, No. 08-CR-240 (BMC), 2020 WL 2572191, at *5 (E.D.N.Y. May 21, 2020) (describing the defendant's "callous disregard for human life" in finding that the Section 3553(a) factors precluded compassionate release). Notably, several of the murders that Amuso ordered were intended to preserve Amuso's own power within the Family and eliminate other members of the Family whom Amuso feared to be cooperating or acting as informants to the government.

In addition to the violence and death inflicted at Amuso's direction, his corrupt influence as a leader of the Family was far reaching and had significant negative effects on the legitimate, hard-working citizens of New York City. As Judge Weinstein held in United States v. Sessa, and as Your Honor cited in the 2023 Opinion:

> The drain on the city's human and economic resources caused by this criminal activity [i.e., the activities of La Cosa Nostra] has been a major factor in the deterioration of our social, political and economic infrastructure . . . The direct and indirect costs of these gangs to the honest people of the metropolitan area are measured in the billions of dollars. Whole industries have been poisoned and adversely affected. Waterfront activities and traffic by ships,

> aircraft and trucks, building trades, garment trades, convention and theatrical facilities, restaurants and even politics are among the innumerable areas where these malefactors have operated . . .The direct costs to taxpayers of police surveillance and prosecutions run into the millions.

821 F. Supp. 870, 874 (E.D.N.Y. 1993).

Amuso's significant sentence was and is consistent with the seriousness of his crimes and reflects the heartless violence that he employed in the service of the Luchese Crime Family—violence that was designed to preserve Amuso's power as the head of that Family and insulate him from facing accountability for his crimes. His sentence also served the important need to deter others from attempting to thwart the criminal justice system by evading law enforcement and ordering and executing the murders of suspected cooperators. Indeed, the defendant's participation in a particularly chilling murder in which a canary was placed in the mouth of a murdered suspected informant was a sinister act intended to send a warning to other witnesses who may consider cooperating with law enforcement. See 2023 Opinion at 3. The Court should again deny Amuso's motion to, among other reasons, send a message to other criminals and would-be criminal leaders, including murderers and those seeking to obstruct justice: that such criminal conduct is severely punished and that a life sentence, in fact, means a life sentence.

As in his Initial Motion, Amuso's Second Motion does not seriously contend with his vast and violent offense conduct, and completely fails to address his leadership role in the Luchese Crime Family, including the years-long racketeering scheme organized at his behest, and which pervaded New York City and its industries; all while directing the murders of numerous people in furtherance of his criminal organization. Instead, Amuso half-heartedly asserts that he is innocent (at least "as to many of the offenses of conviction"), and asserts that his convictions were "largely" based on the testimony of "compromised" cooperating witnesses.

<u>See</u> Second Motion at 14, n. 3.  This argument holds no water.  The defendant was convicted of all 54 counts of the Indictment following over a month-long trial in which the government established, through witness testimony and documentary evidence, Amuso's position at the helm of the Luchese Crime Family; a status he repeatedly used to command that perceived enemies and cooperators be murdered to further his own interests, protect the power he held as Boss of the organization and protect the interests of the organization itself.  The jury's verdict was swift, as it returned a guilty verdict on all counts of the Indictment in less than a day.  <u>Amuso</u>, 21 F.3d at 1257.

Much of Amuso's Section 3553(a) argument calls for the Court to provide sympathy to Amuso in light of his advanced age, including that as "Amuso's life nears its end, the need for closure through a dignified passing assumes profound importance" and emphasizing that Amuso's passing in prison would cause "profound" pain on his family and children.  Second Motion at 17-18.  But such arguments conflate the standards for assessing "extraordinary and compelling reasons" with analysis of the Section 3553(a) factors.  Moreover, such arguments only address the impact of Amuso's incarceration for himself; they fail to address the deep and lasting ramifications of his offense conduct, in which he ordered the murders of numerous individuals whose families will never be able to obtain the very relief and "dignified passing" for their own relatives, and that Amuso himself now seeks.[3]

---

[3]     Amuso seeks compassion, in part, because he relies at times on a wheelchair to navigate his facility.  <u>See</u> Second Motion at 6-11.  As the government noted in its prior submission, ECF No. 1225 at 12, n. 1, this is both ironic and uncompelling, as Amuso left 40-year-old victim Peter Chiodo partially paralyzed and confined to a wheelchair after Amuso's hitmen attempted to murder him to prevent him from cooperating with the government against Amuso.  Amuso's actions confined Chiodo to a wheelchair for years after the attack.  <u>See</u> Eleanor Randolph, <u>N.Y.'s Don Days Warm Up With Trial of 'The Chin'</u>, Los Angeles Times, July 3, 1997, https://www.latimes.com/archives/la-xpm-1997-jul-03-mn-9314-story.html (noting that Chiodo's wounds required his continued use of a wheelchair).  The government is in the process

As this Court has recently found, Amuso's conduct "was simply too serious, too disrespectful of the law, and too destructive to the fabric of society to warrant anything other than a life sentence." 2023 Opinion at 11. Amuso's Second Motion offers no valid basis for the Court to disturb its prior finding that it "cannot in good conscience reduce his sentence," and the Second Motion should be denied. Id.

B. Amuso's History and Characteristics Require His Continued Incarceration

Amuso's history and characteristics also support denial of his motion. See 18 U.S.C. § 3553(a)(1). In addition to his long-standing membership in organized crime, Amuso rose through the ranks of the Luchese Crime Family to become its leader, through which he wielded significant power and influence that he used to command violence to protect his interests. Indeed, as the Court emphasized in denying Amuso's Initial Motion, "[m]urder was a tool in Amuso's arsenal, and one he used regularly in order to advance his business pursuits and ensure that he retained absolute power in the Family." 2023 Opinion at 2-3. Moreover, as described above, Amuso leveraged his corrupt resources to flee from justice after he learned of his impending arrest in connection with his window replacement industry scheme, during which time he assumed a false alias and refused to identify himself to law enforcement, even upon arrest. Id. at 3.

Notably, notwithstanding the extraordinary relief that Amuso seeks in requesting compassionate release, and the burden Amuso bears in proving to the Court that a reduction in his sentence is warranted, the Second Motion fails in any way to denounce or otherwise disclaim association with the Luchese Crime Family that he was convicted of leading at trial. In fact,

---

of notifying Amuso's victims and their families of the instant application and will update the Court promptly regarding any crime victim's views, consistent with the Crime Victims' Rights Act, 18 U.S.C. § 3771 and U.S.S.G. § 1B1.13.

16

none of Amuso's motions mention the Luchese Crime Family or his leadership role therein. Rather, Amuso now claims his innocence and seeks to pin his criminal conduct on his co-conspirator and Underboss, Anthony Casso, who reported to Amuso and worked with Amuso to order several of the murders described above. To that end, the defendant's purported "rehabilitation" is undermined by his unwillingness and inability to (i) take responsibility for the crimes that he was convicted of at trial, or (ii) even denounce La Cosa Nostra, whose widespread harm and impact on New York City and its residents is undeniable. Amuso cites no change in his history and characteristics that warrant a reduction in his sentence. 2023 Opinion at 1. As the Court found less than three years ago, Amuso's "criminal history is so long, and [his] victims so numerous," that a reduction in sentence cannot be granted. 2023 Opinion at 10 (quoting Orena, 92-CR-351 (EK), at *5 ("Following the adoption of the First Step Act, a strain of cases . . . has emerged in which the offenders' criminal history is so long, and their victims so numerous, that even serious health conditions do not suffice to merit relief. This case falls squarely in that category." (emphasis added))).

      C. <u>Amuso Remains a Danger to the Community</u>

Amuso must also remain incarcerated because he is a danger to the community. <u>See</u> 18 U.S.C. § 3553(a)(2)(C). Despite the nature of the offenses of conviction and subsequent flight from justice, during which time he maintained control over his criminal organization, Amuso provides scant argument against OGC's finding that he could pose a danger to the community, relying primarily on letters submitted by his children in which they submit that he is not a danger. <u>See</u> Second Motion, Exhibit A at 20-21.

The very nature of Amuso's role requires that the Court maintain his incarceration to "protect the public from further crimes of the defendant." <u>See</u> 18 U.S.C. § 3553(a)(2)(C). Amuso's ruthless direction and facilitation of murders and attempted murders—often to protect

17

his own interests and power—demonstrates his utter disregard for human life and willingness to resort to violent ends to serve his interests and the interests of the Luchese Crime Family. As the Court itself noted, Amuso led "approximately 120 made men and as many as 1,000 associates, all of whom carried out his bidding," and "[a]t Amuso's command, more than a dozen individuals were ordered to be killed." 2023 Opinion at 2, 10-11 (emphasis added). In short, Amuso's danger stems from his position as the Boss of the Luchese Crime Family, a violent organization that still exists today, and his ability to have others commit violent crimes on his behalf, as he did so many times before his arrest. Judge Cogan's opinion in United States v. Gioeli is instructive:

> **[T]he danger posed by mob leaders, like [the] defendant, is not that these leaders will personally engage in acts of violence, but that they "can command others to do so**." See United States v. Gotti, No. 02-cr-743, 2020 WL 497987, at *9 (S.D.N.Y. Jan. 15, 2020) ("Bosses don't commit violence themselves, they have subordinates to do their bidding."). The record shows that defendant hurt his knee after playing table tennis. Neither that nor his other medical conditions would stop him from picking up a telephone.

Gioeli, 2020 WL 2572191, at *5 (emphasis added) (quoting Gotti, 2020 WL 497987, at *9). The same is true for Amuso. Notwithstanding his advanced age, and any ailments that come with the aging process, Amuso will have the ability to direct others to commit crimes, just as he has in the past, and as established at trial. This is particularly true where, as here, Amuso has repeatedly failed to renounce, or otherwise distance himself from, his position as Boss of the Family. For the reasons described above and in the government's opposition to Amuso's Initial Motion, ECF No. 1225 at 12-15, Amuso has failed to establish that he is no longer a danger to the community and his Second Motion must be denied.

D. <u>Amuso Must Remain Incarcerated to Prevent Sentencing Disparities Among Similarly Situated Defendants</u>

Amuso's motion also should be denied to avoid unwarranted sentence disparities among other organized crime leaders with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6); <u>see also</u> <u>United States v. Conatser</u>, 514 F.3d 508, 521 (6th Cir. 2008) (citations omitted) (noting this factor "concerns national disparities between defendants with similar criminal histories convicted of similar criminal conduct").  Comparing Amuso's life sentence to those sentences imposed on other defendants convicted in connection with their leadership of a major organized crime family indicates Amuso's sentence is not aberrant.  For instance, John Gotti, the Gambino crime family boss, was convicted in 1992 and sentenced to life imprisonment.  No. 90-CR-1051-ILG (E.D.N.Y.).  Carmine Persico, the long-time official boss of the Colombo crime family, was convicted in 1986 and sentenced to 139 years' imprisonment. No. 85-CR-139 (S.D.N.Y.).  Anthony Corallo, the then-boss of the Lucchese crime family, was convicted in 1986 and sentenced to 100 years' imprisonment. No. 86-CR-139 (S.D.N.Y.).  Anthony Salerno, the boss of the Genovese crime family, was convicted in 1987 and 1988 and sentenced to 100 and 70 years, respectively. No. 85-CR-139 (S.D.N.Y.) and 86-CR-245 (S.D.N.Y.).

Similarly situated mob leaders who engaged in equally or less egregious and heinous criminal conduct than Amuso's have also had their requests for compassionate release denied, including second or third requests for compassionate release.  For example:

- <u>Anthony "Gaspipe" Casso</u> – as described above, Casso was the consigliere and eventual Underboss of the Luchese Crime Family under Amuso's leadership.  Casso was also charged in the Indictment for crimes stemming from his position in the Luchese Crime Family and pleaded guilty to, among other crimes, several of the same murders and attempted murders for which Amuso was convicted.  <u>See</u> Government Opposition to Anthony Casso's Motion for Compassionate Release, <u>United States v. Anthony Casso</u>, 90-cr-00446 (FB), Dkt. No 1867, at 3-7.

On November 28, 2020, this Court denied Casso's application for compassionate release, finding, even after "carefully consider[ing] the gravity of [Casso's] medical condition . . . in light of the nature and extent of defendants criminal history, that he remains a danger to the community and that the section 3553(a) factors do not justify early termination of his life sentence." See United States v. Anthony Casso, 90-cr-00446 (FB) (E.D.N.Y. Nov. 28, 2020).

- Victor J. "Little Vic" Orena – Orena served as the acting Boss of the Colombo organized crime family, another one of the five New York Families of La Cosa Nostra. See Memorandum in Response to Motion for Release from Custody, United States v. Victor J. Orena, 92-CR-351 (EK), Dkt. No. 1865. Orena was sentenced to life in prison following his conviction on a number of charges stemming from an internecine war between opposing factions of the organization, which resulted in the attempted assassination, wounding, or successful assassination of 28 individuals, including 12 individuals who were actually killed. Orena was further convicted of the murder of Thomas Ocera, an inducted member of the Colombo family, in aid of racketeering.

  On October 27, 2021, the Honorable Eric Komitee denied Orena's motion, finding that Orena's "undeniably serious" medical conditions did not outweigh the Section 3553(a) factors that supported his continued imprisonment. See United States v. Victor J. Orena, 92-CR-351 (EK) (E.D.N.Y. Oct. 27, 2021). Judge Komitee highlighted the "inescapable conclusion that any sentence short of the life term imposed by Judge Weinstein would insufficiently reflect the seriousness of the offense conduct here and fail to provide just punishment." Id. at 8. On August 31, 2022, the Second Circuit Court of Appeals affirmed Judge Komitee's decision. See United States v. Amato, 48 F.4th 61 (2d Cir. 2022).

  On April 27, 2026, Judge Komitee denied Orena's second motion for compassionate release. United States v. Victor J. Orena, 92-CR-351 (EK), Dkt. No. 1994. Judge Komiteee noted that "even to the extent Orena has experienced a significant decline [in health], the primary basis for the Court's previous denial remains: Section 3553(a) factors including, most prominently, the seriousness of the offense conduct, which left so many dead (including innocent bystanders); the defendant's history and characteristics; and the need for just punishment. Id. at 3-4.

- Michael Sessa – Sessa was a made member and acting captain of the Colombo Crime Family between 1985 and 1992, when he was incarcerated. Sessa's activities on behalf of the Colombo Crime Family included a multi-year loan-sharking operation in which customers were threatened or assaulted if they fell behind on payments. Sessa was also heavily involved in plotting the murders of various individuals viewed as threats to the Family. In one instance, Sessa murdered an associate of the Family by repeatedly shooting him in the head because other members of the Family feared that the associate

would cooperate with federal agents. Following an internal dispute over leadership of the Colombo Crime Family, Sessa and his associates conspired to murder no less than three members of a rival faction, using machine guns, armor piercing bullets, and stolen vehicles. See Memorandum Opposing Motion Third Motion for Reduction in Sentence, United States v. Michael Sessa, 92-CR-351 (EK), Dkt. No. 1987.

On July 14, 2020, the Honorable Allyne R Ross denied the defendant's motion for compassionate release, reasoning that despite Sessa's underlying medical conditions constituting potential extraordinary and compelling circumstances required for release, the sentencing factors set forth at 18 U.S.C. § 3553(a) weighed in favor of the defendant's continued detention. United States v. Sessa, No. 92-CR-351 (ARR), Dkt. No. 1843 at 9 ("Sessa's evidence of extraordinary and compelling reasons for release is outweighed by the nature and circumstances of his offenses; his history and characteristics; and the need for the sentence to reflect the serious[ness] of his offense, promote respect for the law, and provide just punishment for his offense.").

On September 8, 2023, Judge Ross denied Sessa's second motion for compassionate release, observing that the "arguments [were] largely duplicative of those in" his initial motion and that "any evidence of extraordinary and compelling reasons for release [was] outweighed by the nature and circumstances of [Sessa's] offenses; his history and characteristics; and the need for his sentence to reflect the seriousness of his offense, promote respect for the law, and provide just punishment for his offense." United States v. Sessa, No. 92-CR-351 (ARR), 2023 WL 5831162, at *2-3 (E.D.N.Y. Sept. 8, 2023).

On January 2, 2026, Judge Ross denied Sessa's third motion for compassionate release. United States v. Sessa, No. 92-CR-351 (ARR), Dkt No. 1989. Judge Ross found that, in addition to no extraordinary and compelling circumstances existing for release, "the nature and circumstances of Mr. Sessa's multiple brutal offenses, which he committed while occupying a leadership role in the Colombo family," warranted a length sentence, as imposed by Judge Weinstein at the time of sentencing. Id. at 9. Judge Ross further noted that Sessa's life sentence was analogous to that of his co-defendant, Orena, who also failed to obtain compassionate release from his life sentence. Id. at 9-10.

- Michael Spinelli – Spinelli was an associate of the Luchese Crime Family under Amuso's leadership and worked under Peter Chiodo, a Luchese "soldier." Following Chiodo's attempted assassination, described above, Amuso (fearing that Chiodo may testify against him) ordered Spinelli to murder Chiodo's sister, Patricia Capozzalo, to send a message to Chiodo. See Letter in Opposition to Motion for Compassionate Release, United States v. Spinelli, 97-cr-00209 (RJD), Dkt. No. 289. Capozzalo was the mother of

three young children and had no role whatsoever in organized crime.  Id. Spinelli led the extensive planning of Capozzalo's murder, and in March 1992, Capozzalo was shot in the neck and behind her ear following an ambush by Spinelli and others.  Id.  Capozzalo survived but had to undergo surgery to remove the bullet from her neck and was forced into witness protection.  Id. Spinelli was charged and found guilty of racketeering charges related to the attempted murder and sentenced to a total effective sentence of 295 months' imprisonment.  Id.

On May 1, 2023, the Honorable Raymond J. Dearie denied Spinelli's motion for compassionate release, finding that "justice interjects a non-negotiable no here," and that a reduction of Spinelli's sentence "could not possibly comport with the statutory requirement that a criminal sentence reflect the seriousness of the offense, promote respect for the law, and provide just punishment," as required by Section 3553(a)(2).  See United States v. Michael Spinelli, No. 97-CR-00209 (RJD), slip op. at 3 (E.D.N.Y. May 1, 2023).  Judge Dearie emphasized that Spinelli's "apparently genuine conversion, and his unfortunately declining health do not and will not outweigh the trauma suffered by Mr. Spinelli's victim and the callous and unprecedented nature of his criminal act, which he carried out to advance his standing as a committed disciple of organized crime."  Id.

As demonstrated by the above-mentioned cases, courts in this district, including this Court, have routinely denied compassionate release to mob leaders who participated in widespread racketeering schemes and resorted to murder or conspiracy to murder in furtherance of those schemes.  Notably, and as described above, since the Court denied Amuso's Initial Motion in 2023, Orena and Sessa—whose offense conduct the Court has already likened the severity of Amuso's conduct to—have each had successive compassionate release petitions denied, with the court finding in each instance that the Section 3553(a) factors could not justify release based on the severity of their conduct.  See 2023 Opinion at 10-11.  And as the Court already determined in denying Amuso's Initial Motion, an analysis of Amuso's Section 3553(a)

factors, like Casso's, "[does] not justify early termination of his life sentence." Id. at 10 (quoting Casso, 90-CR-446 (FB) (E.D.N.Y. Nov. 28, 2020)).[4]

The out-of-district cases relied on by Amuso are uncompelling. While United States v. Tellier, No. 92-CR-869 (LGS), 2023 U.S. Dist. LEXIS 149994 (S.D.N.Y. Aug. 25, 2023) and United States v. Underwood, No. 88-CR-822 (SHS), 2021 U.S. Dist. LEXIS 8378 (S.D.N.Y. Jan. 15, 2021) each involved the defendants' leadership of criminal organizations and participation in multiple murders, neither of their offense conduct matches the "depth and breadth of Amuso's role in the Luchese Family, and the harm exacted on both individuals and the community," which compelled the Court in its 2023 Opinion to find that it "cannot in good conscience reduce his sentence."[5] 2023 Opinion at 10-11 (noting that at Amuso's command, "more than a dozen individuals were ordered to be killed, and nine were actually slain—for the purpose of maintaining power over a criminal enterprise—all while amassing illicit wealth at the expense of New York City and its surrounding areas" (emphases added)). Amuso's criminality was staggering in its breadth and the harm caused, and Amuso's continued incarceration is necessary in light of both the severity and widespread nature of his offense conduct and the power he wielded on behalf of a violent criminal organization. See 2023 Opinion at 1, 10-11.

---

[4]     In the Second Motion, Amuso argues that the government has "attributed much of [Amuso's offense] conduct to Anthony Casso in connection with Casso's own compassionate release application [], only to shift its characterization when opposing Mr. Amuso's request for similar relief." Second Motion at 14, n. 3. This is misleading and ignores the voluminous trial evidence establishing that Amuso and Casso each held leadership positions within the Family and, together, ordered that many of the murders and acts of violence be committed, including several that Casso participated in himself. See generally PSR ¶¶ 30-50.

[5]     Notably, unlike Amuso, Tellier and Underwood each expressed remorse and acceptance of responsibility for their offense conduct. See Tellier, 2023 U.S. Dist. LEXIS 149994, at *15; Underwood, No. 88-CR-822 (SHS), Dkt. No. 186, Ex. I.

The Court should not disturb its prior finding that "Amuso's case, as with the defendant's in <u>Orena</u>, gives rise to a scenario in which a reduced sentence would not be appropriate." <u>Id.</u> at 10.

III.   <u>No Extraordinary and Compelling Reasons Warrant Compassionate Release</u>

As he did in the Initial Motion, Amuso spends much of his Second Motion arguing that his medical condition and advanced age create extraordinary circumstances warranting compassionate release, now under U.S.S.G. § 1B1.13(b)(2) (age of the defendant) and U.S.S.G. § 1B1.13(b)(1)(B) (medical circumstances of the defendant).  <u>See</u> Second Motion at 5-12.  U.S.S.G. § 1B1.13(b)(2) requires that "defendant (A) is at least 65 years old; (B) is experiencing a serious deterioration in physical or mental health because of the aging process; and (C) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less."  U.S.S.G. § 1B1.13(b)(1)(B) requires that the defendant is "(i) suffering from a serious physical or medical condition, (ii) suffering from a serious functional or cognitive impairment, or (iii) experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover."

Amuso primarily argues that a variety of ailments have resulted in increased and ongoing pain, significant weight loss, confined him to a wheelchair and require him to seek assistance from other inmates "to pick up his food trays and make his bed."  Second Motion at 5-9.  As an initial matter, many of the ailments that Amuso complains of—in particular, his arthritis, for which he uses a wheelchair—were already addressed by the Court in its 2023 Opinion, in which the Court concluded that such conditions were "a product of his life sentence, rather than extraordinary and compelling circumstances."  2023 Opinion at 8 (noting that Amuso had "several chronic medical conditions," including arthritis, which requires him to use a

24

"wheelchair to move around his facility" and obtain "assistance from other inmates").  No different conclusion is warranted now.  While Amuso submits that his medical circumstances have "materially worsened" since the Court denied his Initial Motion, the new conditions that Amuso cites are "predominately old-age-related conditions are being managed by BOP through regular medical exams and medication."  United States v. Al Ghazi, No. 07-CR-354 (JSR), 2025 WL 918788, at *2 (S.D.N.Y. Mar. 26, 2025); see generally Exhibit A (medical records) (filed under seal).[6]

Amuso first cites pain caused by his arthritis, which requires his use of a wheelchair to navigate the prison facility and obtain the assistance of fellow inmates to complete tasks.  Second Motion at 5-7.  Notwithstanding the limitations caused by his arthritis, Amuso cites no material differences in his arthritis or use of a wheelchair since the Court denied his Initial Motion less than three years ago, in which it found that Amuso's arthritis and other ailments did not rise to the level of extraordinary and compelling circumstances, as he had not "received a terminal diagnosis, [or] endured any prolonged hospital stays."  2023 Opinion at 7.  Amuso also complains of "shingles, burn-related injuries, and the effects of skin atrophy."  Second Motion at 6-7.  As an initial matter, Amuso's burn injury was caused by an accident in which he spilled hot coffee, not an age-related deterioration, as required under U.S.S.G. § 1B1.13(b)(2).  Ex. A at 32-33.  However, Amuso fails to articulate how any of these ailments rise to the level of "serious deterioration" as required to find extraordinary and compelling

---

[6]    The government respectfully requests permission to submit exhibit A under seal to protect Amuso's sensitive medical records contained therein.  The government is sensitive to the need to minimize the amount of information in a criminal case that is filed under seal. See, e.g., United States v. Aref, 533 F.3d 72, 83 (2d Cir. 2008).  However, sealing is warranted here based on the need to protect Amuso's sensitive medical records.  See United States v. Amodeo, 44 F.3d 141, 147 (2d Cir. 1995). Under these circumstances, the government's interest in protecting Amuso's privacy outweighs the public's right to qualified access.

circumstance. To the contrary, Amuso's medical records reveal that he has received treatment for skin ailments he has experienced, including a recent successful procedure at an off-site facility in April 2026 to treat basal carcinoma. Ex. A at 1-5, 20; Second Motion, Ex. A at 38. Finally, while Amuso cites a "significant loss of body mass," based on a March <u>2024</u> visit noting that he had lost thirty pounds, a March <u>2025</u> visit reveals that he had a Body Mass Index ("BMI") of 23.9, within the "healthy" range of body weight for individuals of Amuso's height. <u>See</u> Ex. A at 130; <u>see also</u> Calculate Your BMI, National Institute of Health (Jun. 2, 2026), https://www.nhlbi.nih.gov/calculate-your-bmi (noting that a "healthy" BMI range falls between 18.5 and 24.9). In recent medical visits, Amuso has denied pain, and reported that he is "doing well and has no complaints." <u>See</u> Ex. A at 1-3.

Amuso further contends that the BOP cannot provide "adequate elderly care." Second Motion at 7. This claim is undermined by his medical records, which evidence routine visits to address medical concerns raised by Amuso. <u>See generally</u> Ex. A. In support of his claim, Amuso cites an August 2025 visit in which he reported "10/10" leg pain in his right leg. <u>See</u> Ex. A at 7. However, this was a result of Amuso's own unwillingness to seek immediate treatment, not the BOP's inability to provide it. <u>Id.</u> ("Inmate stated 'I didn't come down here because I thought it would get better but now it's 10/10 (R>L).'"). More recently, in January 2026, Amuso described his leg pain as a 5/10, <u>Id.</u> at 12, and as recently as April 2026, reported that he was "doing well and has no complaints." <u>Id.</u> at 2. Amuso also cites the incident in which he burned his leg after he spilled coffee on himself. However, as Amuso admits, and the medical records confirm, any delay in treatment resulted in Amuso's own failure to report for medical attention following the spill. Second Motion at 7; <u>see also</u> Ex. A at 32.

Amuso has not demonstrated that his conditions rise to the level of extraordinary and compelling reasons based on his medical circumstances, as required under U.S.S.G. § 1B1.13(b)(1)(B). The government recognizes that this case presents a closer question as to whether the defendant has met the prongs of U.S.S.G. § 1B1.13(b)(2), which requires that the defendant has "experience[ed] a serious deterioration in physical or mental health because of the aging process." Id. (emphasis added).[7] The defendant cites to certain out-of-district cases where, on the facts of those cases, courts determined that defendants had demonstrated such "serious deterioration." See, e.g., United States v. Carter, No. 13-CR-900 (JMF), 2025 WL 1865278, at *1 (S.D.N.Y. July 7, 2025) (noting that defendant suffered from "debilitating arthritis," but that such disease was also accompanied by "a diaphragmatic hernia, hyperlipidemia, prediabetes, gastro-esophageal reflux disease, age-related cataracts, and a Vitamin D deficiency," not all of which are present in this case); United States v. Castillo, No. 03-CR-979 (KMW), 2026 WL 444695, at *2 (S.D.N.Y. Feb. 17, 2026) (noting that the defendant "had a heart attack, chronic kidney disease, prostate disorder, prediabetes, hypertension, hyperlipidemia, and problems with his vision," not all of which are present here). Nonetheless, at least one in-district case, United States v. Garcia, 758 F. Supp. 3d 47, 55 (E.D.N.Y. 2024), has found that the second prong of U.S.S.G. § 1B1.13(b)(2) was not satisfied where the defendant was "experiencing unfortunate but common and non-serious age-related health conditions that are being appropriately managed and treated by the BOP," including various heart conditions that fell short of congestive heart failure. Id.; see also Al Ghazi, 2025 WL 918788, at *2 (finding that the second prong of U.S.S.G. § 1B1.13(b)(2) was not met where defendant's receipt of an

---

[7]    The government does not dispute that Amuso meets the requirements of the first and third prongs of U.S.S.G. § 1B1.13(b)(2).

aortic aneurism repair and related issues were "predominately old-age-related conditions [] being managed by BOP through regular medical exams and medication."). The Court need not determine this issue, however, because it is clear that Amuso's motion should be denied on consideration of the Section 3553(a) factors, which compels that he serve the remainder of his life sentence.

Finally, Amuso contends that the "cumulative weight of Mr. Amuso's present circumstances," including his "advanced age, serious medical conditions, more than 34 years of imprisonment, and demonstrated rehabilitation constitutes an extraordinary and compelling circumstance" under U.S.S.G. § 1B1.13(b)(5). However, as the Court is aware, "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason" for a reduction in sentence. See 28 U.S.C. § 994(t); U.S.S.G. § 1B1.13(d). "[E]very inmate should strive for a productive institutional record while incarcerated because that is what is expected." United States v. Saleh, No. 93-CR-181 (WHP), 2020 WL 3839626, at *4 (S.D.N.Y. July 8, 2020); see also United States v. Veliu, No. 17-CR-404 (KAM), 2022 WL 2484240, at *5 (E.D.N.Y. July 6, 2022) ("[M]odel prison conduct is expected."). And there is serious basis to doubt whether Amuso is, in fact, rehabilitated, particularly in light of his unwillingness to show remorse or acceptance of responsibility for his crimes of conviction, or even denounce the very criminal organization he was convicted of (and denies) leading. As this Court has already determined, Amuso's "age, the time he has served, and his rehabilitation—do not tip the balance toward finding that extraordinary and compelling circumstances exist." 2023 Opinion at 8.

As Judge Komitee emphasized in Orena—and as this Court reiterated in denying Amuso's Initial Motion—"Judge Weinstein surely understood that a life sentence would likely result in Orena's incarceration even as an elderly and infirm inmate, and he would not have

imposed the sentence lightly, given that understanding." 2023 Opinion at 8-9 (quoting Orena, 92-cr-00351 (EK), slip op. at 8, n.7). The same remains true here for Amuso, whose heinous crimes committed on behalf of the Luchese Crime Family, and the lasting impact they had on New York City, warrant the lengthy sentence imposed. The Court should not disturb its well-reasoned denial of Amuso's Initial Motion. Amuso's Second Motion should similarly be denied, and he should be required to serve out the full term of his sentence.

CONCLUSION

For the foregoing reasons, the government respectfully submits that Amuso's second motion for compassionate release should be denied.

Dated:     Brooklyn, New York
           June 3, 2026

Respectfully submitted,

JOSEPH NOCELLA, JR.
UNITED STATES ATTORNEY

By:    /s/ Elias Laris
       Elias Laris
       Assistant United States Attorney
       (718) 254-6599

cc:    Clerk of Court (FB) (by ECF)
       Anthony DiPietro, James R. Frocarro, Mathew J. Mari
       (Counsel for Defendant) (by ECF)