THE LAW OFFICES OF

# ANTHONY DIPIETRO, P.C.

15 CHESTER AVENUE        (914) 948 3242
WHITE PLAINS, NY 10601    (914) 948 5372 FAX
                                    DIPIETROLAW@YAHOO.COM

June 11, 2026

**By ECF**
The Honorable Frederic Block
United States District Judge
225 Cadman Plaza East
Brooklyn, NY 11201

         Re:     *United States v. Vittorio Amuso*, 90-cr-00446
                 Reply in Support of Motion for Reduction in Sentence

Dear Judge Block:

The Government demands that the Court embrace its relentless pursuit of retributive punishment, driven by dated organized-crime enforcement objectives of another era, while the First Step Act, principles of humanity, and present-day realities counsel a different course—one grounded in mercy and recognition of the elderly and ailing prisoner who now stands before the Court.

The Court need not follow the Government's invitation to prioritize retribution above all else, especially where no convincing reason exists to require that a 91-year-old prisoner who is immobile, medically fragile, and dependent upon chronic, end-of-life care must die in a prison cell rather than in the care of his children.

By any measure, after more than thirty-four years of imprisonment, Mr. Amuso's continued confinement serves no meaningful sentencing objective. It will not protect the public. It will not enhance deterrence. It will not promote respect for the law. It will merely ensure that a medically fragile 91-year-old man continues to suffer in the cold confines of a prison cell, with the final consequences of that suffering ultimately reduced to a cardboard box of belongings delivered to his children after decades of hardship and heartache.

Justice must never be reduced to such draconian punishment for punishment's sake, nor to the perpetual pursuit of retribution untethered from present circumstances. The measure of a civilized society is not how long it can continue to punish its prisoners, but whether it retains the wisdom to recognize when punishment has accomplished its purpose and mercy serves a greater end.

Accordingly, the Court is not asked to resolve whether Mr. Amuso deserved the punishment imposed in this case decades ago, but whether the aims of punishment are today served by requiring an elderly and immobile prisoner to continue suffering in a prison cell until his death. The answer is resoundingly no.

The law permits mercy. The facts warrant it. Conscience compels it.

## I.    <u>Extraordinary and Compelling Reasons</u>

The Government is wrong across the board in asserting that Mr. Amuso fails to present extraordinary and compelling reasons warranting compassionate release. At its core, the Government's opposition rests on the dubious premise that nothing has changed since this Court denied Mr. Amuso's prior motion in 2023. *See* Gov't Opp'n at 9 ("The circumstances have not materially changed since the Court's denial of Amuso's Initial Motion less than three years ago. Amuso's Second Motion provides no valid basis for the Court to disturb its prior denial of compassionate release.")

But the opposite is true. Both the facts and the law have changed substantially. Mr. Amuso is older, frailer, and significantly more debilitated than he was three years ago, as the aging process has further eroded his physical functioning and ability to care for himself. At the same time, the governing policy statement no longer requires a showing of either terminal illness or the BOP's inability to provide care. The Government's position therefore fails to grapple with the very developments—both factual and legal—that now place Mr. Amuso squarely within the heartland of cases warranting compassionate release.

Today, Mr. Amuso is 91 years old. He is wheelchair dependent. He cannot get in and out of bed without assistance. He relies upon another inmate for many of the most basic activities of daily living. He suffers from chronic sleep deprivation, debilitating pain, and a rapidly deteriorating quality of life. The circumstances of his confinement are both grim and alarming. A 91-year-old man sits awake in a prison cell, unable to sleep because of relentless pain. He struggles simply to stand long enough to use the toilet and lives with the constant fear that his deteriorating knee will break beneath him. These are the conditions under which Mr. Amuso now serves his life sentence—conditions marked by relentless pain, dependency, and steadily declining physical function. His own words are more revealing than any medical chart:

> The pains at night have kept me from a decent sleep since I have been here. To hop out of bed to reach the toilet is painful and I can only stand for seconds to sit on the toilet because the right knee is truly in very bad shape. It has been 6 months since Mr. Mclure has called me to give me any shot or to call me to see how I am doing. Because at nights I do not sleep even for a solid hour, in the mornings I do have a few naps for moments in my wheelchair where inmates at times wake me thinking I am sick and need help. There is no way I can stand for more than a few seconds before it feels the knee is ready to break and I must try my best that never happens, God forbid. When the pains at night prevent me from sleeping the tears jump out of my eyes where I take some toilet paper to reach out of my wheelchair that I keep very close to my bed. The Tylenols do not help at all, but I take 3 at a time hoping it can relieve me a bit. My cellmate can hear me each and every night cursing as quiet as possible when the pains come real sharp. I truly believe if the judge was in my cell one night he too will cry. If I have to

remain in prison for the rest of my life, I will ask God to take me as soon as possible.

*See* Exhibit 1, Email from Vittorio Amuso to Anthony DiPietro (June 4, 2026, 6:49 p.m.) (capitalization and punctuation modified).

By any measure, these are not conditions of normalcy. They are conditions of serious and relentless suffering. Significantly, the government officials responsible for Mr. Amuso's care, confinement, and release review acted in a manner consistent with that reality. Unlike in 2023, the Warden approved Mr. Amuso's request at the institutional level. Bureau personnel thereafter initiated release planning. A social worker contacted the family regarding future care and living arrangements, and Probation officers inspected and approved the proposed residence. Even the Office of General Counsel acknowledged that Mr. Amuso satisfied the Bureau's elderly inmate criteria. These developments arose from the assessments of the very officials tasked with managing Mr. Amuso's daily realities, medical limitations, care needs, and release planning. The Government offers no legitimate basis to dismiss their significance and, indeed, barely attempts to grapple with them at all. Viewed collectively, these actions substantially undermine the Government's present effort to minimize the severity of Mr. Amuso's circumstances.

The Government's position is also legally flawed. The legal landscape governing compassionate release is materially different today than it was when this Court denied Mr. Amuso's prior motion in 2023. Although the Government acknowledges that the Sentencing Commission's November 2023 amendments to U.S.S.G. § 1B1.13 have since become effective (Gov't Opp'n at 24), it nevertheless repeatedly urges the Court to rely heavily upon conclusions reached under the prior framework. In doing so, it continues to focus on considerations that are no longer dispositive, including whether Mr. Amuso is "terminally" ill and whether the Bureau of Prisons is capable of providing some degree of medical treatment (*see* Gov't Opp'n at 25). *See United States v. Castillo*, 2025 U.S. App. LEXIS 915 (2d Cir. Jan. 15, 2025) (summary order) (holding that a defendant need only show a "serious deterioration" in health due to the aging process, not impairment of "basic human functions," to satisfy Section 1B1.13(b)(2)); *United States v. Castillo*, No. 03-CR-979 (KMW), 2026 U.S. Dist. LEXIS 24417, at *7 (S.D.N.Y. Feb. 17, 2026) ("The Government's motion misapprehends the nature of the inquiry under the second condition of § 1B1.13(b)(2). As Castillo properly argues, under § 1B1.13(b)(2), the Court is not concerned with whether the BOP is appropriately managing Castillo's medical conditions. Instead, the Court looks at whether Castillo has articulated 'a trend of seriously deteriorating health related to the aging process.'")

The amended policy statement expressly recognizes that advanced age, deterioration resulting from the aging process, diminished ability to provide self-care within a correctional facility, and other comparable circumstances may independently or collectively constitute extraordinary and compelling reasons warranting relief. See U.S.S.G. § 1B1.13(b)(1)(B) ("Medical Circumstances"), (2) ("Age of the Defendant"), (5) ("Other Reasons"). Mr. Amuso plainly satisfies those

standards. *See* Amuso Mot. at 5–13. Indeed, given the central role that advanced age plays within the amended framework, it is difficult to imagine how a 91-year-old, wheelchair-dependent prisoner suffering from severe physical deterioration, chronic pain, and profound functional limitations could fall short where substantially younger and less physically impaired defendants have otherwise satisfied the threshold. *See, e.g., United States v. Campbell*, No. 09-CR-119-24 (ARR), 2023 U.S. Dist. LEXIS 191801 (E.D.N.Y. Oct. 25, 2023) (finding that the 68-year-old defendant satisfied § 1B1.13(b)(2) based upon the progression of a degenerative back condition); *United States v. Carter*, No. 13-CR-900 (JMF), 2025 U.S. Dist. LEXIS 290752 (S.D.N.Y. July 7, 2025) (finding that the 67-year-old defendant was experiencing a serious deterioration in physical health because of the aging process due to debilitating arthritis); *United States v. Diaz*, No. 07 CR 387-06, 2024 U.S. Dist. LEXIS 216479 (S.D.N.Y. Nov. 26, 2024) (finding that the 65-year-old defendant made a "colorable argument for relief" under § 1B1.13(b)(2) where he suffered from knee osteoarthritis, seborrheic keratosis, and an enlarged prostate).

The Government's reliance on *United States v. Al Ghazi* is entirely unhelpful. *See* Gov't Opp'n at 25. There, the defendant was 78 years old, mobile, housed at a non-medical facility (FCI Otisville), and failed to demonstrate either a "serious deterioration in physical and mental health" under § 1B1.13(b)(2) or a medical condition that substantially diminished his ability to provide self-care under § 1B1.13(b)(1)(B). No. 07-cr-354 (JSR), 2025 U.S. Dist. LEXIS 155570, at *5 (S.D.N.Y. Mar. 26, 2025).

The Government's reliance on *United States v. Garcia* is similarly unavailing. *See* Gov't Opp'n at 27. There, the defendant was 65 years old, mobile, housed at a non-medical facility (FCI Fort Dix), and failed to establish either a serious deterioration in health due to the aging process or a medical condition that substantially diminished his ability to provide self-care within a correctional facility. 758 F. Supp. 3d 47, 54-56 (E.D.N.Y. 2024). Notably, the Warden also denied the defendant's request for compassionate release at the institutional level. *Id.* at 52.

Those facts bear little resemblance to the record before this Court. Unlike the defendants in *Al Ghazi* and *Garcia*, Mr. Amuso is 91 years old, immobile, and has long suffered from a serious deterioration in physical health due to the aging process. Unlike those defendants, Mr. Amuso has been unable to provide self-care within a medical correctional facility for years and remains dependent upon other inmates to assist with many of the most basic activities of daily living. Indeed, these are not new matters of dispute. They are facts this Court itself recognized in its 2023 decision. *See* Order at 4 (A. 4) ("Now 88 years old, Amuso suffers from a litany of age-related health conditions. The most debilitating is severe osteoarthritis of the hips, which causes him extreme pain and has rendered him wheelchair-bound for ambulating long distances.") If anything, the passage of time has only reinforced those findings, as Mr. Amuso is now three years older and considerably more physically debilitated by the aging process than he was when this Court last evaluated his circumstances.

The Government's treatment of the medical record further illustrates its futile efforts to downplay the reality of Mr. Amuso's qualifying circumstances, including its dubious attempts to fault Mr. Amuso for delays in obtaining medical treatment. *See* Gov't Opp'n at 26. The Government overlooks the central point: Mr. Amuso is not a healthy prisoner capable of independently navigating prison life and advocating for his own medical needs. He is a 91-year-old, wheelchair-dependent prisoner who struggles with many of the most basic activities of daily living and often relies upon others for assistance. The relevant question is therefore not whether Mr. Amuso could have done more to obtain care, but whether his present condition has left him increasingly unable to care for himself. The record overwhelmingly demonstrates that it has.

Another striking example appears in the Government's discussion of the serious coffee burns Mr. Amuso recently suffered. *See* Gov't Opp'n at 26. The Government focuses on the fact that he did not seek treatment immediately. That misses the point entirely. The significance of the episode is that a 91-year-old, wheelchair-dependent prisoner suffered burns later classified as second- and third-degree injuries, remained untreated for days, and lacked the wherewithal to obtain help on his own. More troubling still, no staff member identified the need for intervention despite the fact that he remained in the housing unit suffering from serious burn injuries. The episode therefore illustrates not only Mr. Amuso's frailty, dependence, and inability to independently obtain care, but also the reality that a prison is ill-equipped to function as a substitute for the type of daily monitoring, support, and assistance that a severely debilitated 91-year-old prisoner requires.

Likewise, the Government's attempt to cherry-pick isolated entries from Mr. Amuso's medical records to overcome the reality of his circumstances is equally unconvincing. *See* Gov't Opp'n at 25-26. For example, the Government's reliance on Mr. Amuso's memorialized statement on April 8, 2026, that he was "doing well and no complaints" ignores the obvious context of that notation. The notation concerned the surgical removal of basal cell carcinoma performed that day, not Mr. Amuso's overall health or functional condition. Indeed, given the medical records before the Court spanning the period from 2023 through the present, no fair reading of the record could conclude that Mr. Amuso is "doing well." The overwhelming evidence establishes precisely the opposite.

Nor should the Court accept the implicit premise underlying much of the Government's argument—that a prison is a suitable setting for elderly and medically fragile prisoners requiring increasing levels of care. It is not. While the amended policy statement does not even require a showing that the Bureau of Prisons is incapable of providing care, it is well established that prisons function as institutions of punishment and security. They are not nursing homes, assisted-living facilities, or comprehensive providers of geriatric and end-of-life care. Common sense dictates as much. The only question remains whether Mr. Amuso has experienced a serious deterioration in physical health due to the aging process and whether he can

adequately care for himself within a correctional setting. On this record, there can be no serious dispute that he has and that he cannot.

Accordingly, the Court should reject the Government's effort to manufacture obstacles where none exist. The record overwhelmingly demonstrates that Mr. Amuso meets the threshold requirement to establish extraordinary and compelling reasons for compassionate release under the amended policy statement.

## II.    Section 3553(a) Factors

The Government's opposition is remarkable not for what it addresses in its § 3553(a) analysis, but for what it ignores. While devoting substantial attention to decades-old offense conduct, it largely sidesteps the reality of the defendant who now stands before this Court: a ninety-one-year-old, wheelchair-bound prisoner who has spent more than thirty-four years in federal custody without committing a single disciplinary infraction.

At the outset, the Government's contention that Mr. Amuso remains a danger to the public finds no support in the record. For nearly forty years, Mr. Amuso has not committed a single crime, act of violence, or disciplinary infraction. Indeed, there is no allegation that Mr. Amuso has ever directed, authorized, encouraged, or participated in any act of violence while incarcerated.

That reality is particularly significant because the Government continues to portray Mr. Amuso as an individual who possessed extraordinary authority and influence within the Lucchese family for the past forty years. Yet, the Government cannot credibly maintain that Mr. Amuso possessed the ability to direct violence from prison while simultaneously ignoring the undeniable reality that he never exercised any such purported authority. The complete absence of violence, threats, witness intimidation, or criminal conduct during that period strongly undermines the Government's claim that Mr. Amuso presents a danger to the public and further supports the significance of his perfect institutional record.

Recognizing this void, the Government overstates Mr. Amuso's role in the offense conduct in an effort to skew the § 3553(a) analysis. Indeed, the Government's opposition repeatedly portrays the charged conduct as occurring solely at Mr. Amuso's direction, while omitting any meaningful discussion of the direct role of failed cooperating witness Anthony Casso in many of the same offenses. *Compare* Gov't Opp'n at 2-6 *to* ECF No. 1219, at 3-10, 18-24. This selective presentation serves only to refocus the Court's attention upon the same offense-conduct considerations that previously resulted in the denial of relief, rather than the present-day inquiry mandated by the First Step Act. *See United States v. Kibble*, 992 F.3d 326, 335 (4th Cir. 2021) (explaining that a court may not satisfy its § 3553(a) obligation by merely recounting the considerations that supported the original sentence because compassionate release requires reconsideration in light of present circumstances).

In this regard, the Government also attempts to conflate counsel's challenge to its characterization of the offense conduct with the separate question of remorse. *See* Gov't Opp'n at 23, n. 4-5; 28. Yet neither Mr. Amuso nor counsel has ever suggested that the offense conduct was anything other than serious. To the contrary, that reality has been expressly acknowledged since the first petition filed in 2023. *See* ECF No. 1223, at 1, 16 ("[T]he underlying offense conduct is admittedly serious….") Mr. Amuso's remorse and rehabilitation are instead reflected by what has occurred during the decades since: a perfect institutional record and the many accounts submitted by those who have observed his conduct and character firsthand.

Nonetheless, the Government's repeated effort to maximize Mr. Amuso's culpability for purposes of the § 3553(a) analysis, and to portray him as singularly responsible for the violence of an entire era and therefore unworthy of compassion today, should not go unchecked, particularly where the Government relies so heavily upon the offense conduct itself. As one non-exhaustive example, the Government writes with respect to the murder of Bruno Facciola that "Amuso feared that Facciola was cooperating with the government and ordered him to be murdered….A dead canary was placed in his mouth, which served as Amuso's warning to potential informants." Gov't Opp'n at 5. Yet that account is not fully representative of the evidence and materially omits the fact that, according to cooperating witness Alphonse D'Arco, "Casso claimed Facciola was a 'rat' and that he had to be killed because he had revealed that 'Little Al' (D'Arco) had been involved in the Dilapi murder. It is believed that Casso fabricated this claim because Facciola had fallen out of favor with Casso." Exhibit 2, FBI 302, at *1 (October 1991) (emphasis added).

Nor is the Facciola example isolated. Similar omissions appear throughout the Government's discussion of the Salerno, Taylor, Visconti, and Chiodo matters. For example, while the Government writes that Salerno "was resentful when Corallo promoted Amuso to leader" and that "Amuso, knowing of Salerno's hostility, thought he might be an informant and ordered Salerno's murder," Gov't Opp'n at 5, it omits evidence that Casso met with D'Arco after Amuso was on the lam and "told D'Arco that he (D'Arco) had to kill Mike Salerno. Casso was adamant and labeled Salerno a rat." Exhibit 2, FBI 302, at *3 (December 1992). Likewise, while the Government states that Amuso "demanded" the "executions" of Taylor and Visconti and that "Amuso feared that Chiodo was cooperating with the government and wanted Chiodo dead," Gov't Opp'n at 5-6, it omits evidence that D'Arco advised the FBI that Casso claimed Taylor needed to be killed, that "Casso ordered" the murder of Visconti, and that "during one telephone contact with Casso, Casso ordered D'Arco to arrange the homicide" of Peter Chiodo and Anthony Fava. Exhibit 2, FBI 302, at *2 (October 1991) ("Casso felt that Chiodo had infringed on Casso's financial interests, and that Chiodo entered a guilty plea without consulting with and obtaining Casso's approval.") (emphasis added).

The point is not to relitigate the offense conduct or diminish its seriousness. Rather, it is to demonstrate that the Government's presentation of that conduct—the principal factor upon which it relies to oppose compassionate release after nearly

four decades—is neither as complete nor as one-sided as its opposition suggests, particularly where it seeks to have those same events outweigh every intervening development in Mr. Amuso's life. By repeatedly emphasizing Mr. Amuso's role while omitting evidence of Casso's direct involvement and conduct that actually precipitated much of the underlying violence, the Government attempts to portray Mr. Amuso as the singular embodiment of the violence underlying this case and therefore beyond redemption. The historical record is more nuanced than that, and the Court should be cautious not to allow such a selective portrayal of decades-old conduct to eclipse the present-day realities that now govern the § 3553(a) analysis.

In the same vein, the Government again attempts to diminish the significance of Mr. Amuso's present condition by pointing to the "irony" that Peter Chiodo was confined to a wheelchair. *See* Gov't Opp'n at 15, n. 3. Such an argument is both callous and misplaced. Compassionate release is not an exercise in comparative suffering, nor is it an eye-for-an-eye contest. If it were, the First Step Act would be rendered a nullity.

Nonetheless, the § 3553(a) analysis does not turn solely upon offense conduct that occurred nearly forty years ago, regardless of how the Government chooses to characterize it. Rather, the Court must conduct a present-tense assessment of all relevant circumstances, and those circumstances overwhelmingly favor compassionate release. This is particularly true where numerous similarly situated defendants nationwide—including those who are younger, healthier, less physically impaired, and have served fewer than thirty-four years of consecutive imprisonment—have received relief under the First Step Act.

Tellingly, the Government's advocacy on this point only underscores the lingering retributive impulses that continue to weigh heavily in cases such as Mr. Amuso's, and the importance of this application's call for the Court to courageously reject them:

> And while the Government may strenuously object, and the noise of negative media coverage may be loud in the immediate news cycle that follows, the mercy granted here will endure as both just and lasting— alleviating the unnecessary infliction of continued suffering on an elderly and infirm prisoner, and prompting other courts to reflect when they are called upon to extend similar compassion to those in equally dire need.

*See* Amuso Mot. at 18.

The Government has become far too comfortable opposing compassionate release in cases such as this based upon little more than the organized-crime-enforcement objectives of another era, which it apparently still believes should command special judicial deference today. *See* Gov't Opp'n at 19-22. Its position ultimately reduces to a simple proposition: because other organized-crime defendants died in prison, Mr. Amuso should as well. *See* Gov't Opp'n at 19 (citing John Gotti, Carmine Persico, Anthony Corallo, and Anthony Salerno). That is neither justice nor the individualized, present-tense inquiry contemplated by the First Step Act. Rather,

it is a categorical approach that elevates history above humanity and past labels above present realities. The First Step Act was enacted precisely to reject such categorical thinking and instead require courts to evaluate the individual defendant who stands before them today.

Indeed, the Government offers no reasoned explanation for its apparent effort to isolate Italian organized-crime defendants as uniquely comparable only to one another for purposes of the § 3553(a) analysis. *See* Gov't Opp'n at 19-22. Nor does it offer any principled basis for treating an Italian organized-crime defendant differently from any other defendant who once participated in racketeering activity but now presents materially different circumstances decades later. The First Step Act does not create separate classes of defendants for purposes of mercy.

The § 3553(a) factors likewise do not carry one meaning for an alleged Italian organized-crime member and another for members of the Latin Kings, Bloods, Crips, MS-13, violent drug-trafficking organizations, or other criminal enterprises. Courts throughout the country have repeatedly granted compassionate release to defendants who occupied leadership roles in such organizations, ordered acts of violence, committed murders, and otherwise participated in extraordinarily serious criminal conduct that destroyed lives and inflicted lasting harm upon the communities in which they operated. *See, e.g., United States v. Jones*, No. 99-CR-264 (VAB), 2020 U.S. Dist. LEXIS 94041, at \*7–8 (D. Conn. May 29, 2020) (granting a sentence reduction even though the defendant was convicted of orchestrating multiple murders as the leader of a drug enterprise, and the sentencing judge originally stated: "The [life] sentence that's called for by the guidelines in your case is well deserved…. How many lives did you destroy as a result of the poison that you fed into the streets of Bridgeport? But you weren't satisfied with destroying lives through the drug trade. You were a murderer as well"); *United States v. Underwood*, No. 88-Cr-822 (SHS), 2021 U.S. Dist. LEXIS 8378 (S.D.N.Y. Jan. 15, 2021) (granting compassionate release to a sixty-seven-year-old defendant who had led a heroin trafficking enterprise and was responsible for at least five "brutal and calculated" murders aimed at eliminating competitors, informants, and actual or potential witnesses); *United States v. Tellier*, 2023 U.S. Dist. LEXIS 149994, at \*1–2 (S.D.N.Y. Aug. 25, 2023) (granting early release to a sixty-three-year-old defendant who had led a criminal organization and was responsible for at least four murders and an attempted murder); *United States v. Wong Chi Fai*, No. 93-CR-1340 (RJD), 2019 U.S. Dist. LEXIS 126774 (E.D.N.Y. July 30, 2019) (reducing three life sentences to time served after 26 years of imprisonment for defendant who was the leader of a gang deeply entrenched in killings and gang warfare, and responsible for multiple murders); *United States v. Miller*, No. 92-CR-91 (NGG), 2024 U.S. Dist. LEXIS 160865 (E.D.N.Y. Sept. 6, 2024) (reducing six life sentences to time served—after approximately 34 years of imprisonment—for the leader of the "Supreme Team" enterprise, a violent crack-cocaine distribution organization responsible for multiple murders and acts of intimidation committed under the defendant's direction and in furtherance of the enterprise's expansion); *United States v. Fisher*, 493 F. Supp. 3d 231 (S.D.N.Y. 2020) (granting release after thirty-eight years of imprisonment for

73-year-old defendant who served as a "drug kingpin" and committed at least four murders during course of leading a significant drug trafficking conspiracy).

By any measure, the depth and breadth of favorable First Step Act jurisprudence granting relief to similarly situated offenders nationwide—including leaders of violent racketeering enterprises convicted of participating in multiple murders—renders untenable the Government's selective attempt to deny Mr. Amuso compassionate release on the basis that other Italian organized-crime defendants have previously died in prison or otherwise been denied relief by certain courts. *See, e.g., supra* (collecting cases); *see also United States v. Rodriguez*, 492 F. Supp. 3d 306 (S.D.N.Y. 2020) (reducing a life sentence to 30 years where the defendant led a violent criminal organization and tortured and murdered an informant to protect the enterprise); *United States v. Ramirez*, 571 F. Supp. 3d 40 (S.D.N.Y. 2021) (reducing sentence for defendant who led a drug trafficking organization and was personally involved in two murders); *United States v. Glynn,* No. 06-cr-580 (JSR), 2022 U.S. Dist. LEXIS 32794 (S.D.N.Y. Feb. 24, 2022) (reducing life sentence and concurrent 40-year sentences imposed on leader of Bloods subset responsible for contract killings); *United States v. Rios*, No. 94-CR-112 (JBA), 2020 U.S. Dist. LEXIS 230074 (D. Conn. Dec. 8, 2020) (granting a sentence reduction where the defendant, who possessed a significant criminal history, was convicted of murder, drug trafficking, and racketeering as a member of the Latin Kings, and was found to have acted "with the hard heart of a calculated killer"); *United States v. Cheng*, 678 F. Supp. 3d 312 (E.D.N.Y. 2023) (reducing five life sentences to time served after 31 years of imprisonment notwithstanding that defendant participated in three planned murders with fellow Green Dragon gang members, committed two armed robberies, and raped one of the robbery victims); *United States v. Tidwell*, 476 F. Supp. 3d 66 (E.D. Pa. 2020) (granting compassionate release to defendant sentenced to life for two counts of murder in furtherance of a continuing criminal enterprise); *United States v. Morris*, No. 99-CR-264-17 (VAB), 2022 WL 3703201 (D. Conn. Aug. 26, 2022) (reducing four life sentences imposed for participation in a drug enterprise and murder); *United States v. Ramsay*, 538 F. Supp. 3d 407 (S.D.N.Y. 2021) (reducing life sentence imposed for attempted murder resulting in the deaths of three innocent bystanders, including an unborn child); *United States v. Cruz,* No. 3:94-CR-112 (JCH), 2021 U.S. Dist. LEXIS 68857 (D. Conn. Apr. 9, 2021) (reducing a life sentence imposed for a double murder committed as a member of the Latin Kings); *United States v. Chan*, 645 F. Supp. 3d 71 (E.D.N.Y. 2022) (reducing three life sentences imposed for three murders to 33 years' imprisonment).

Moreover, the Government's selective citations ignore the many cases in which Italian organized-crime defendants have been afforded relief under the First Step Act. There is therefore no principled basis to deny relief here merely because a handful of courts reached a different sentencing result in other cases, particularly where those decisions either predated the First Step Act or continue to place dispositive weight upon the same organized-crime considerations and retributive objectives that dominated a prior era rather than the present-day realities courts are

directed to evaluate today.[1] *See, e.g., United States v. Manna*, No. 88-00239 (RK), 2025 U.S. Dist. LEXIS 72609 (D.N.J. Apr. 16, 2025) (granting compassionate release for elderly defendant convicted of "high-level involvement in organized crime" as part of the Genovese Family enterprise and of "participating in crimes of violence, exploitation, and intimidation.") *United States v. Trucchio*, No. 8:04-cr-348-CEH-TGW, 2024 U.S. Dist. LEXIS 212632 (M.D. Fla. Nov. 22, 2024) (reducing term of life imprisonment to time served, after 20 plus years of imprisonment, for 73-year-old defendant who was convicted, following a guilty trial verdict, of RICO conspiracy that included acts of murder, robbery, extortion, and kidnapping in connection with his role in the Gambino Family enterprise); *United States v. Russo*, 643 F. Supp. 3d 325, 339 (E.D.N.Y. 2022) (reducing sentence of life imprisonment to 35 years for 70-year-old defendant convicted of RICO conspiracy and two murders occurring during a mob war between members of the Colombo Family enterprise); *United States v. Monteleone*, No. 92-CR-351, 2023 U.S. Dist. LEXIS 62518, 2023 WL 2857559 (E.D.N.Y. Apr. 10, 2023) (same); *United States v. Mongelli*, No. 02-CR-307 (NGG), 2020 U.S. Dist. LEXIS 205469 (E.D.N.Y. Nov. 3, 2020) (reducing sentence based on defendant's medical circumstances during COVID-19 pandemic, even though the defendant participated in a racketeering conspiracy predicated on illegal gambling activity, conspiracy to commit murder, and murder in connection with his role in the Bonanno Family enterprise); *United States v. Donato*, No. 03-CR-929, 2024 U.S. Dist. LEXIS 27620 (E.D.N.Y. Feb. 16, 2024) (reducing sentence for defendant convicted of conspiracy to commit murder in aid of racketeering as part of his role in the Bonanno Family enterprise); *Reynolds v. United States*, No. 99-CR-520 (NGG), 2022 U.S. Dist. LEXIS 82483 (E.D.N.Y. May 6, 2022) (reducing sentence for defendant convicted of racketeering activity that included drug distribution, bank robberies and burglaries, extortion, attempted murder, and several homicides); *United States v. Grecco*, No. 89-00250, 2022 U.S. Dist. LEXIS 209668 (D.N.J. Nov. 18, 2022) (reducing 65-year sentence for 78-year-old defendant, who had been convicted of RICO conspiracy and violent crimes in aid of racketeering as part of the Genovese Family enterprise).

Overall, the Court should reject the Government's selective and incomplete analysis. Likewise, the Court should find little persuasive value in decisions that continue to elevate retribution above present-day realities by requiring elderly prisoners suffering from dementia, dependency, and profound physical deterioration to remain incarcerated until death. In doing so, such decisions effectively resurrect the very categorical thinking that the First Step Act was designed to overcome and disregard the substantial body of modern compassionate-release jurisprudence that has developed in its wake. Fortunately, this Court is not bound to follow that bleak and unforgiving approach, and instead possesses the discretion to chart a more just

---

[1] The Government's own present-day organized crime prosecutions underscore this reality, reflecting that the last murder allegedly sanctioned by an Italian organized-crime enterprise occurred more than a decade ago, and that acts of serious violence have become exceedingly uncommon.

and humane course—one consistent with both the purpose of the First Step Act and the realities of the prisoner who stands before it today.

Furthermore, the Government offers no convincing argument to overcome the present-day realities that remain relevant to the remaining § 3553(a) factors, all of which weigh in favor of the requested relief. Specific deterrence has long since been achieved. After more than thirty-four years of imprisonment, there is simply no reason to believe that further incarceration is necessary to deter Mr. Amuso from future misconduct, particularly where he is now ninety-one years old, wheelchair-bound, medically ailing, and has not committed a single crime or disciplinary infraction in nearly four decades. General deterrence has likewise been fully satisfied. Few sentences in modern history provide a more powerful deterrent message than a life sentence resulting in more than thirty-four years of consecutive imprisonment and confinement into one's nineties while suffering profound physical decline. No reasonable observer could either conclude that the continued imprisonment of a ninety-one-year-old, wheelchair-bound prisoner would meaningfully enhance deterrence or view release, at this juncture and under these circumstances, as a windfall. *See, e.g., Mongelli*, 2020 U.S. Dist. LEXIS 205469, at *8 ("The extraordinary and compelling reasons for Mr. Mongelli's release undercut the possibility that a longer sentence would be necessary to reinforce principles of deterrence: the position in which Mr. Mongelli finds himself is both unique and unfortunate, and no right-minded observer would regard his release, at this juncture and under these circumstances, as a windfall.")

Continued incarceration also does little to promote respect for the law. Respect for the law is not measured by a refusal to acknowledge changed circumstances through an act of mercy. Rather, it is enhanced when courts faithfully exercise the authority Congress granted through the First Step Act and evaluate each defendant based upon present-day realities. The compassionate-release statute exists precisely because Congress recognized that even lawfully imposed sentences may, with the passage of time and changing circumstances, cease serving the purposes of sentencing.

It also should not be overlooked that continued incarceration imposes a profound and immeasurable burden not only upon the prisoner but upon his children. Here, Mr. Amuso's children have spent decades watching their father grow old behind prison walls. They have witnessed his physical deterioration, his loss of mobility, his increasing dependence upon others, and the reality that time is rapidly running out. At ninety-one years old, Mr. Amuso has little time remaining, and so too do his children for the opportunity of dignified closure. The Government simply has no clue about the draconian and collateral path that it unnecessarily bargains to be rendered here, and the Court should mercifully intervene at all costs. The stakes could not be any higher, and the result more impactful.

Finally, the Court's analysis of the § 3553(a) factors is not confined to the absolute decision of whether to fully grant compassionate relief or require Mr. Amuso to die in prison. Indeed, the Court has broad discretion to strike a balance and

impose alternative sentencing conditions, including continuing Mr. Amuso's sentence through home confinement. The availability of such a measured course confirms the unreasonableness of the Government's quest to require an elderly and infirm prisoner to die in a prison cell merely because it insists that he do so there.

Accordingly, it has never been truer that mercy through compassionate release serves a greater end, for justice attains its highest purpose not when it insists upon punishment at all costs, but when it recognizes that a punishment once imposed need not continue forever to destroy both the prisoner and his children. Under circumstances such as these, mercy is not a departure from justice—it is its fulfillment.

## <u>Conclusion</u>

For the foregoing reasons, together with those set forth in Mr. Amuso's moving papers and the prior proceedings in this matter, the Court should grant compassionate release.

Respectfully submitted,

*Anthony DiPietro*

Anthony DiPietro, Esq.