THE LAW OFFICES OF

ANTHONY DIPIETRO, P.C.

15 CHESTER AVENUE
WHITE PLAINS, NY 10601

(914) 948 3242
(914) 948 5372 FAX
DIPIETROLAW@YAHOO.COM

October 15, 2026

**By ECF**
The Honorable Frederic Block
United States District Judge
225 Cadman Plaza East
Brooklyn, NY 11201

Re: *United States v. Vittorio Amuso*, No. 90-CR-00446 (FB)
Motion for Reconsideration of Order Denying Compassionate Release

Dear Judge Block:

This motion respectfully seeks reconsideration of the Court's October 2, 2026 Order (ECF No. 1241) denying Defendant Vittorio Amuso's motion for compassionate release. As explained below, reconsideration is necessary to correct clear errors of law and to prevent a manifest injustice. Specifically, the Court's decision effectively creates an offense-based exclusion from compassionate release that neither Congress nor the Sentencing Commission authorized, truncates the individualized, present-day § 3553(a) assessment contemplated by the First Step Act, permits its prior denial of compassionate release to Anthony Casso to displace that inquiry, and fails to meaningfully distinguish substantial favorable jurisprudence granting relief to defendants convicted of comparably serious, and in some instances more extensive, violent criminal conduct.

**Preliminary Statement**

Given the profound humanitarian consequences of continued imprisonment for elderly and infirm prisoners like Mr. Amuso, the clear errors underlying the Court's denial of compassionate release warrant particular attention, especially where each additional day of confinement imposes an increasingly severe punishment upon a profoundly debilitated 91-year-old man. Indeed, in its own book, *A Second Chance*, the Court confronted the consequential humanitarian issue concerning the imprisonment of elderly, medically infirm, and profoundly debilitated offenders until death, expressly agreeing with the observation that "[w]e have to ask ourselves, what are we accomplishing?" Frederic Block, *A Second Chance: A Federal Judge Decides Who Deserves It*, ch. 12, at 168 (2024). The Court further acknowledged, in then discussing Mr. Amuso's first motion for compassionate release, the force of the argument that compassionate release requires reassessing the sentencing factors rather than merely recounting those supporting the original sentence, declaring, "This logic made sense to me." *Id.* at 160 (citing *United States v. Kibble*, 992 F.3d 326, 335 (4th Cir. 2021)).

Most significantly, after examining Mr. Amuso's prior motion for compassionate release in connection with an article by Katie Engelhart concerning aging prisoners, and her reported interactions with prisoner Victor Orena—who, at age 87, suffered from

dementia, Alzheimer's disease, serious cardiovascular conditions, wheelchair dependence, and profound cognitive and physical deterioration, yet was denied compassionate release because of the seriousness of his historical crimes—the Court candidly acknowledged that it agreed with the following conclusion: "In this country, we incarcerate way too many people for way too long. We give people life sentences. And then they turn 90, they're in diapers, they get demented." *Id.* at 167–68.

Yet, when confronted with this very dilemma again, the Court unfortunately returned to the very offense-based rationale it previously questioned: that "a strain of cases . . . has emerged in which the offenders' criminal history is so long, and their victims so numerous, that even serious health conditions do not suffice to merit relief," declaring that "[t]he past being immutable," Mr. Amuso's case "still falls squarely in that category." Order at 9 (quoting *United States v. Orena*, No. 92-CR-351 (E.D.N.Y. Oct. 27, 2021)[1]). But in doing so, the Court overlooked that the immutability of the past is precisely why the First Step Act requires meaningful consideration of the present. Indeed, a central purpose of the First Step Act was to expand access to relief for prisoners presenting extraordinary and compelling circumstances, especially the growing population of elderly and debilitated prisoners.[2] Many of these prisoners have grown old and infirm precisely because they were once convicted of serious offenses.[3]

The central question—"what are we accomplishing?"—assumes even greater significance in Mr. Amuso's case today because the Court was confronted with the extraordinary fact that even the Warden and social workers—the very officials responsible for Mr. Amuso's institutional confinement and care—recognized his profound infirmities and the humanitarian consequences of his continued imprisonment and took the remarkable step of approving his compassionate release at the institutional level. These were not merely humanitarian appeals advanced by family members or counsel, but favorable assessments undertaken by government officials with direct institutional knowledge of this

[1] The Court's Order attributes *Orena* to the Honorable Edward R. Korman (Order at 9), but that decision was issued by the Honorable Eric R. Komitee.

[2] *See* First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239–41 (expressly entitled "Increasing the Use and Transparency of Compassionate Release"); U.S. Senate Comm. on the Judiciary, *Support for First Step Act Keeps Building in Senate* (Dec. 3, 2018) (quoting Senator Bill Cassidy, a cosponsor of the FSA, who observed that "[k]eeping geriatric inmates with Alzheimer's under guard is a waste of prison beds").

[3] Indeed, the humanitarian consequences of such reasoning are neither speculative nor insignificant. A comprehensive September 2025 report by the ACLU National Prison Project and the University of Texas at Austin documented the profound medical deterioration, unnecessary suffering, and preventable deaths associated with elderly incarceration, while identifying categorical exclusions based on historical offenses as significant barriers to compassionate release, including for prisoners serving life without parole. *See* Alyssa Gordon, Michele Deitch & Alycia Welch, *Trapped in Time: The Silent Crisis of Elderly Incarceration* 10, 26–28, 43–44, 50 (Am. Civ. Liberties Union Nat'l Prison Project & Prison & Jail Innovation Lab, Univ. of Tex. at Austin Sept. 2025).

elderly prisoner, his condition, and the realities of his continued confinement.

Beyond addressing the errors enumerated below, the Court should meaningfully consider why the Warden and other BOP officials approved compassionate release in the first place, and what significance their assessments carry in determining whether continued imprisonment remains necessary. The Government offered no meaningful explanation at oral argument, and the Court's decision has yet to address this most important consideration.[4]

## I. Reconsideration Is Warranted Because the Court Effectively Created an Unauthorized Categorical Bar to Compassionate Release Based on the Seriousness of Mr. Amuso's Historical Offenses.

The Court committed clear legal error by effectively treating the seriousness of Mr. Amuso's historical offenses as a categorical impediment to compassionate release. In denying relief, the Court declared that his case continues to fall within a purported "strain of cases . . . in which the offenders' criminal history is so long, and their victims so numerous, that even serious health conditions do not suffice to merit relief." Order at 9 (quoting *United States v. Orena*, No. 92-CR-351 (E.D.N.Y. Oct. 27, 2021)). The Court further reasoned that, because "[t]he past [is] immutable," Mr. Amuso's case "still falls squarely in that category." *Id.* Yet neither Congress nor the Sentencing Commission has established any class of offenders whose historical crimes are so serious that extraordinary humanitarian circumstances and present-day § 3553(a) considerations cannot justify compassionate release.

Had Congress intended to exclude defendants convicted of multiple murders, racketeering offenses, or other particularly serious crimes from the remedial reach of § 3582(c)(1)(A), it could have expressly done so. It did not. *Cf. United States v. Lespier*, No. 22-1372-cr, 2024 U.S. App. LEXIS 1259, at *4 (2d Cir. Jan. 19, 2024) ("[I]f the district court denied Lespier's motion for compassionate release on the ground that his mandatory minimum sentence categorically precluded the court from granting the motion, it erred.");

[4] Significantly, the Supreme Court has now expressly recognized that the "heartland of compassionate release" has historically concerned the personal circumstances of prisoners, particularly their advanced age, medical condition, and family circumstances. *Rutherford v. United States*, 146 S. Ct. 1320, 1331 (2026). Indeed, in tracing the history and purpose of compassionate release, the Supreme Court emphasized that its longstanding application has centered on prisoners suffering from terminal illness, severe medical infirmities, and the deterioration of physical and mental health associated with aging. *Id.* at 1327–28, 1331. More importantly, the Court expressly recognized that BOP officials, entrusted with the housing and care of prisoners, are particularly well positioned to identify personal circumstances warranting compassionate relief. *Id.* at 1331 n.6. Thus, the profoundly debilitating humanitarian circumstances confronting the Court in Mr. Amuso's case were not peripheral considerations but lie at the very heart of compassionate release. And here, those circumstances were sufficiently compelling that the very institutional officials responsible for Mr. Amuso's care approved his release.

*United States v. Castillo*, Nos. 23-6229, 23-6233, 2025 U.S. App. LEXIS 915, at *5 (2d Cir. Jan. 15, 2025) ("If, however, the district court's denial was based on the view that Note 1(B) applies only to defendants whose health conditions impair basic human functions, the court erred; the plain text of the Note contains no such requirement."). Neither § 3582(c)(1)(A) nor U.S.S.G. § 1B1.13 establishes such an exclusion based upon the number of victims, the length of a defendant's criminal history, or the gravity of the underlying offenses. Instead, Congress established a mechanism that permits courts to reconsider the continued necessity of imprisonment when extraordinary and compelling circumstances arise, notwithstanding the original judgment of conviction.

To be sure, the individualized assessment required by § 3553(a) in an application for relief under § 3582(c)(1)(A) must account for the circumstances of the prisoner at the time relief is sought, including the punishment already endured, the prisoner's present physical and medical condition, and whether continued incarceration remains necessary to serve the purposes of sentencing. Yet if a district court may simply assign a defendant's offense conduct to a category for which even extraordinary humanitarian circumstances cannot justify release, the statutory balancing ends before it begins. The seriousness of the underlying offenses is no longer weighed against the remaining considerations; it automatically defeats them. Indeed, no degree of medical deterioration, advanced age, punishment already endured, or combination of present-day considerations could alter the outcome because the one factor the Court deemed controlling here—the underlying offense conduct—can never change. That is not an individualized exercise of sentencing discretion; it is a categorical exclusion masquerading as a § 3553(a) analysis.

Moreover, if such a judicially created "line of [disqualifying] cases" truly exists under § 3582(c)(1)(A), it begs the question why the same categorical reasoning does not apply to sentencing reductions under § 3553(e), where the seriousness of the underlying crimes remains an equally relevant consideration under § 3553(a). *See United States v. Richardson*, 521 F.3d 149, 159 (2d Cir. 2008) (recognizing that, after determining the maximum permissible substantial-assistance departure under § 3553(e), the district court may consider other sentencing factors in deciding whether to grant the departure to its full extent); *United States v. Williams*, 551 F.3d 182, 186–87 (2d Cir. 2009) (explaining that a district court may decline to grant the full extent of a substantial-assistance departure based on the nature and circumstances of the underlying crime, the defendant's characteristics, or other applicable sentencing considerations); *United States v. Katsman*, 905 F.3d 672, 675–76 (2d Cir. 2018) (recognizing that the district court may consider § 3553(a) factors in determining whether and to what extent to reduce a sentence under Rule 35(b)).

Although substantial-assistance departures and compassionate release serve different statutory purposes, the underlying crimes do not become any less immutable merely because a defendant assisted federal prosecutors. Yet courts in this very district have granted extraordinary sentencing reductions to cooperating defendants whose criminal conduct involved substantially more murders and destructive conduct than is attributed to Mr. Amuso. *See* John J. Goldman, Gotti Accuser Sentenced to Five Years in Plea Deal, L.A. Times (Sept. 27, 1994) (reporting that Salvatore "Sammy the Bull" Gravano, implicated in nineteen murders, received a five-year sentence following his cooperation); Associated Press, Mob Turncoat Spared a Life Sentence, Deseret News (Oct. 29, 2010)

(reporting that Salvatore Vitale, who admitted involvement in eleven murders, received a sentence of time served after nearly eight years of imprisonment); Mob Boss Turned Government Informant Sentenced to Time Served, CBS N.Y. (July 10, 2013) (reporting that Joseph Massino, who faced life imprisonment for eight murders and other organized-crime offenses, received time served after approximately ten and one-half years following his cooperation). The victims in those cases are no less dead, the impact on the community no less horrific, and the "goal of punishment" no less substantial merely because the defendants cooperated. If the offender's criminal history and offense conduct did not foreclose extraordinary sentencing relief in those cooperation-based proceedings, they cannot reasonably be transformed into an insurmountable barrier to relief here. Congress authorized both avenues of sentencing relief, and nothing in that legislative choice suggests that the immutable seriousness of historical crimes becomes disqualifying only when the justification for relief is based on humanitarian factors rather than prosecutorial efforts.

Accordingly, the Court clearly erred in placing Mr. Amuso in a class of offenders effectively beyond the reach of compassionate release, imposing a categorical exclusion that neither Congress nor the Sentencing Commission authorized.

## II. Reconsideration is warranted because the Court improperly conflated the circumstances and compassionate-release determinations of two distinct defendants, allowing its prior denial of relief to Anthony Casso to displace the individualized, present-day assessment of Mr. Amuso required by § 3553(a)

In denying Mr. Amuso's motion for compassionate release, the Court further clearly erred in its consideration that "it would be hard to justify granting Amuso compassionate relief after denying it to [Anthony] Casso." Order at 9. Significantly, this was not an isolated consideration. In summarizing Mr. Amuso's case, the Court recounted Casso's prosecution, his subsequent compassionate-release application, and its rejection in a "brief electronic order" based upon his criminal history. *Id.* at 2–3. The Court then returned to that denial as an express justification for refusing Mr. Amuso relief. *Id.* at 9. Thus, from its recitation of the procedural history through its ultimate § 3553(a) analysis, the Court effectively joined the defendants and their respective applications, as though the denial of one necessarily weighed against granting relief to the other. But their individual circumstances are not interchangeable, nor does § 3582(c)(1)(A) make one defendant's entitlement to relief dependent upon another's fate. The Court's perceived difficulty in reconciling two different outcomes is not itself a statutory sentencing consideration, and § 3553(a)(6) does not require identical compassionate-release outcomes for defendants whose individual and present-day circumstances materially differ.

Moreover, the Court's reliance on its prior denial of Casso's motion continues to overlook that Casso's circumstances were materially distinguishable, both in the extent of his criminal conduct and in his extraordinary personal history with this Court. Casso pleaded guilty to seventy crimes, including participation in fifteen murders. *United States v. Casso*, 9 F. Supp. 2d 199, 200–01 (E.D.N.Y. 1998), while reportedly admitting involvement in thirty-six murders. *See* Rebecca Leung, *Ex-Mob Boss Points a Finger*, CBS News (Apr. 7, 2005). More significantly, Casso was alleged to have plotted the assassination of federal prosecutor Charles Rose and Judge Nickerson, whose recusal

preceded reassignment of Casso's case to this Court, and the FBI subsequently reportedly advised the Court that Casso had threatened its life as well. *See* Bennette Deacy Kramer, *A Conversation with District Judge Frederic Block*, Federal Bar Council Quarterly (Dec. 2024–Feb. 2025). These circumstances are entirely foreign to Mr. Amuso's case and materially distinguish the two defendants for purposes of the individualized assessment required under § 3553(a), particularly given Mr. Amuso's "spotless" institutional record spanning approximately thirty-five years.

Indeed, in considering Casso's unsuccessful motion for compassionate release, it is difficult to conceive of a more personally charged circumstance in which a judge is called upon to exercise compassion than one involving a prisoner who allegedly threatened the lives of multiple judicial officers, including the judge assigned to decide his motion. Moreover, the reported threat against this Court allegedly came directly from federal law enforcement officials in extrajudicial fashion, underscoring the exceptional circumstances surrounding Casso's case. Frederic Block, *A Second Chance: A Federal Judge Decides Who Deserves It*, ch. 6, at 66-70 (2024). Consequently, whatever considerations informed the Court's denial of Casso's motion belonged to Casso; they cannot legitimately be transferred to Mr. Amuso's application for compassionate release today.[5]

The Court's reliance on its prior denial of Casso's motion further overlooks the troubling humanitarian circumstances surrounding that decision and its aftermath. In November 2020, Casso was 78 years old, wheelchair-dependent, and suffering from prostate cancer, heart disease, kidney disease, and COVID-19. He was hospitalized on November 9, 2020, and placed on a ventilator on November 17, 2020. Nevertheless, on November 28, 2020, while Casso remained hospitalized and dependent upon mechanical ventilation, the Court denied his compassionate release. Just seventeen days later, on December 15, 2020, Casso died in federal custody. Against that history, the more appropriate question is whether the Court should have extended compassion to Casso, notwithstanding his criminal history, rather than whether Mr. Amuso must now endure the same fate. Indeed, it is difficult to conceive what legitimate sentencing purpose was advanced by requiring Casso, a gravely ill, ventilator-dependent human being, to remain imprisoned during a national pandemic for the final seventeen days of his life. The denial of compassion to one dying prisoner cannot become the measure of justice for another, much less serve as justification for perpetuating such aimless and draconian suffering.

---

[5] Indeed, even a defendant's own prior denials of compassionate release do not foreclose relief upon renewed individualized consideration. *See United States v. Manna*, No. 88-00239 (RK), 2025 U.S. Dist. LEXIS 72609 (D.N.J. Apr. 16, 2025) (granting the third compassionate-release motion of an alleged former Genovese crime family consigliere convicted of offenses involving murder and murder conspiracies, notwithstanding prior denials and the Government's reliance on the gravity of his organized-crime conduct). *See also* Gov't Opp'n, ECF No. 19, at 24–28, *Manna*, No. 88-CR-239 (D.N.J. Oct. 16, 2020). If a defendant's own prior denials do not dictate the outcome of a renewed application, another defendant's denial certainly cannot determine it.

### III. Reconsideration Is Warranted Because the Court Placed Mr. Amuso Within a Purported Category of Offenders for Whom Compassionate Release Is Effectively Foreclosed, While Overlooking Favorable Jurisprudence Demonstrating That Such Offense Conduct Is Not Dispositive.

The Court further committed clear error by concluding that Mr. Amuso's historical criminal conduct places him within a category of offenders for whom even extraordinary humanitarian circumstances cannot justify compassionate release, while failing to meaningfully address substantial favorable jurisprudence demonstrating that the very offenses the Court deemed effectively insurmountable have not foreclosed relief in cases involving comparable, and in some instances substantially more extensive, criminal conduct. Indeed, the Court reasoned that "there comes a point when each additional crime adds little to the equation" and that "[s]ix murders go well past that point." Order at 9. Yet the Court neither addressed nor distinguished numerous decisions granting compassionate release to defendants whose criminal conduct involved numerous murders, leadership of violent criminal enterprises, and devastating consequences for innocent victims, their families, and entire communities, and notwithstanding that those defendants were substantially younger and presented far less compelling humanitarian circumstances than Mr. Amuso. Significantly, the Government's own descriptions of the extraordinary violence and broader community devastation underlying these cases make it clear that the Court must reconsider its decision that Mr. Amuso's offense conduct forecloses relief.

Perhaps the most striking example is *United States v. Fisher*, 493 F. Supp. 3d 231 (S.D.N.Y. 2020), granting compassionate release to a 73-year-old leader of the infamous Council narcotics organization, whose members included Leroy "Nicky" Barnes. According to the Government, the Council operated for more than a decade, pooling resources, sharing narcotics sources, allocating territories, resolving disputes, and managing the businesses of imprisoned members. Its distribution included heroin, cocaine, PCP, and marijuana. After Barnes's imprisonment, Fisher assumed his role supplying wholesale quantities of pure heroin to the other Council members. Gov't Mem. Opp'n at 1–2, *United States v. Fisher*, No. 83-CR-150 (PAC) (S.D.N.Y. Aug. 21, 2020), ECF No. 89. The Government described the Council as a "notoriously violent enterprise," whose members "routinely approved the murders of those suspected of being potential witnesses against the Council or of people who had been insubordinate." *Id.* at 2 (*quoting United States v. Thomas*, 757 F.2d 1359, 1362 (2d Cir. 1985)). It identified trial evidence of at least eight murders of suspected informants, including numerous victims personally executed by Fisher, who had risen to leadership partly through his reputation for violence. *Id.* at 3.

The particulars were chilling. Fisher used an associate with law-enforcement connections to determine whether intended victims were informants. After two were identified as such, Fisher and another individual lured them into an office and shot them to death; their bodies were wrapped in rugs and abandoned in a van. Another identified informant was shot ten times at such close range that his shirt ignited, and his body was dumped near Columbia Presbyterian Hospital. When the Council voted to kill two people who had stolen approximately $50,000 from Fisher's girlfriend, it left the details to Fisher,

who ordered one victim shot on the street and personally participated in shooting the other inside a garage. *Id.* The Government further recounted evidence of Fisher's participation in the chain-saw executions of two additional victims and his threat to kill a witness's family if the witness testified against him. *Id.* at 2 n.2.

The societal harm described by the Government extended far beyond those killings. In urging continued imprisonment under § 3553(a), it emphasized:

> Here, the nature and circumstances of the offenses of conviction are among the *most serious and reprehensible imaginable*. The Council was a highly organized, complex organization whose drugs ravaged the community for more than a decade.

*Id.* at 15. The Government further invoked "the scores of other individuals whose lives were surely devastated by the lethal drugs that the Council distributed for over a decade," maintaining that Fisher's failure to acknowledge those victims undermined his claims of remorse. *Id.* at 14. It argued that he had not meaningfully confronted either the people he personally murdered or the additional murders he approved, and warned that release could endanger those whose cooperation had secured his imprisonment. *Id.* at 13–14, 16. Thus, *Fisher* involved not merely multiple executions, but a sophisticated criminal enterprise whose violence and narcotics distribution imposed profound human and societal costs. Nevertheless, those circumstances did not prevent his compassionate release. *Fisher*, 493 F. Supp. 3d at 232, 239.

Equally consequential is *United States v. Underwood*, No. 88-CR-822 (SHS), 2021 U.S. Dist. LEXIS 8378 (S.D.N.Y. Jan. 15, 2021), granting compassionate release to a 67-year-old defendant who had led the extraordinarily violent Vigilantes heroin-trafficking enterprise for nearly two decades and received a mandatory Guidelines sentence of life imprisonment. According to the Government, the organization comprised approximately forty participants and expanded from street-level distribution in West Harlem to retail operations elsewhere in New York City, wholesale distribution, and heroin importation from Europe. During one period, it sold between three and five-and-one-half kilograms of diluted heroin weekly. Gov't Mem. Opp'n at 1–2, *United States v. Underwood*, No. 88-CR-822 (SHS) (S.D.N.Y. May 22, 2020), ECF No. 191. Murder sustained its operations by eliminating competitors, informants, and witnesses. Beyond the five murders and one attempted murder presented at trial, the Government cited a judicial account identifying fifteen homicide investigations in which the Vigilante members led by Underwood were suspects, with eight known members then under indictment for murder. *Id.* at 2–3 & n.2.

The particulars were again chilling. Underwood personally shot one victim in the face and sent associates to finish killing him; ordered the murder of a rival drug dealer who had previously shot him; and, when another rival could not be located, ordered that rival's innocent brother killed instead. The brother was ambushed outside his apartment complex and shot to death. Underwood left the original murder order in place, and his men subsequently located and wounded the intended target in a shootout. *Id.* at 3. He also repeatedly ordered the murder of a former associate who had cooperated with prosecutors, culminating in his execution on a street corner. Upon learning the identity of a prosecution eyewitness in another murder case, Underwood directed that witness's killing; the victim

was shot twice in the head. *Id.* at 3–4. That victim was a vulnerable heroin addict, among those the enterprise exploited as intermediaries and testers who injected heroin samples in exchange for narcotics. *Id.* at 4 n.4.

The Government emphasized the broader devastation as well, describing "a notorious narcotics enterprise whose drugs ravaged the community" and invoking the sentencing court's condemnation of the consequences for children and society: "[Y]our children and the children of everyone else in the community are the ones who are affected by the constant increase in the drug trade in this country, by the endless scourge of drugs which has had terrible effects in all sorts of ways on too many people in our society." *Id.* at 24 (quoting sentencing transcript). Nor did the Government concede genuine remorse: it argued that Underwood minimized his leadership, failed to acknowledge the true scope of his crimes, and neglected the murder victims and their families. *Id.* at 12–13, 24–25. Yet, like *Fisher*, the offense conduct in *Underwood* did not foreclose compassionate release.[6]

The Court's reasoning for denying Mr. Amuso's motion makes its silence on these authorities alarming. In declining to distinguish Mr. Amuso from Casso, the Court reasons that additional crimes eventually add little to the equation because six murders already exceed the relevant point. Order at 9. But the Government's accounts in *Fisher* and *Underwood* describe precisely the extensive violence and numerous victims that supposedly place Mr. Amuso beyond relief. Moreover, the age and circumstances of these defendants at the time of relief further make the Court's failure to confront these authorities even more consequential. Underwood was 67 when granted relief, and the Government expressly maintained in opposing his application that "[d]espite Underwood's age, he appears to be healthy." Gov't Mem. Opp'n at 25, *United States v. Underwood*, No. 88-CR-822 (SHS) (S.D.N.Y. May 22, 2020), ECF No. 191. Fisher was 73—eighteen years younger than Mr. Amuso—and, although he presented medical concerns, the Government disputed that he was experiencing serious deterioration from aging and emphasized that he remained capable of self-care. Gov't Mem. Opp'n at 10–11, *United States v. Fisher*, No. 83-CR-150 (PAC) (S.D.N.Y. Aug. 21, 2020), ECF No. 89.

Consequently, the record reveals no meaningful distinction that justifies treating Mr. Amuso's historical offenses as effectively insurmountable when other courts have granted compassionate release to defendants whose criminal conduct was at least equally grave. This disparity is particularly troubling given the Court's candid acknowledgment

[6] Another example is *United States v. Tellier*, No. 92-CR-869 (LGS), 2023 U.S. Dist. LEXIS 149994 (S.D.N.Y. Aug. 25, 2023), granting compassionate release to a 63-year-old defendant who helped lead a violent criminal enterprise and committed multiple murders, including the killing of a seventeen-year-old girl, two murders arising from disputes over criminal proceeds, and the murder of a witness to one of those killings. The Government also detailed a murder-for-hire attempt in which the victim survived three gunshot wounds. Gov't Opp'n at 2–3, *Tellier*, No. 92-CR-869 (LGS) (S.D.N.Y. Mar. 3, 2023), ECF No. 541. Notwithstanding his rehabilitation and decades of imprisonment, the Government argued that the number and depravity of his murders required continued confinement. *Id.* at 9–11.

that anticipated media criticism may influence judicial decision-making in cases like Mr. Amuso's. *See* Frederic Block, *A Second Chance: A Federal Judge Decides Who Deserves It*, ch. 12, at 162 (2024) ("The press was all over the case. I probably shouldn't have read any of the papers before I put pen to paper, but my law clerks had placed some of them on my desk, and I guess curiosity got the best of me….But one thing was clear to me, I would be brutalized by the media if I let Vittorio Amuso out of jail. It would make 'Judge Blockhead' look like child's play….I wonder to this day whether my subconscious was at work, and I did not want to see 'Judge Blockhead' in print once more."); *id.* ("The Post noted that '[t]he filing comes as the latest from a string of aging Mafiosos pleading for compassionate release under the First Step Act of 2018.'")

Nonetheless, the recognizable differences in these comparable cases weigh decisively in Mr. Amuso's favor. He is 91 years old, immobile, wheelchair-dependent, and suffering from chronic, severe pain after more than thirty-four years of imprisonment and a spotless institutional record. His profound deterioration, marked by significant weight loss, bedsores, and diminished capacity for self-care, has left him dependent upon others for basic activities of daily living, including dressing, shaving, and personal care. Order at 4, 6 n.1, 7. If the murders, witness executions, and widespread societal devastation described in *Fisher* and *Underwood* did not foreclose compassionate release, notwithstanding those defendants' substantially younger ages and less compelling humanitarian circumstances, it is difficult to reconcile those outcomes with the denial of relief here. The seriousness of those crimes was no less immutable, nor were the consequences for their victims and communities any less devastating. Yet those district courts granted relief. Surely, where the historical offenses are comparable, and in some instances more extensive, while the humanitarian considerations weigh substantially more heavily in Mr. Amuso's favor, the Court must meaningfully explain why continued imprisonment remains necessary in his case. Its silence leaves both sides of the comparison unanswered: why equally grave criminal conduct did not foreclose relief in those cases, and why Mr. Amuso's far more compelling end-of-life circumstances do not warrant relief here.

**Conclusion**

For the foregoing reasons, together with those set forth in Mr. Amuso's moving papers and the prior proceedings in this matter, the Court should grant reconsideration and order Mr. Amuso's compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A).

Respectfully submitted,

Anthony DiPietro

Anthony DiPietro, Esq.