THE LAW OFFICES OF
**ANTHONY DIPIETRO, P.C.**

15 CHESTER AVENUE
WHITE PLAINS, NY 10601

(914) 948 3242
(914) 948 5372 FAX
DIPIETROLAW@YAHOO.COM

November 10, 2026

**By ECF**
The Honorable Frederic Block
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: *United States v. Vittorio Amuso*, No. 90-CR-00446 (FB)
Reply to Government's Opposition to Motion for Reconsideration

Dear Judge Block:

The Government's opposition carries an unmistakable message: the Court should simply accept its position without demanding meaningful answers to justify the draconian and wholly unnecessary outcome it seeks to perpetuate—the continued imprisonment of a profoundly debilitated, wheelchair-bound 92-year-old human being, left to endure his final days painfully soiled in a prison cell, notwithstanding nearly 35 years of punishment and the very humanitarian circumstances Congress enacted legislation to address. Indeed, the Government offers no meaningful response to the legal errors raised in Mr. Amuso's motion for reconsideration, nor does it confront the profound human cost of continued imprisonment or the very question this Court once so poignantly posed: "What Are We Accomplishing?"[1]

**I. The Government Again Fails to Confront the Extraordinary Significance of the Warden's Approval of Compassionate Release.**

The Government again offers no meaningful answer to one of the most extraordinary circumstances in this case: the Warden, with the involvement of institutional officials directly responsible for Mr. Amuso's care, approved his compassionate release. *See* Mot. at 2–3. Indeed, at the institution's request, probation officials from this very district visited his children's home to assess its suitability and advised the family of his approved release. Even this Court recognized the significance of the Warden's determination and questioned the Government about it during oral argument. Yet, as before, the Government offers no meaningful response beyond reciting the undisputed procedural history. Gov't Opp. at 2. But that recitation answers nothing and leaves unanswered what circumstances compelled the Warden to approve Mr. Amuso's release at this juncture, and why that determination carries so little weight now.

[1] Frederic Block, *A Second Chance: A Federal Judge Decides Who Deserves It*, ch. 12, at 168 (2024).

Despite the Government's continued failure to confront its significance, courts have expressly recognized the substantial weight a Warden's favorable determination carries, even when BOP General Counsel later rejects it. *See, e.g., United States v. Estrada-Elias*, No. 21-5680, 2021 U.S. App. LEXIS 35074, at *1–2 (6th Cir. Nov. 24, 2021) (holding that the district court abused its discretion in denying compassionate release to a 90-year-old, terminally ill prisoner notwithstanding the warden's agreement that he should be released, and rejecting the district court's determination that life imprisonment remained the only appropriate sentence necessary to protect the public); *United States v. Karr*, 611 F. Supp. 3d 395, 408 (E.D. Ky. 2020) (finding the Warden's initial recommendation a "telling factor" that strongly favored relief); *Garavito-Garcia v. United States*, 544 F. Supp. 3d 484, 487, 490 (S.D.N.Y. 2021) (finding "no real dispute" that the defendant met the standard for release, especially because the "Warden -- *who is most familiar with the welfare of his inmates*" granted the request and determined that the defendant suffered from a debilitated medication condition) (emphasis added); *United States v. Reynolds*, No. 14-cr-80227, 2020 U.S. Dist. LEXIS 134768, at *5-6 (S.D. Fla. July 8, 2020) ("Ultimately BOP's general counsel denied the reduction, stating that Defendant's conditions were "indeterminate" and not "terminal." However, I find that the Warden's decision nonetheless weighs in favor of compassionate release"); *United States v. Clyne*, No. 1:16-CR-115-BLW, 2019 U.S. Dist. LEXIS 123505, at *4 (D. Idaho July 22, 2019) ("While the General Counsel's Office focused on his stabilization, the Court is focusing on his deterioration. It is important in this analysis that the Warden at Springfield — the local official closest to the frequent medical treatments of defendant — approved his petition for a compassionate release"); *United States v. Fletcher*, No. CR 18-3063 RB, 2020 U.S. Dist. LEXIS 168567, at *4-5 (D.N.M. Sep. 15, 2020) ("The Court agrees with the warden and the treating doctor. Ms. Fletcher's medical condition is debilitating and provides extraordinary and compelling circumstances for a sentence reduction."); *United States v. Conner*, 465 F. Supp. 3d 881, 888 (N.D. Iowa 2020) ("[T]he warden of his facility recognized that Conner's situation could be extraordinary and compelling and recommended that Conner be considered for compassionate release, even before the COVID-19 pandemic.")

Moreover, the significance of the Warden's approval extends well beyond Mr. Amuso's profound physical deterioration. It provides compelling institutional evidence of his character, conduct, and suitability for release. *See Karr*, 611 F. Supp. 3d at 408 ("The Court finds it unlikely that the Warden would have signed off if Karr had been anything less than a model prisoner"). Rather than adequately consider the Warden's decision in this context, bolstered by 35 years of spotless institutional conduct, the Government directs this Court to place greater weight on its self-serving speculation about Mr. Amuso's perceived remorse. Gov't Opp. at 4-5.

Finally, the Government's silence is particularly glaring in light of *Rutherford v. United States*, 146 S. Ct. 1320, 1327–28, 1331 (2026), where the Supreme Court recognized that the very "heartland of compassionate release" concerns elderly and profoundly debilitated prisoners, and that BOP officials entrusted with their custody and care are particularly well positioned to identify circumstances warranting relief. *Id.* at 1331 n.6. Mr. Amuso's case presents precisely those circumstances. His profound deterioration

was apparently so compelling that the Warden himself approved his release, notwithstanding the very criminal history the Government continues to invoke as justification for his imprisonment. Yet the Government ignores *Rutherford*, dismisses the significance of that institutional determination, and offers no meaningful explanation why nearly 35 years of exemplary conduct and the Warden's firsthand judgment should yield to the same historical considerations that have remained unchanged for decades.

Accordingly, the Government's silence cannot erase what the Warden's approval establishes: those directly responsible for Mr. Amuso's confinement recognized circumstances sufficiently extraordinary to warrant his release. That judgment deserves meaningful consideration. Reconsideration is warranted.

## II. The Government Cannot Dispel the Court's Effective Categorical Exclusion from Compassionate Release.

The Government further offers no meaningful answer to the Court's effective creation of a categorical bar to compassionate release based on Mr. Amuso's historical offenses. Gov't Opp. at 4. Instead, it merely invokes the Court's discretion under § 3553(a), ignoring the unmistakable language of its decision: Mr. Amuso falls within a purported "strain of cases" involving offenders whose criminal histories and victims are so numerous that "even serious health conditions do not suffice to merit relief." Order at 9. Indeed, because "[t]he past [is] immutable," the Court declared that his case "still falls squarely in that category." *Id.* This reasoning exposes the very error the Government seeks to dismiss: Mr. Amuso's immutable past effectively dictates the outcome, irrespective of his present condition and the extraordinary humanitarian circumstances confronting the Court. That is not an individualized balancing of the § 3553(a) factors; it remains a categorical exclusion masquerading as one.

The Government cannot escape the plain language of the Court's decision by selectively invoking other passages suggesting that the § 3553(a) factors were considered. Gov't Opp. at 4. Indeed, the Government seizes upon the Court's reference to Mr. Amuso's "personal characteristics and criminal conduct," as though that language somehow cures the error. But the very criminal conduct invoked to justify the denial is precisely the immutable history upon which the Court predicated its categorical reasoning in the first place. Far from dispelling the error, the Government's reliance on that same historical conduct merely reinforces it.

Perhaps most telling, the Government never explains how the Court's purported "strain of cases" is anything other than a categorical exclusion when the very decision supplying its foundation, *United States v. Orena*, No. 92-CR-351 (EK), involves humanitarian circumstances of such unimaginable severity. Indeed, the continued denial of compassionate release to Orena, now 92 years old, blind, bedridden, and suffering from profound dementia and devastating physical deterioration, reveals the disturbing reality of this supposed "strain of [disqualifying] cases." The horrifying consequences of that reasoning are laid bare in Orena's most recent application, which recounts the following extraordinary suffering:

> As recently as January/February 2025 Orena was in the ICU on three different occasions, with toxic respiratory failure, heart failure and was

> considered critical. In fact, Orena's family was called to inquire if the patient should be resuscitated in the event that he goes into total heart failure. He suffered from hypoxic respiratory failure/bi lateral pleural effusions pneumonia and chf exacerbation and needed fluids to be removed via a chest tube. Prognosis being poor. In addition to this, Orena's dementia has gotten so bad that he is completely helpless at this point and is legally blind. He is bed ridden and needs assistance for literally all of his needs.

Motion in *Orena*, No. 92-CR-351 (EK), ECF No. 1976, at 1 (Apr. 18, 2026).[2]

If this is not an impermissible judicially created class of offenders effectively precluded from compassionate release by their historical crimes, what conceivable humanitarian circumstances would ever permit their release? Must a prisoner endure suffering beyond that of a 92-year-old man, blind, bedridden, ravaged by dementia, and incapable of attending to his most basic bodily needs? Must he deteriorate into a vegetative state? Or would even that degree of human suffering invariably yield to the same immutable offenses committed decades earlier? The Government offers no answer. And therein lies the fundamental defect: if even the most extreme humanitarian circumstances cannot overcome the seriousness of historical offenses, those offenses are not merely being weighed under § 3553(a)—they are dictating the outcome. The statutory balancing ends before it begins, rendering compassionate release an impossibility rather than an individualized determination.[3]

---

[2] With all due respect to the district court that decided *Orena*, undersigned counsel remains unabashed in characterizing the continued denial of compassionate release under such circumstances as an abomination to human decency and a profound betrayal of the humanitarian purposes underlying the First Step Act. Indeed, having considered this Court's own writings, public statements, and expressed concerns about the continued imprisonment of elderly and profoundly debilitated prisoners, it is difficult to imagine that this Court would embrace such an outcome were Orena's circumstances presented directly before it. That makes its continued reliance on *Orena* all the more troubling. Why should a decision embodying the very humanitarian injustice the First Step Act was designed to address become the foundation for denying relief to another 92-year-old prisoner? Far from advancing the statute's remedial purpose, such reliance threatens to render its promise of compassion meaningless precisely where it is needed most.

[3] Unsurprisingly, the Government is also silent concerning the extraordinary sentencing reductions afforded to cooperating defendants under 18 U.S.C. § 3553(e) and Rule 35(b), including those implicated in as many as nineteen murders. *See* Mot. at 4–5. The inconsistency remains unanswered: historical offenses do not categorically foreclose extraordinary sentencing relief when the justification is assistance to prosecutors, yet supposedly become insurmountable when relief rests on profound human suffering after nearly 35 years of imprisonment. Congress authorized both avenues of relief, and nothing permits the Government to treat the same historical offenses as categorically disqualifying only when the grounds for relief are humanitarian.

### III. The Government Cannot Justify the Court's Erroneous Reliance on Its Prior Denial of Compassionate Release to Anthony Casso.

The Government offers no persuasive justification for the Court's reliance on its prior denial of compassionate release to Anthony Casso as a reason to deny Mr. Amuso relief. Gov't Opp. at 4–5. Indeed, the Court expressly reasoned that "it would be hard to justify granting Amuso compassionate relief after denying it to [Anthony] Casso." Order at 9. Yet the Government invokes § 3553(a)(6), concerning unwarranted sentencing disparities, as though that provision permits one prisoner's unsuccessful application to weigh against another's. It does not. The Court's perceived difficulty in reconciling two different outcomes cannot displace the individualized, present-day assessment required under § 3553(a) and § 3582(c)(1)(A). To hold otherwise would transform the denial of compassion to one prisoner into an independent justification for denying it to another—a result neither statute authorizes.[4]

Moreover, the Government ignores the profound differences between Casso and Mr. Amuso, whose respective criminal histories and personal circumstances were hardly interchangeable. Casso reportedly admitted involvement in 36 murders and was alleged to have plotted the murders of two federal judges, including this Court, and a federal prosecutor—circumstances entirely foreign to Mr. Amuso's case. *See* Mot. at 5–6. Whatever considerations informed Casso's denial belonged to Casso. They cannot be transferred to Mr. Amuso under the guise of avoiding sentencing disparities.

More disturbing still, the Government offers no answer to the humanitarian consequences of Casso's denial. In November 2020, Casso lay gravely ill, hospitalized, and dependent upon a ventilator during a national pandemic. On November 28, 2020, the Court denied compassionate release. Just seventeen days later, he died in federal custody. *See* Mot. at 6. Again, the Government avoids answering what, precisely, was accomplished by requiring him to remain imprisoned for those final seventeen days? What conceivable sentencing aim served a higher need to ensure that a dying, ventilator-dependent prisoner remained confined until his last breath?

If the Government cannot explain, even after more than five years, what legitimate sentencing purpose was served by compelling Casso to die in federal custody under such draconian circumstances, this Court should not allow that prior denial to influence the fate of another profoundly debilitated 92-year-old prisoner. Rather, the tragedy of Casso's final days should give this Court pause and compel reconsideration of whether continued imprisonment serves any legitimate sentencing purpose for Mr. Amuso today, after nearly 35 years of punishment and in light of his profound deterioration. Surely, Congress did not enact the First Step Act to perpetuate human suffering, much less to require courts to reaffirm the tragic consequences of past decisions merely for the sake of consistency.

---

[4] The Government ignores *United States v. Manna*, 2025 WL 1122286 (D.N.J. Apr. 16, 2025), granting a 95-year-old organized-crime defendant compassionate release after two prior denials. If even a defendant's own prior denials do not foreclose relief, surely another's cannot justify denying it here.

## IV. The Government Cannot Justify the Court's Failure to Meaningfully Address Favorable Compassionate-Release Decisions Involving Equally Serious or Graver Offenses.

Finally, the Government offers no persuasive answer to the Court's failure to meaningfully address substantial favorable jurisprudence granting compassionate release to defendants convicted of equally serious, and in some instances far graver, offenses, despite their substantially younger ages and far less compelling humanitarian circumstances. *See United States v. Fisher*, 493 F. Supp. 3d 231 (S.D.N.Y. 2020); *United States v. Underwood*, No. 88-CR-822 (SHS), 2021 U.S. Dist. LEXIS 8378 (S.D.N.Y. Jan. 15, 2021); *United States v. Tellier*, No. 92-CR-869 (LGS), 2023 U.S. Dist. LEXIS 149994 (S.D.N.Y. Aug. 25, 2023). Instead, the Government attempts to shift the focus to Mr. Amuso's purported lack of remorse, as though that distinction somehow answers the central error raised in his motion: that the very offenses deemed effectively insurmountable here did not prevent compassionate release in those cases. Gov't Opp. at 5. The Government's reliance on remorse neither reconciles those decisions with the Court's reasoning nor explains why Mr. Amuso's far more compelling present-day circumstances should warrant a different outcome.

More revealing still, the Government ignores its own prior opposition papers in those very cases, which Mr. Amuso's reconsideration motion examined in detail. Those submissions described multiple murders, witness executions, leadership of extraordinarily violent criminal enterprises, and devastating community harm—conduct the Government itself characterized as among the "most serious and reprehensible imaginable." Mot. at 8 (quoting Gov't Mem. Opp'n at 15, *Fisher*, No. 83-CR-150 (PAC) (S.D.N.Y. Aug. 21, 2020), ECF No. 89). Yet those same submissions also challenged the defendants' remorse. In *Fisher*, the Government argued that the defendant failed to adequately acknowledge his murder victims despite his rehabilitation and spotless institutional record. *Id.* at 13–14. In *Underwood*, it maintained that the defendant minimized his leadership of a murderous enterprise, failed to acknowledge the full scope of his offenses, and disregarded the suffering of victims and their families. Gov't Mem. Opp'n at 12–13, 24–25, *Underwood*, No. 88-CR-822 (SHS) (S.D.N.Y. May 22, 2020), ECF No. 191. Nevertheless, both courts granted relief. The Government cannot now invoke remorse as though its own prior objections never existed, or as though those objections somehow distinguish decisions in which courts declined to make them dispositive.

Nor does the Government's characterization of Mr. Amuso as insufficiently remorseful withstand meaningful scrutiny. Its position rests principally on his perceived unwillingness to express particular views about organized crime, notwithstanding nearly 35 years of uncontested "spotless" institutional conduct, the absence of further criminal activity, substantial family support, and the extraordinary fact that his Warden approved compassionate release. *See* Order at 9. Indeed, does this Court truly believe that if Mr. Amuso submitted a letter acknowledging his historical offenses and expressing remorse, the Government would have conceded to relief? Or would it simply return to those same historical offenses to justify continued imprisonment? The Government's shifting emphasis only underscores its failure to confront the issue actually presented.

Perhaps most significantly, the Government's attempted distinctions ignore the most consequential differences between these cases. Underwood was approximately 67 when granted relief, Fisher 73, and Tellier 63. Mr. Amuso is now 92—wheelchair-dependent, profoundly debilitated, and dependent upon others for basic daily care after nearly 35 years of imprisonment. Those defendants were granted a second chance at life despite extraordinarily serious crimes and the Government's objections. Mr. Amuso seeks something squarely rooted in human decency: the opportunity to spend his remaining days outside a prison cell, with dignity and the care of his family until passage. If the historical offenses and disputed expressions of remorse in those cases did not foreclose relief, the Government must explain why they should effectively do so here, where the humanitarian circumstances are immeasurably more compelling. Its opposition offers no answers.

**Conclusion**

For the First Step Act to fulfill its true purpose, district courts must be willing to recognize that little is gained by keeping elderly and profoundly debilitated human beings confined to prison beds, helpless, soiled, and in pain, when Congress has provided a statutory avenue through which they may spend their final days with dignity in the care of their family. At some point, continued imprisonment ceases to serve any meaningful sentencing purpose, and the suffering it inflicts far outweighs whatever legitimate justification remains. Surely, the purposes of sentencing cannot be so immutable, nor the demands of human decency so easily dismissed.

That point has surely been reached here. Mr. Amuso is now 92 years old, profoundly debilitated, and has endured nearly 35 years of imprisonment.[5] If humanitarian relief cannot be justified under these circumstances—where a prisoner is confined to a wheelchair, dependent upon others for his most basic needs, and facing his final days in pain—then when, if ever, can it be justified? The Government offers no meaningful answer, and the law does not require this Court to wait until death renders the question moot.

Accordingly, Mr. Amuso respectfully requests that the Court grant reconsideration of its October 2, 2026 Order and reduce his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A), permitting his compassionate release.

Respectfully submitted,

*Anthony DiPietro*

Anthony DiPietro, Esq.

---

[5] According to Mr. Amuso and his children, he is not receiving physical examinations from treating physicians and continues to endure significant pain without adequate treatment, including repeated lapses in cortisone injections intended to provide relief. To the extent necessary, counsel respectfully invites the Court to observe Mr. Amuso's current physical condition firsthand, whether by videoconference, by directing the BOP to provide current photographs documenting his condition, or by such other means as the Court deems appropriate.